# United States Court of Appeals
# for the District of Columbia Circuit

―――――――――
No. 23-7051
―――――――――

NIA LUCAS,
*Plaintiff-Appellant,*

v.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES & AMERICAN
FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 228,
*Defendants-Appellees.*

―――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

―――――――――

**FINAL BRIEF OF APPELLANT**

David R. Dorey
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

*Counsel for Plaintiff-Appellant Lucas*

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28(a)(1), the undersigned hereby certifies the following:

### A.    Parties and Amici

Nia Lucas ("Lucas") is Appellant in the consolidated matters before this Court. She was Plaintiff in both actions in the district court.

American Federation of Government Employees (or "AFGE National") and American Federation of Government Employees, Local 228 ("Local 228") (collectively "AFGE") were Defendants in district court no. 22-cv-0777 and are now Appellees in the consolidated matters before this Court.

AFGE National, Local 228, Michael Kelly (former vice president of National) ("Kelly"), and Johnnie D. Green (former president of Local 228) ("Green") (collectively the "union") were Defendants in district court no. 22-cv-1540 and are now Appellees in the consolidated matters before this Court. Green proceeded *pro se* and did not appear in the district court, so the clerk served Green with the notice of appeal as required by Federal Rule of Appellate Procedure 3(d). *Lucas v. AFGE*, No. 22-cv-1540 (D.D.C.

Jan. 9, 2024), ECF No. 33. He is proceeding *pro se* in this Court as well and has not appeared.

There were no amici in the district court. The Equal Employment Opportunity Commission appeared before this Court as Amicus Curiae for Lucas.

## B.    Rulings Under Review

This consolidated appeal is from the memorandum opinion and order entered by Judge Amy Berman Jackson on March 29, 2023, which dismissed Lucas's complaints in two actions consolidated in the United States District Court for the District of Columbia: Case No. 22-cv-0777 and Case No. 22-cv-1540. The memorandum opinion has not yet been published in the Federal Supplement but is available at *Lucas v. AFGE*, No. 22-cv-0777, No. 22-cv-1540, 2023 WL 2682175 (D.D.C. Mar. 29, 2023), ECF No. 23 (22-cv-0777), ECF No. 24 (22-cv-1540) (JA328–50, 539–61). The district court's order is unpublished. ECF No. 22 (22-cv-0777) (JA326–27); ECF No. 23 (22-cv-1540) (JA537–38).

### C. Related Cases

Other than the district court, this case has not previously been before this Court or any other court. Counsel for Lucas are not aware of any related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C).

Respectfully submitted,

May 24, 2024

**/s/ David R. Dorey**
David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Lucas requests oral argument. The district court dismissed Lucas's cases, brought under generally applicable anti-discrimination laws, for lack of subject matter jurisdiction—holding that her claims had to be stated as unfair labor practices and brought to an independent board instead. If permitted to stand, this holding would leave federal employees in a remedial gap, unable to vindicate their right to a workplace free of discrimination and harassment. Exploration of these issues at oral argument would assist the Court in rendering its decision.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .i

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..........................iv

TABLE OF AUTHORITIES.................................................................vii

GLOSSARY ....................................................................................xiii

INTRODUCTION.................................................................................1

STATEMENT OF JURISDICTION......................................................3

STATEMENT OF THE ISSUES...........................................................3

PERTINENT STATUTES AND REGULATIONS .................................4

STATEMENT OF THE CASE ..............................................................4

SUMMARY OF ARGUMENT ............................................................11

STANDARD OF REVIEW.................................................................12

ARGUMENT ....................................................................................13

I.     FEDERAL COURTS HAVE JURISDICTION OVER CLAIMS AGAINST FEDERAL-SECTOR UNIONS UNDER GENERALLY APPLICABLE ANTI-DISCRIMINATION LAWS.............................................................13

     A.    Overlapping, Non-Exclusive Remedies Are the Law of Federal Employment Anti-Discrimination ......................14

     B.    Neither the Text nor the Legislative History of the CSRA Evidence Congressional Intent to Carve Federal-Sector Unions out of Generally Applicable Anti-Discrimination Laws.............................................................................16

     C.    Lucas's Anti-Discrimination Claims Were Made Under and Are Governed by Title VII and the ADA—Not the CSRA.............................................................................19

          1.    Title VII and the ADA are Substantially More Protective of Victims' Substantive Rights than the CSRA......................................................................24

          2.    Title VII and the ADA Afford Victims Substantially Greater Procedural Rights than Does the CSRA......27

3. Title VII and the ADA Afford Victims Substantially Greater Remedies than the CSRA ............................ 32

II. FEDERAL COURTS HAVE JURISDICTION OVER CLAIMS AGAINST FEDERAL-SECTOR UNIONS UNDER THE ANTI-RETALIATION PROVISION OF THE FAIR LABOR STANDARDS ACT ........................ 39

A. Congress's Policy of Providing Maximum Protection Against Retaliation for Reporting Violations of the FLSA Demonstrates That Claims for Retaliation Are Not Preempted by the CSRA .................................................... 39

B. Substantive Differences Between FLSA Retaliation and a ULP Based on the Duty of Fair Representation Also Show Congress Did Not Intend to Foreclose Retaliation Claims Against Federal-Sector Unions ........................................ 43

CONCLUSION ......................................................................... 45

# TABLE OF AUTHORITIES[*]

**Cases**                                                                                          **Page(s)**

*Air Line Pilots Ass'n, Int'l v. O'Neill,*
    499 U.S. 65 (1991) ............................................................... 28, 44, 45

*Alexander v. Gardner-Denver Co.,*
    415 U.S. 36 (1974) ............................................. 14, 15, 17, 18, 34, 38

*Anjelino v. N.Y. Times Co.,*
    200 F.3d 73 (3d Cir. 1999) ................................................... 27

*Arias v. Raimondo,*
    860 F.3d 1185 (9th Cir. 2017) ............................................. 41

*Axon Enter., Inc. v. FTC,*
    598 U.S. 175 (2023) ..................................................... 13, 38

*Benton v. Laborers' Joint Training Fund,*
    121 F. Supp. 3d 41 (D.D.C. 2015) ..................................... 43

*Bowe v. Judson C. Burns, Inc.,*
    137 F.2d 37 (3d Cir. 1943) ................................................. 41

*Burlington N. & Sante Fe Ry. Co. v. White,*
    548 U.S. 53 (2006) ..................................................... 42, 44

*Carducci v. Regan,*
    714 F.2d 171 (D.C. Cir. 1983) ............................... 21–22, 22

*Conejo v. AFGE,*
    No. 17-CV-1802, 2020 WL 5051441 (D.D.C. Aug. 24, 2020) ........... 21

*Cooke v. Rosenker,*
    601 F. Supp. 2d 64, (D.D.C. 2009) ....................... 43–44, 45

*CRST Van Expedited, Inc. v. EEOC,*
    578 U.S. 419 (2016) ................................................. 34–35

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*AFGE v. Trump,*
929 F.3d 748 (D.C. Cir. 2019) ................................. 15–16, 40

*Darveau v. Detecon, Inc.,*
515 F.3d 334 (4th Cir. 2008) .................................. 42

*Dixon v. Int'l Bhd. Police Officers,*
504 F.3d 73 (1st Cir. 2007) ................................... 27

*Dowd v. United Steelworkers, Loc. No. 286,*
253 F.3d 1093 (8th Cir. 2001) ................................ 26–27

*Fair v. Kohler Die & Specialty Co.,*
228 U.S. 22 (1913) ........................................... 20

*Figueroa v. Foster,*
864 F.3d 222 (2d Cir. 2017) .................................. 15, 20

*Free Enter. Fund v. PCAOB,*
561 U.S. 477 (2010) .......................................... 32

*Garity v. APWU Nat'l Lab. Org.,*
828 F.3d 848 (9th Cir. 2016) ................................. 25–26, 27

*\*Green v. Am. Fed'n Tchrs./Ill. Fed'n Tchrs. Loc. 604,*
740 F.3d 1104 (7th Cir. 2014) ................................ 25

*\*Gutierrez v. Flores,*
543 F.3d 248 (5th Cir. 2008) ................................. 20–21, 23

*Hackley v. Roudebush,*
520 F.2d 108 (D.C. Cir. 1975) ................................ 28

*Harris v. Forklift Sys., Inc.,*
510 U.S. 17 (1993) ........................................... 16

*Hudson v. AFGE,*
630 F. Supp. 3d 214 (D.D.C. 2022) ........................... 17, 32

*Hudson v. AFGE,*
No. 19-cv-2738, 2020 WL 3035039 (D.D.C. June 5, 2020) ....... 22

*Hudson v. AFGE,*
No. 22-cv-289, 2022 WL 16551322 (D.D.C. Oct. 31,
2022) ................................................................. 32, 38–39

*In re Antilles Consol. Educ. Ass'n,*
36 FLRA 776 (1990) ......................................... 44

*Johnson v. Ry. Express Agency, Inc.,*
421 U.S. 454 (1975) ........................................... 18

*Jones v. Am. Postal Workers Union,*
192 F.3d 417 (4th Cir. 1999) ............................ 14

*Kolstad v. Am. Dental Ass'n,*
527 U.S. 526 (1999) ........................................... 33

*\*Macklin v. Spector Freight Sys., Inc.,*
478 F.2d 979 (D.C. Cir. 1973) ......................... 14–15

*McKennon v. Nashville Banner Publ'g Co.,*
513 U.S. 352 (1995) ........................................... 34

*\*Meritor Sav. Bank, FSB v. Vinson,*
477 U.S. 57 (1986) ..................................... 16–17, 26

*Nat'l R.R. Passenger Corp. v. Morgan,*
536 U.S. 101 (2002) ........................................... 36

*Newman v. Piggie Park Enters., Inc.,*
390 U.S. 400 (1968) ........................................... 35

*Palmer v. Barry,*
894 F.2d 449 (D.C. Cir. 1990) ......................... 36

*Peden v. Dist. Council 33 Loc. 696,*
662 F. App'x 183 (3d Cir. 2016) ...................... 26

*Peeples v. City of Detroit,*
891 F.3d 622 (6th Cir. 2018) ........................... 26

*RICU v. HHS,*
22 F.4th 1031 (D.C. Cir. 2022) ....................... 12

*Sapperstein v. Hager,
188 F.3d 852 (7th Cir. 1999) ........................................................ 41

Segar v. Smith,
738 F.2d 1249 (D.C. Cir. 1984) ............................................ 27–28, 31

Spagnola v. Mathis,
859 F.2d 223 (D.C. Cir. 1988) ...................................................... 22

United States v. Fausto,
484 U.S. 439 (1988) ...................................................................... 22

Vaca v. Sipes,
386 U.S. 171 (1967) ...................................................................... 31

*Walter Irving Banks v. Int'l Union Operating Eng'rs Loc. 99,
200 F. Supp. 3d 70 (D.D.C. 2016) ............................................ 23, 26

Wood v. AFGE,
255 F. Supp. 3d 190 (D.D.C. 2017) .......................................... 15, 21

Woods v. Graphic Commc'ns,
925 F.2d 1195 (9th Cir. 1991) ...................................................... 27

Yates v. U.S. Soldiers' & Airmen's Home,
533 F. Supp. 461 (D.D.C. 1982) .................................................. 18

## Statutes and Regulations

5 U.S.C. § 1101 ............................................................................. 9
5 U.S.C. § 2302(a)(2)(A) ............................................................... 23
5 U.S.C. § 7101 ............................................................................ 16
5 U.S.C. § 7101(a) ....................................................................... 20
5 U.S.C. § 7104(f)(1) ................................................................... 29
5 U.S.C. § 7114(a)(1) ............................................................ 4, 24–25
5 U.S.C. § 7116(b)(4) ................................................................... 24
5 U.S.C. § 7116(b)(8)..................................................................... 25
5 U.S.C. § 7116(b)–(c) ................................................................. 20
5 U.S.C. § 7118(a)(4)(A)................................................................ 35

5 U.S.C. § 7118(a)(7) ............................................................... 33

5 U.S.C. § 7123(a)(1) ............................................................... 30

28 U.S.C. § 1367 ....................................................................... 9

29 U.S.C. § 201 ......................................................................... 8

29 U.S.C. § 203(a) ................................................................... 40

29 U.S.C. § 215(a)(3) .............................................................. 40

42 U.S.C. § 1981a(a)(1)–(2), (b) .......................................... 33

42 U.S.C. § 2000e ................................................................ 3, 8

42 U.S.C. § 2000e-2(c)(1) ............................................... 14, 24

42 U.S.C. § 2000e-2(c)(2)–(3) ............................................. 24

42 U.S.C. § 2000e-3 ............................................................... 24

42 U.S.C. § 2000e-5(g)(1) ..................................................... 29

42 U.S.C. § 2000e-5(k) .......................................................... 34

42 U.S.C. § 12111 ................................................................ 3, 8

42 U.S.C. § 12111(2) .............................................................. 14

42 U.S.C. § 12112(a)–(b) ....................................................... 24

42 U.S.C. § 12188(a)(2) .......................................................... 29

42 U.S.C. § 12205 ................................................................... 34

5 C.F.R. § 2423.10(a) ............................................................. 28

5 C.F.R. § 2423.10(a)(1)–(2) ................................................. 28

5 C.F.R. § 2423.11(a) ............................................................. 28

5 C.F.R. § 2423.11(c) .............................................................. 29

5 C.F.R. § 2423.11(f)–(g) ....................................................... 30

5 C.F.R. § 2423.32 .................................................................. 28

5 C.F.R. § 2430.1 .................................................................... 34

5 C.F.R. § 2430.2(b) ............................................................... 34

## Other Authorities

DAVID OSBORNE, FEDERAL LABOR BOARD RECORDS SHOW CHALLENGE OF UNION ACCOUNTABILITY 3 (Dec. 2023), https://americansforfairtreatment.org/2023/12/20/report-federal-labor-board-records-show-challenge-of-union-accountability/ [https://perma.cc/M5TB-QTMY].......................................................... 29, 30

FLRA, ULP Frequently Asked Questions (FAQs), https://www.flra.gov/resources-training/resources/information-case-type/ulp-resources/ulp-frequently-asked-questions-faqs#:~:text= The%20FLRA%20may%20order%20make,not%20to%20violate%20 the%20law [https://perma.cc/57D9-3PLA] (last visited Feb. 9, 2024).... 33

Letter from Edda E. Perez, General Counsel of the Government Accountability Office, to President Joseph R. Biden, Feb. 8, 2023, *available at* https://www.gao.gov/assets/820/817383.pdf [https://perma.cc/2YEZ-Q7ME] ............................................................. 30

# GLOSSARY

| | |
|---|---|
| **ADA** | The Americans with Disabilities Act of 1990 |
| **ADEA** | Age Discrimination in Employment Act |
| **AFGE** | American Federation of Government Employees |
| **APA** | Administrative Procedure Act |
| **CSRA** | Civil Service Reform Act of 1978 |
| **EEOC** | U.S. Equal Employment Opportunity Commission |
| **FLRA** | Federal Labor Relations Authority |
| **FLSA** | Fair Labor Standards Act |
| **FOIA** | Freedom of Information Act |
| **FSLMRS** | Federal Service Labor-Management Relations Statute |
| **LMRA** | Labor Management Relations Act |
| **LMRDA** | Labor-Management Reporting and Disclosure Act |
| **NLRA** | National Labor Relations Act |
| **NLRB** | National Labor Relations Board |
| **SBA** | Small Business Administration |
| **Title VII** | Title VII of the Civil Rights Act of 1964 |
| **ULP** | Unfair labor practice |

# INTRODUCTION

Nia Lucas is an Army veteran who suffered a traumatic brain injury while serving her country that left her disabled. She is also African American and the mother of three children, including most recently twin newborns.

After returning from war, Lucas chose to continue serving her country as a civil servant in the federal government. The government did not treat Lucas reciprocally. Among other problems, it failed to pay her overtime to which she was entitled. Because Lucas was then represented by a union, AFGE, she asked multiple of its officers to file a grievance seeking to rectify the government's conduct.

That was when the situation went off the rails. As her complaints allege, the union immediately began discriminating against Lucas based on her protected traits. Over the course of several years, it demonstrated outright animus toward her for being a woman, disabled, and a nursing mother. Green also repeatedly sexually harassed Lucas and openly retaliated against her for spurning his advances and for reporting his conduct to the union. The union ensured that Lucas's grievance was

unsuccessful, delaying and ultimately withdrawing it 678 days later. Lucas later separated from federal service because of the union's conduct.

Lucas then commenced these two consolidated actions in the court below, pleading claims that the union unlawfully discriminated against her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans with Disabilities Act of 1990 ("ADA") and retaliated against her for asserting her rights under the Fair Labor Standards Act ("FLSA"). The district court dismissed both cases for lack of subject matter jurisdiction, holding that such claims were really unfair labor practices ("ULPs") that must be adjudicated, if at all, by an independent board, the Federal Labor Relations Authority ("FLRA"). That holding would leave federal employees in a yawning gap—a disfavored class unable to avail themselves of the robust substantive, procedural, and remedial rights the generally applicable anti-discrimination laws afford. Because this would undermine Congress's purpose to remove discrimination from the workplace root and branch, Lucas now appeals to this Court.

# STATEMENT OF JURISDICTION

Lucas invoked the district court's jurisdiction under 28 U.S.C. § 1331 because her complaints alleged violations of Title VII and the ADA. 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 12111 *et seq.*

The union moved to dismiss Lucas's complaints under Federal Rules of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction and 12(b)(6) for failure to state a claim. On March 29, 2023, the district court issued a memorandum opinion ("Op.") (JA328–50, 539–61) and order (JA326–27, 537–38) granting the union's 12(b)(1) motion and dismissing all of Lucas's claims for lack of subject matter jurisdiction.

On April 28, 2023, Lucas timely filed a Notice of Appeal, over which this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

# STATEMENT OF THE ISSUES

1. Whether federal courts have jurisdiction over claims against federal-sector unions that arise under generally applicable anti-discrimination laws.

2. Whether federal courts have jurisdiction over claims against federal-sector unions under FLSA's anti-retaliation provision.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum.

## STATEMENT OF THE CASE

### A.    Background[1]

Lucas is a former civil servant of the United States Small Business Administration ("SBA") who worked in Washington, DC. She is an African American woman, a mother of three children including twin newborns, and an Army veteran living with a disability caused by a traumatic brain injury suffered during her military service. 777 Compl. ¶¶ 14–15 (JA008). At SBA, Lucas worked in a bargaining unit represented by AFGE. *Id.* ¶¶ 17–18 (JA008). Pursuant to the Federal Service Labor-Management Relations Statute ("FSLMRS"), AFGE is the "exclusive" representative of all employees in that unit, meaning it is the only entity authorized to negotiate with SBA regarding the terms and conditions of their employment. *See* 5 U.S.C. § 7114(a)(1).

---

[1] This summary draws on the pleadings from both of Lucas's lawsuits, which the district court addressed in a single opinion. These well-pleaded allegations are taken as true because the court below dismissed the cases for lack of subject matter jurisdiction. *See* Standard of Review, *infra*.

In September 2017, Lucas worked overtime hours but did not receive overtime pay. 777 Compl. ¶¶ 27–29 (JA009); Williams Aff. ¶¶ 6–7 (JA021–022). She asked the union to submit an employee grievance about this, but it refused. 777 Compl. ¶¶ 27–28 (JA009); Williams Aff. ¶ 8 (JA022). Despite this refusal, the union filed a grievance on behalf of a male employee who had worked the same overtime hours as Lucas and also was not appropriately compensated. Williams Aff. ¶¶ 6–8 (JA021–022). Green, who at the time was President of Local 228, advised Lucas that the union was historically biased against disabled women like her; he also claimed that he would file a ULP charge against the AFGE representative who declined to file Lucas's grievance but never actually did so. 777 Complaint ¶¶ 30–31 (JA009).

On January 20, 2018, SBA suspended its operations because of a government shutdown. 1540 Compl. Ex. 3 at 11 (JA386–87) (Congressional resolution acknowledging shutdown). SBA required Lucas to report to work on January 22 to complete "orderly" shutdown-related activities, even though she was on an alternative work schedule that day. Williams Aff. ¶ 10 (JA022). Longstanding Executive Branch guidance has recognized that employees in these circumstances are

entitled to premium pay. 1540 Compl. Ex. 4 at 15 (JA389–90). But after the shutdown ended, SBA did not pay Lucas the overtime she had earned. 1540 Compl. ¶ 19 (JA361–62). At the time, Lucas had an ongoing grievance regarding workplace infractions committed by her supervisor, so the union amended that grievance in February 2018 to include an FLSA claim based on the shutdown pay issue. 1540 Compl. Ex. 1 at 2–3 (JA378–79).

Initially, Green handled Lucas's grievance. 777 Compl. ¶¶ 32–33 (JA009–10). He soon began sexually harassing Lucas by making "unwanted sexual advance[s]" and by "telling her he loved her and wanted to support her financially." *Id.* ¶ 35 (JA010). Green continued this harassment throughout 2018, as arbitration on Lucas's grievance was scheduled for early 2019. *Id.* ¶¶ 37–38 (JA010). Lucas reported Green's harassment to AFGE National officials including Kelly and personally told Green to stop. *Id.* ¶¶ 24–25, 43–44 (JA009–11). Green eventually withdrew from representing Lucas in her grievance arbitration just one week before a May 2019 hearing. Further, in retaliation for Lucas reporting his unwanted advances, he selected an inexperienced steward as his replacement. *Id.* ¶¶ 45–46 (JA011). At that time, Lucas was "a

nursing mother and required a private room to occasionally nurse her child." *Id.* ¶ 47 (JA011). Before he withdrew, Green made disparaging remarks about Lucas being a mother, claiming the "additional expenses and logistics" associated with her nursing were "a burden to the union." *Id.* ¶¶ 48–49 (JA011). Lucas also reported these comments to AFGE National officials. *Id.* ¶ 50 (JA011).

In retaliation for Lucas's complaints of sexual harassment, the union forced her to pay its legal bills associated with the arbitration hearing, as well as the arbitrator's fee. *Id.* ¶¶ 51–55 (JA011–12). The union also terminated Lucas's membership and refused to represent her in any further grievances. *Id.* ¶ 65 (JA013). It then continually delayed the arbitration before withdrawing the grievance altogether on January 22, 2020. *Id.* ¶ 68 (JA013). By that time, the arbitration hearing had been delayed, without good cause, for six hundred and seventy-eight (678) days. *Id.* ¶ 67 (JA013).

The union had multiple illegal motives for delaying adjudication of and ultimately withdrawing Lucas's grievance. The first of these was Green's animus toward Lucas's disability and status as a nursing mother: after withdrawing her grievance, he openly "stated to [Lucas] that AFGE

did not want to represent disabled mothers of newborns such as [her]." *Id.* ¶ 71 (JA013). The second motive was collusion with SBA. SBA wanted to stop Lucas from encouraging other employees to pursue valid FLSA claims, so it enlisted the union to torpedo her grievance and silence her. 1540 Compl. ¶¶ 48–50, 52 (JA365).

Rattled by her experience with a union that not only tolerated sex and disability discrimination by its officers but helped them cover it up, as well as an employer that refused to pay its employees consistent with the law, Lucas was forced to retire from SBA in April 2020. *Id.* ¶¶ 14, 58–59, 61 (JA359–60, 366).

## B. Procedural History

In Appeal No. 23-7051, (district court no. 22-cv-777), Lucas brought four claims against AFGE:

1) Sex discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq.*;
2) Disability discrimination in violation of the ADA, 42 U.S.C. § 12111 *et seq.*;
3) Sexual harassment and creation of a hostile work environment in violation of Title VII and the ADA; and
4) Retaliation against protected activity under Title VII and the ADA.

777 Compl. at 9–13 (JA014–18). In Appeal No. 23-7054 (district court no. 22-cv-1540), Lucas brought a claim of retaliation based on protected

activity under the FLSA, 29 U.S.C. § 201 *et seq.*, as well as five claims under state law.[2] 1540 Compl. at 10–17 (JA366–73). In both cases, the union moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1), arguing that Lucas's claims were preempted by the Civil Service Reform Act ("CSRA"), 5 U.S.C. § 1101 *et seq.*, because her allegations against the union related to AFGE's role as exclusive representative of Lucas's bargaining unit. *See* Op. at 13 (JA340) ("[AFGE] submit[s] that all of [Lucas's] claims . . . are preempted . . . [because they] arise out of [Lucas's] relationship with and representation by [AFGE] . . . .").

In a single opinion, the district court dismissed both of Lucas's suits on the basis urged by the union: the CSRA precluded her claims wholesale. Op. at 13–20 (JA340–47).[3] However, the court was only able to reach this conclusion by rebranding Lucas's claims as ULP charges under the CSRA.

---

[2] The district court did not address Lucas's state law claims, presumably declining to exercise supplemental jurisdiction after ruling it lacked subject-matter jurisdiction over her federal cause of action. *See* 28 U.S.C. § 1367(c)(3).

[3] The cases were consolidated in the court below pursuant to D.D.C. Local Civil Rule 40.5(a)(3).

The court first noted that the Federal Labor Relations Authority ("FLRA") has "exclusive enforcement authority" over the CSRA, including resolution of "complaints of [ULPs] under [5 U.S.C. § 7118] . . . ." *Id.* at 14–15) (quoting 5 U.S.C. § 7105(2)(G)). It then observed that a union's breach of its duty of fair representation constitutes a ULP. *Id.* at 15. Quoting *Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527, 532 (1989), the court below stated that Congress had never authorized "a parallel remedy in . . . federal district court to enforce the duty of fair representation." Op. at 15 (JA342).

The district court then proceeded to hold that, even though Lucas's pleadings stated independent claims under federal employment discrimination statutes, those claims were "properly characterized as a mere repackaging of her claims under the CSRA for breach of the duty of fair representation." *Id.* at 18 (JA345); *see also id.* at 20 (JA347) ("[Lucas] cannot pursue a breach for [*sic*] the duty of fair representation merely by reframing it as . . . a violation of the [FLSA]."). The court reasoned that because Lucas had previously filed ULP charges against AFGE based on facts similar to those presented in her lawsuits, her only remedy lay

within the CSRA. *Id.* at 17–18, 20 (JA344–45, 347).[4] Based on its preclusion rationale, the court did not consider the substantive merits of Lucas's claims under Title VII, the ADA, or the FLSA.

Lucas timely filed notices of appeal on April 28, 2023. ECF No. 1997314 (Appeal No. 23-7051); ECF No. 1997801 (Appeal No. 23-7054). On July 14, 2023, the union filed motions for summary disposition. ECF No. 2008024. Lucas opposed those motions, ECF No. 2009341, and the Equal Employment Opportunity Commission ("EEOC") participated as *amicus curiae* in support of their denial, ECF No. 2009974. On October 19, 2023, a panel of this Court denied the union's motions and invited EEOC to participate as *amicus curiae* on the merits. ECF No. 2022759.

## SUMMARY OF ARGUMENT

The CSRA does not preempt any of Lucas's claims, which are brought under generally applicable federal anti-discrimination and

---

[4] The union attached copies of these ULPs to its motion to dismiss in each case. 777 Mot. Dismiss Exs. 1–3 (JA090–109); 1540 Mot. Dismiss Exs. 1–2 (JA455–63). The court considered them pursuant to its authority under Federal Rule of Civil Procedure 12(b)(1) to "consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case." Op. at 12 (JA339) (quoting *Scolaro v. D.C. Bd. Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000)).

retaliation statutes. The mere fact that a federal-sector union engaged in this conduct does not change the analysis, contrary to the district court's view. To hold otherwise would be to grant these unions a carveout from some of our country's most important laws and frustrate congressional intent to afford multiple fora for eradicating workplace discrimination. And it would make federal servants second-class citizens—substantially less able to assert their rights against invidious discrimination and to receive the panoply of remedies Congress prescribed for all American workers. There is no support in any of these laws or the cases interpreting them for such an aberrant result. The decision of the court below must be reversed.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's dismissal for lack of subject matter jurisdiction. *RICU v. HHS*, 22 F.4th 1031, 1034 (D.C. Cir. 2022). In doing so, this Court "assum[es] the truth of all well-pled material factual allegations in the complaint and grant[s] [Lucas] the benefit of all reasonable inferences from the alleged facts." *Id.* (cleaned up).

## ARGUMENT

### I. FEDERAL COURTS HAVE JURISDICTION OVER CLAIMS AGAINST FEDERAL-SECTOR UNIONS UNDER GENERALLY APPLICABLE ANTI-DISCRIMINATION LAWS

The district court's holding that the CSRA provides the only remedy for Lucas's sex and disability discrimination claims flies in the face of a bedrock principle of employment discrimination law: overlapping remedies are generally permitted to combat the pervasive evil of prejudice in the workplace. In the private sector, this well-settled rule has led courts to permit discrimination claims against labor unions to proceed despite the availability of parallel remedies like ULP charges and grievance proceedings under collective bargaining agreements. In the absence of a clear indication that Congress intended to displace this fundamental policy by enacting the CSRA, that rule controls this case and should permit Lucas to proceed with her claims in federal court. "Recall our task: to decide if a claim is of the type Congress thought belonged within a statutory scheme." *Axon Enter., Inc. v. FTC*, 598 U.S. 175, 188–89 (2023) (cleaned up).

## A. Overlapping, Non-Exclusive Remedies Are the Law of Federal Employment Anti-Discrimination

By their plain terms, both Title VII and the ADA prohibit discrimination by labor unions. *See* 42 U.S.C. § 2000e-2(c)(1) (prohibiting a "labor organization" from "discriminat[ing] against . . . any individual because of his race, color, religion, sex, or national origin . . . ."); 42 U.S.C. § 12111(2) (defining "covered entity" under the ADA to include a "labor organization").[5] There is every reason to regard the liability under these provisions, on one hand, and the remedies available under the CSRA, on the other, as complementary. This is because "legislative enactments in [the area of employment discrimination] have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47 (1974). Consistent with this principle, this Court has held that employees can pursue employment discrimination claims against their unions even when they have already submitted contractual grievances regarding the same issues. *Macklin v. Spector Freight Sys., Inc.*, 478 F.2d 979, 988 (D.C. Cir.

---

[5] *See also Jones v. Am. Postal Workers Union*, 192 F.3d 417, 428 (4th Cir. 1999) (federal-employee unions "constitute labor organizations for purposes of Title VII liability and by proxy the ADA.").

1973); *see also Alexander*, 415 U.S. at 48–49 (same). Similarly, the Second Circuit recently held that the NLRA's authorization of ULP charges for breach of the duty of fair representation did not preempt discrimination claims against labor unions brought under New York's Title VII analog. *Figueroa v. Foster*, 864 F.3d 222, 233 (2d Cir. 2017) ("A union . . . is subject to liability under both the NLRA's duty of fair representation and under Title VII, as well as under other federal anti-discrimination statutes enforced by the EEOC.").

Despite this overarching policy of allowing cumulative remedies, the district court held that the CSRA exclusively governs Lucas's discrimination claims simply because they arose while she worked in a bargaining unit represented by AFGE.[6] Op. at 17–20 (JA344–47). This overbroad holding was wrong, as "[t]he CSRA does not preclude an employee from suing his union under all circumstances." *Wood v. AFGE*, 255 F. Supp. 3d 190, 197 (D.D.C. 2017) (cleaned up). Instead, the district court should have analyzed whether Lucas's sex and disability discrimination claims are "of the type Congress intended to be reviewed"

---

[6] The court supplied no body of law or decision rule to support its ability to transform Lucas's anti-discrimination claims into ULPs. Op. at 17–20 (JA344–47). There is none.

under the CSRA. *AFGE v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019). And, as discussed below, they are not.

**B.  Neither the Text nor the Legislative History of the CSRA Evidence Congressional Intent to Carve Federal-Sector Unions out of Generally Applicable Anti-Discrimination Laws**

Nothing in the CSRA's text says it preempts generally applicable anti-discrimination laws. 5 U.S.C. § 7101 *et seq.* Instead, the CSRA expressly provides that its "provisions" should instead "be interpreted in a manner consistent with the requirement of an effective and efficient Government." 5 U.S.C. § 7101(b). Permitting workplace discrimination by federal-sector unions by exempting them from generally applicable anti-discrimination laws is wholly at odds with this purpose. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993) ("A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers."); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("One can readily envision working environments so heavily polluted with discrimination as to destroy

completely the emotional and psychological stability of minority group workers.") (cleaned up).

The CSRA's legislative history likewise contains no discussion indicating that the CSRA would remove federal employees from the ambit of the Nation's employment discrimination laws. *Cf. Hudson v. AFGE*, 630 F. Supp. 3d 214, 223 (D.D.C. 2022) ("[Plaintiff's] status as a member of a CSRA-covered union cannot alone answer the preemption question.").

In light of the pre-existing congressional policy of providing the widest possible range of remedies for discrimination, this silence speaks quite loudly. If Congress had intended to displace this policy when it came to federal employees, the matter would have been discussed. That it was not supplies an additional reason to reverse the district court.

Significantly, the Supreme Court has repeatedly recognized that Congress authorized and intended employees to bring claims simultaneously under Title VII and other statutes. As the Court explained in *Alexander*, "Congress indicated that it considered the policy against discrimination to be of the highest priority." 415 U.S. at 47 (cleaned up). Preventing discrimination is so important that "legislative

enactments in this area have long evinced a general intent to accord parallel or overlapping remedies against discrimination." *Id.*; *see also Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 472 (1975) (Marshall, J., concurring in part) (Congressional intent to "devis[e] a flexible network of remedies to guarantee equal employment opportunities" explains the coexistence of Title VII's early administrative reporting requirement and the longer statute of limitations for "an independent . . . action" under 42 U.S.C. § 1981). For example, an employee subject to discrimination that violates both the National Labor Relations Act ("NLRA") and Title VII may enforce her rights under ***both*** statutes.[7] 110 Cong. Rec. 7207 (1964) ("If a given action should violate both title VII and the [NLRA], the National Labor Relations Board [("NLRB")] would not be deprived of jurisdiction."); *see Alexander*, 415 U.S. at 59–60 (an employee is permitted "to pursue fully both his remedy under the grievance-arbitration clause of a collective-bargaining agreement and his cause of action under title VII").

---

[7] "[CSRA] was modeled, in part, after the [NLRA] . . ., which governs labor relations in the private sector." *Yates v. U.S. Soldiers' & Airmen's Home*, 533 F. Supp. 461, 463 (D.D.C. 1982).

As further evidence of its intent to allow individuals to challenge unlawful discrimination under Title VII and other statutes, Congress rejected amendments to Title VII and the Equal Employment Opportunity Act of 1972 that would have made Title VII the exclusive remedy for unlawful employment practices. H.R. 9247, 92nd Cong. (1971); 110 Cong. Rec. 13650 (1964) ("My amendment would assure employers that they would not have to respond simultaneously to investigations and directions from the title VII, EEOC . . . ."); 117 Cong. Rec. 26555 (1971) ("[C]harges filed under title VII shall be the exclusive federal remedy for persons claiming to be aggrieved by discriminatory practices of covered respondents."); 117 Cong. Rec. 31981 (1971) ("So a person bringing an action under this cannot shop around for another forum . . . we would make the Equal Employment Opportunity Act the sole Federal remedy for relief from discriminatory employment practices.").

## C.  Lucas's Anti-Discrimination Claims Were Made Under and Are Governed by Title VII and the ADA— Not the CSRA

Lucas's claims are about the union's sex and disability discrimination in violation of generally applicable anti-discrimination

laws. She has not pleaded or asked any court to adjudicate a claimed ULP. "Of course, the party who brings a suit is master to decide what law he will rely upon . . . . if the plaintiff really makes a substantial claim under an act of Congress, there is jurisdiction whether the claim ultimately be held good or bad." *The Fair v. Kohler Die & Specialty Co.*, 228 U.S. 22, 25 (1913).

Lucas's claims are distinct from the duties prescribed for unions in the CSRA and the concomitant ULPs and remedies enumerated in 5 U.S.C. § 7116(b)–(c), which does not capture the union's discrimination against her.[8] *See Gutierrez v. Flores*, 543 F.3d 248, 255 (5th Cir. 2008) ("Gutierrez is not alleging that Appellees violated a duty established under the CSRA. Rather, on the face of his well-pleaded complaint, he

_____

[8] *Cf. Figueroa v. Foster*, 864 F.3d 222, 233 (2d Cir. 2017) ("The Supreme Court recently noted that the NLRA's 'unique purpose, which is to preserve the balance of power between labor and management' 'is inapposite in the context of Title VII, which focuses on eradicating discrimination." ***A union, therefore, is subject to liability under both the NLRA's duty of fair representation and under Title VII, as well as under other federal anti-discrimination statutes enforced by the EEOC***.") (emphasis added) (citing *Vance v. Ball State Univ.*, 570 U.S. 421, 434 n.7 (2013)); *see also* 5 U.S.C. § 7101(a) ("The Congress finds that —experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choose in decisions which affect them—safeguards the public interest").

alleges that Appellees' letter and e-mail were defamatory and intended to inflict emotional distress. Nothing in the CSRA pertains to this specific scenario.") (cited with approval in *Wood*, 255 F. Supp. 3d at 197). The CSRA does not permit district courts to unilaterally alter claims to fit an inapposite statute as it has done here. *See Wood*, 255 F. Supp. 3d at 197 ("Plaintiff is suing his union and other union members, but Plaintiff's defamation claim does not allege that his union breached their duty of fair representation, nor does it otherwise appear to implicate any unfair labor practices as that term is defined under the CSRA."); *see also id.* (the CSRA "only precludes claims alleging that the union committed an 'unfair labor practice.'").[9]

It is true that this Court and the Supreme Court have held the CSRA precludes certain *other* generally applicable federal claims, including requests for judicial review of agency action under the Administrative Procedure Act ("APA") and *Bivens* claims. *See, e.g.*,

---

[9] *Cf. Conejo v. AFGE*, No. 17-CV-1802, 2020 WL 5051441, at *2 (D.D.C. Aug. 24, 2020) ("Nor were the harms Mr. Conejo suffered adverse employment actions because Mr. Conejo does not seek review of the GPO's decision to deny him a temporary promotion. Rather, he seeks damages against the Federation for torts he alleges that the Federation's agents committed against him. That distinction makes all the difference.").

*Carducci v. Regan*, 714 F.2d 171, 175 (D.C. Cir. 1983) (APA); *Spagnola v. Mathis*, 859 F.2d 223, 229–30 (D.C. Cir. 1988) (*Bivens* claims); *United States v. Fausto*, 484 U.S. 439, 455 (1988) (suit under the Back Pay Act). None of these cases, however, confronted the uniquely potent congressional policy in favor of overlapping remedies for the paramount evil of employment discrimination. Instead, each was decided by stacking the policies underlying the statutes providing for the plaintiff's claims against the CSRA's purpose of "establish[ing] a comprehensive system for reviewing personnel action taken against federal employees." *Fausto*, 484 U.S. at 455; *see also Carducci*, 714 F.2d at 173–75; *see also Spagnola*, 859 F.2d at 250–53. The district court also relied on *Hudson v. AFGE*, No. 19-cv-2738, 2020 WL 3035039 (D.D.C. June 5, 2020), in which the court held the CSRA precluded plaintiff's claims brought under the Labor-Management Reporting and Disclosure Act ("LMRDA") and the Labor Management Relations Act ("LMRA"). But, unlike Title VII and the ADA, neither the LMRDA nor LMRA applies to public-sector unions. *Hudson*, 2020 WL 3035039, at *10 ("[T]he LMRA, just like the LMRDA, does not apply to public-sector unions."). Accordingly, none of these cases stand for the categorical proposition that the CSRA preempts *all*

generally applicable laws authorizing suits by federal employees against their unions. Furthermore, prior cases finding CSRA preemption have all arisen in challenges to "personnel actions" taken by federal employers against their employees. *See* 5 U.S.C. § 2302(a)(2)(A) (defining personnel actions). As the Fifth Circuit explained in *Gutierrez*, 543 F.3d at 253–54, the CSRA's structuring of the federal "employment relationship" raises stronger preemption concerns than its separate provisions about federal-sector unions.

As explained below, the generally applicable anti-discrimination laws are substantively and procedurally more protective of victims' rights and afford far more comprehensive remedies to victims than does the CSRA and thus further evidences that the latter does not preempt the former. "Defendants offer no authority for the proposition that federal anti-discrimination statutes are preempted by federal labor laws. Nor could they. Each of the three federal statutes that Plaintiff invokes—Title VII, the [Age Discrimination in Employment Act ("ADEA")], and the ADA—expressly applies to labor unions." *Walter Irving Banks v. Int'l Union Operating Eng'rs Loc. 99*, 200 F. Supp. 3d 70, 75 (D.D.C. 2016).

1. Title VII and the ADA are Substantially More Protective of Victims' Substantive Rights than the CSRA

Title VII paints with a broad brush prohibiting discrimination by labor unions against anyone—not just union or bargaining unit members. The law makes it "an unlawful employment practice" for a labor union to "exclude or expel from its membership, *or otherwise discriminate against*, any individual because of his race, color, religion, sex, or national origin[.]" 42 U.S.C. § 2000e-2(c)(1) (emphasis added). And it goes on to prohibit a host of other discriminatory conduct by labor unions. 42 U.S.C. §§ 2000e-2(c)(2)–(3), 2000e-3. So too the ADA prohibits union discrimination "against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a)–(b).

The CSRA on the other hand makes it an "unfair labor practice" for a union "to discriminate against an employee *with regard to the terms or conditions of membership in the labor organization*" based on "race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition[.]" 5 U.S.C. § 7116(b)(4); *see also* 5 U.S.C. § 7114(a)(1) (creating a limited duty of fair representation: "[a]n exclusive

representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.") *and* 5 U.S.C. § 7116(b)(8) (it is a ULP for a union to "otherwise fail or refuse to comply with any provision of this chapter.").

To argue that the CSRA's narrow discrimination prohibition or duty of fair representation supersedes Title VII's sweeping prohibitions

> would make Title VII pointless. Unless a contract, or some other statute, gave the plaintiff an entitlement, Title VII would do nothing. Yet if a union has, and violates, such a duty, then a remedy may be had under that statute or contract. Title VII would be otiose, and claims of discrimination against unions would be either unavailing or unnecessary.

*Green v. Am. Fed'n Tchrs./Ill. Fed'n Tchrs. Loc. 604*, 740 F.3d 1104, 1106 (7th Cir. 2014). The same reasoning applies to the ADA: "We are persuaded . . . that a Title VII claim against a union does not include an extra-textual 'breach of the duty of fair representation' element, and see no reason why the Seventh Circuit's analysis should not apply with equal force to the ADA claim before us here." *Garity v. APWU Nat'l Lab. Org.*,

828 F.3d 848, 863 (9th Cir. 2016).[10] Title VII and the ADA "cannot be read to parrot a cause of action that already exists under federal labor laws." *Id.* at 864.

Contrary to the union's arguments below, Title VII and the ADA prohibit sexual harassment by unions, too. 777 Mot. Dismiss at 21–22 (JA079–80); *see Meritor Sav. Bank*, 477 U.S. at 64 ("Without question, when a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor discriminates on the basis of sex."). Other circuit courts are in accord: "Thus the plain language of the statute suggests that unions may be liable for any discrimination, including a claim of hostile work environment." *Dowd v. United Steelworkers, Loc.*

---

[10] A growing chorus of other circuit courts agree. *Peeples v. City of Detroit*, 891 F.3d 622, 637–38 (6th Cir. 2018) (adopting the reasoning of *Green* and *Garity*: "The [duty of fair representation] doctrine protects union members specifically, while Title VII protects all employees, including union members. It does not follow that union members should only have protection under a strict combination of the two."); *Peden v. Dist. Council 33 Loc. 696*, 662 F. App'x 183, 186 n.2 (3d Cir. 2016) (citing *Garity*: "[W]e question whether Peden actually needs to satisfy part (1) ("that the Union breached its duty of fair representation") to maintain a claim under the ADA or Title VII."); *see also Walter Irving Banks*, 200 F. Supp. 3d at 76 (following *Green* and *Garity*: "[T]his court agrees with the Seventh and Ninth Circuits that a plaintiff is not required to show a breach of a union's duty of fair representation in order to make out a prima facie case of discrimination under Title VII, the ADA, and the ADEA.").

*No. 286*, 253 F.3d 1093, 1102 (8th Cir. 2001); *Woods v. Graphic Commc'ns*, 925 F.2d 1195, 1201 (9th Cir. 1991) ("We see no reason why a union should not be equally liable [compared to employers] for [the union's] acts of . . . harassment against its own members."); *Anjelino v. N.Y. Times Co.*, 200 F.3d 73, 95 (3d Cir. 1999) ("[A] union may be held liable under Title VII [for sexual harassment if it] . . . itself **instigated or actively supported** the discriminatory acts allegedly experienced by the appellants.") (emphasis added); *Dixon v. Int'l Bhd. Police Officers*, 504 F.3d 73, 85 (1st Cir. 2007) ("This is a case of discrimination within the union, by union members (including members of the Local's executive board), under the supervision and acquiescence of the Local's president."). And as explained in Section I.C.2–3, *infra*, harassment claims are a particularly poor fit with the CSRA scheme vis-à-vis unions.

### 2. Title VII and the ADA Afford Victims Substantially Greater Procedural Rights than Does the CSRA

Under the "plaintiff-friendly pleading standards" that apply to Title VII and ADA claims, "the claimant need only make a series of factual assertions before the burden shifts to the defendant." *Garity*, 828 F.3d at 864 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973)); *Segar v. Smith*, 738 F.2d 1249, 1276 (D.C. Cir. 1984) ("Both the

27

policies underlying Title VII and general principles of evidence suggest that the burden of production of such evidence must rest with the defendant."). Throughout the plaintiff is afforded a neutral federal forum with all the ordinary rights including to appeal an adverse determination. *See generally Hackley v. Roudebush*, 520 F.2d 108, 118 (D.C. Cir. 1975).

In contrast, ULP charges filed with FLRA have no mechanism to shift the burden to the charged union. 5 C.F.R. § 2423.32 (when prosecuting a complaint the FLRA General Counsel has chosen to file on behalf of a complainant in response to his or her ULP charge, "[t]he General Counsel shall . . . have the burden of proving the allegations of the complaint by a preponderance of the evidence"); *accord Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 78 (1991) ("Any substantive examination of a union's performance . . . must be highly deferential . . . ."). They are filed with FLRA's Office of General Counsel and assigned to a Regional Director to adjudicate in the first instance. 5 C.F.R. § 2423.10(a). The Regional Director is empowered to dismiss the charges outright or counsel individuals to withdraw them. 5 C.F.R. § 2423.10(a)(1)–(2); 5 C.F.R. § 2423.11(a). According to FLRA's response

to a recent FOIA request, individual charges against labor unions are dismissed or withdrawn over 99% of the time.[11] FLRA REPORT at 3 ("Fewer than 1% of individuals' charges resulted in enforcement action. . . . Over 52% of individuals' charges were dismissed."). Lucas's ULP charges received the same treatment—FLRA summarily dismissed them. 777 Mot. Dismiss Exs. 4–5 (JA110–16); *see also* FLRA REPORT at 52, 54, 55. This is discordant from the *McDonnell Douglas* burden shifting framework where defendants are put to their proof and decisions timely made on the merits—to include appropriate injunctive relief to stop the discrimination and harassment. 42 U.S.C. § 2000e-5(g)(1); 42 U.S.C. § 12188(a)(2).

The charging party's only option on dismissal is to then appeal to FLRA's general counsel, 5 C.F.R. § 2423.11(c), who is a principal officer of the United States appointed by the President and confirmed by the Senate to a term of five years. 5 U.S.C. § 7104(f)(1). One problem with this setup is FLRA has not had a general counsel since January 20, 2017,

---

[11] DAVID OSBORNE, FEDERAL LABOR BOARD RECORDS SHOW CHALLENGE OF UNION ACCOUNTABILITY 3 (Dec. 2023) [hereinafter "FLRA REPORT"], https://americansforfairtreatment.org/2023/12/20/report-federal-labor-board-records-show-challenge-of-union-accountability/ [https://perma.cc/M5TB-QTMY].

so subject to the requirements of the Vacancies Reform Act FLRA has regularly had *no* authority to adjudicate ULP charge appeals (including between November 16, 2017 and March 23, 2021; and November 16, 2021 to the present).[12]

And for this reason there is a massive backlog of appeals stretching back to at least 2017, FLRA REPORT at 5, including Lucas's appeals, which have been pending since 2020. FLRA REPORT at 8, 9, 28. Another problem is the General Counsel's determination on appeal is the final word on the matter—there is no right of review in any court or by anyone else. 5 U.S.C. § 7123(a)(1); 5 C.F.R. § 2423.11(f)–(g). And since 2017, of those that have been decided, FLRA has denied *every* appeal filed by an individual, leaving those persons without recourse. FLRA REPORT at 4 ("[A]ppeals have been granted just twice, and in both instances, the appeal was filed by a federal agency, not an individual employee."). The remainder of the appeals are awaiting General Counsel action in the event a nominee is confirmed by the Senate.

---

[12] Letter from Edda E. Perez, General Counsel of the Government Accountability Office, to President Joseph R. Biden, Feb. 8, 2023, at 2–3, 5, *available at* https://www.gao.gov/assets/820/817383.pdf [https://perma.cc/2YEZ-Q7ME].

The decision of the court below is effectively that discrimination and harassment claims involving a federal union must be brought to FLRA—where they are almost certain to wither and die. This is vastly different from what Congress intended: "Title VII of the Civil Rights Act of 1964 proclaims one of this nation's most fundamental, if yet unrealized, principles: a person shall not be denied full equality of employment opportunity on account of race, color, religion, sex, or national origin." *Segar*, 738 F.2d at 1258; *cf. Vaca v. Sipes*, 386 U.S. 171, 182–83 (1967).

> The existence of even a small group of cases in which the Board would be unwilling or unable to remedy a union's breach of duty would frustrate the basic purposes underlying the duty of fair representation doctrine. For these reasons, we cannot assume from the NLRB's tardy assumption of jurisdiction in these cases that Congress, when it enacted N.L.R.A. § 8(b) in 1947, intended to oust the courts of their traditional jurisdiction to curb arbitrary conduct by the individual employee's statutory representative.

*Id.* The scope and tenor of FLRA's defined adjudicatory abilities, and its capabilities in practice, are no match for the robust judicial process the anti-discrimination laws afford victims. General anti-discrimination laws are outside FLRA's "competence and expertise," do not "require

technical considerations of [FLRA] policy" and instead present "standard questions . . . which the courts are at no disadvantage in answering." *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 491 (2010).

### 3. Title VII and the ADA Afford Victims Substantially Greater Remedies than the CSRA

ULP proceedings at FLRA are a remarkably poor fit for remedying unlawful discrimination. *Hudson*, 630 F. Supp. at 222 ("The Court concludes, however, that the CSRA's preemptive effect does not extend to Hudson's claims in this case because they are not of the type Congress intended to be reviewed within the CSRA's structure.") (cleaned up). The chasm between the remedies afforded by the anti-discrimination laws and the CSRA is dispositive: "Two claims may be sufficiently alike for preemption purposes if they would, if successful, yield the ***same relief***, even if other slight differences between them exist." *Hudson v. AFGE*, No. 22-cv-289, 2022 WL 16551322, at *6 (D.D.C. Oct. 31, 2022) (emphasis added).

***First***, FLRA's available remedies for ULPs are only what it describes as "make-whole."[13] This includes, FLRA says, "reinstatement and backpay for discharged employees, rescission of the action at issue, and informational remedies, such as the posting (including electronic posting) of a notice in which the charged party promises not to violate the law."[14] 5 U.S.C. § 7118(a)(7). Significantly, FLRA explains that it "may not assess penalties."[15]

In contrast, Title VII and the ADA permit awards of compensatory and punitive damages in cases of intentional discrimination (as here). 42 U.S.C. § 1981a(a)(1)–(2), (b); *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 529 (1999) ("Under the terms of the Civil Rights Act of 1991, punitive damages are available in claims under Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act of 1990.") (cleaned up). This demonstrates an entirely different congressional purpose than ULP

---

[13] FLRA, ULP Frequently Asked Questions (FAQs), https://www.flra.gov/resources-training/resources/information-case-type/ulp-resources/ulp-frequently-asked-questions-faqs#:~:text=The%20FLRA%20may%20order%20make,not%20to%20violate%20the%20law [https://perma.cc/57D9-3PLA] (last visited Feb. 9, 2024).

[14] *Id.*

[15] *Id.*

remedies. *See, e.g.*, *McKennon v. Nashville Banner Publ'g Co.*, 513 U.S. 352, 358 (1995).

> Congress designed the remedial measures in these statutes to serve as a "spur or catalyst" to cause employers "to self-examine and to self-evaluate their employment practices and to endeavor to eliminate, so far as possible, the last vestiges" of discrimination. Deterrence is one object of these statutes. Compensation for injuries caused by the prohibited discrimination is another.

*Id.* (citations omitted); *see also Alexander*, 415 U.S. at 45 ("[T]he private litigant [in Title VII cases] not only redresses his own injury but also vindicates the important congressional policy against discriminatory employment practices[.]").

*Second*, individuals may not recover counsel fees from unions at FLRA even if they prevail; only charged unions can, and only if they prevail over FLRA's general counsel. *E.g.*, 5 C.F.R. § 2430.1 (counsel fees may be awarded pursuant to the Equal Access to Justice Act only when "[a]n eligible party . . . prevails over the General Counsel" of FLRA); 5 C.F.R. § 2430.2(b). On the other hand, Title VII and the ADA permit a "prevailing party" to be awarded counsel fees—even without a merits victory. 42 U.S.C. § 2000e-5(k); 42 U.S.C. § 12205; *see CRST Van Expedited, Inc. v. EEOC*, 578 U.S. 419, 421 (2016) ("[A] favorable ruling

on the merits is not a necessary predicate to find that a defendant has prevailed."). The disparity in treatment would further frustrate federal employees' ability to vindicate meritorious discrimination claims because of their inability to secure counsel.

> When the Civil Rights Act of 1964 was passed, it was evident that enforcement would prove difficult and that the Nation would have to rely in part upon private litigation as a means of securing broad compliance with the law. . . . If successful plaintiffs were routinely forced to bear their own attorneys' fees, few aggrieved parties would be in a position to advance the public interest by invoking the injunctive powers of the federal courts. Congress therefore enacted the provision for counsel fees—not simply to penalize litigants who deliberately advance arguments they know to be untenable but, more broadly, to encourage individuals injured by racial discrimination to seek judicial relief under Title II.

*Newman v. Piggie Park Enters., Inc.*, 390 U.S. 400, 401–02 (1968).

**Third and finally**, the CSRA requires ULP charges to be filed within six months, 5 U.S.C. § 7118(a)(4)(A), and FLRA does not recognize the concept of continuing violations. *EEOC v. AFGE Loc. 3637*, 53 FLRA 487 (1997) ("The Authority has not subsequently applied a continuing violation theory in ULP cases."). FLRA dismissed Lucas's ULP charges in part for this reason. *See* 777 Mot. Dismiss Exs. 4–5 (JA110–16). It

refused to recognize that AFGE committed a ULP by continuing to delay Lucas's arbitration rather than in a single act. Instead it pinpointed a single occurrence and dismissed her ULP charges as untimely because they were filed more than six months after FLRA's chosen date.

In comparison, in many cases (including here because Lucas worked in Washington, DC, a deferral jurisdiction[16]) Title VII and ADA claims may be filed within 300 days, and continuing violations are recognized. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002).

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The "unlawful employment practice" therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own. Such claims are based on the cumulative effect of individual acts.

*Id.* (citations omitted).

FLRA recognized that one of Lucas's alleged violations occurred within its six-month statute of limitations. But it still opted not to issue

---

[16] "Under Title VII, the District of Columbia is a deferral jurisdiction for purposes of processing discrimination complaints." *Palmer v. Barry*, 894 F.2d 449, 451 n.2 (D.C. Cir. 1990).

a complaint for her because, according to FLRA, Lucas was no longer an "employee" within the meaning of the CSRA at the time it occurred. "[T]he 'employee' rights protected under Section 7102 did not apply to [her] and the Union could not have committed a violation of the [FSLMRS]." 777 Mot. Dismiss, Ex. 4 at 3 (JA112). With neither FLRA nor the district court willing to hear her claims, Lucas was left with ***no*** forum for redress.

When put into perspective with the lack of damages or counsel fees available at FLRA, the district court's rule that only FLRA can enforce anti-discrimination laws (transmogrified as ULPs) when they involve a federal union puts federal employees in a marked remedial gap compared to everyone else in the country (including anyone not part of a bargaining unit these unions represent). Most likely unable to obtain counsel, they must attempt to decipher FLRA's byzantine ULP process *pro se* in a matter of months after the first even potentially discriminatory act takes place and file a charge (that, as discussed *supra*, is almost certain to fail). And in the case of a union discriminating against a federal employee after his or her employment is terminated (such as during a post-termination grievance procedure), or in a case where an employee resigns because of

discrimination (as here), the district court's holding would mean that neither FLRA nor the district court has jurisdiction. The district court created a black hole: an entire disfavored class of potentially millions of people who have no forum to vindicate discrimination claims—a class that contains some of those ***most*** deserving of protection, such as veterans like Lucas. *See Axon*, 598 U.S. at 186 (2023) (describing the *Thunder Basin* factors: "First, could precluding district court jurisdiction foreclose all meaningful judicial review of the claim? Next, is the claim wholly collateral to the statute's review provisions"? And last, is the claim outside the agency's expertise? When the answer to all three questions is yes, we presume that Congress does not intend to limit jurisdiction.").

The generally applicable anti-discrimination laws neither admit of nor require such a dramatic handicap for federal servants individually— nor for the irreducible goal of eradicating discrimination generally that civil rights lawsuits are designed to vindicate. *See Alexander*, 415 U.S. at 58 n.19 ("[A] breach of the union's duty of fair representation may prove difficult to establish. In this respect, it is noteworthy that Congress thought it necessary to afford the protections of Title VII against unions as well as employers.") (cleaned up); *Hudson*, 2022 WL 16551322, at *6

("[C]ourts must consider claims through the perspective of the requested relief in order to answer the preemption question.") (citing *Elgin v. Dep't Treasury*, 567 U.S. 1 (2012)).

## II. FEDERAL COURTS HAVE JURISDICTION OVER CLAIMS AGAINST FEDERAL-SECTOR UNIONS UNDER THE ANTI-RETALIATION PROVISION OF THE FAIR LABOR STANDARDS ACT

### A. Congress's Policy of Providing Maximum Protection Against Retaliation for Reporting Violations of the FLSA Demonstrates That Claims for Retaliation Are Not Preempted by the CSRA

In her second lawsuit, Lucas brought an FLSA retaliation claim against AFGE and two individual defendants: Green and Kelly. 1540 Compl. ¶¶ 17–18, 63–78 (JA360–61, 366–68). The district court found this claim "preclude[d] . . . [by] the CSRA" for essentially the same reason as Lucas's Title VII and ADA claims: because they arose from a set of facts that might also implicate AFGE's duty of fair representation, the CSRA is the exclusive means of relief. Op. at 19–20 (JA557–58).

This was likewise incorrect. As with Title VII and the ADA, the CSRA does not extinguish Lucas's FLSA claims simply because there is some factual overlap between those claims and a ULP charge based on AFGE's duty of fair representation. Rather, for the CSRA to have preclusive effect, the FLSA retaliation claim asserted by Lucas must be

"of the type Congress intended to be reviewed" under the CSRA. *AFGE v. Trump*, 929 F.3d 748, 754 (D.C. Cir. 2019). Allowing the CSRA to swallow all FLSA retaliation claims brought against federal-sector unions would thwart the well-established congressional policy of providing robust protection for would-be reporters of employment discrimination. The district court failed to even consider this policy, instead summarily assuming preclusion of Lucas's retaliation claim. *See* Op. at 19–20 (JA557–58). Because that result is untenable and does not reflect the will of Congress, it must be reversed.

In the broadest possible terms, the FLSA prohibits retaliation against employees who assert their rights under that law:

> It shall be unlawful for ***any person*** . . . to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter . . . .

29 U.S.C. § 215(a)(3) (cleaned up) (emphasis added). In turn, the Act defines "person" to mean any "individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons." 29 U.S.C. § 203(a). Courts have contrasted the anti-retaliation provision's broad application to "any person" with FLSA's

40

wage and hour provisions, which only apply to "employers." *See Arias v. Raimondo*, 860 F.3d 1185, 1189–92 (9th Cir. 2017) (discussing differences in language and purpose between retaliation and substantive provisions of FLSA); *Sapperstein v. Hager*, 188 F.3d 852, 856 (7th Cir. 1999) (retaliation provision provided "alternative basis for subject matter jurisdiction" where plaintiff could not prove defendant met FLSA's definition of "employer"). Notably, in *Bowe v. Judson C. Burns, Inc.*, 137 F.2d 37, 39 (3d Cir. 1943), the Third Circuit found the retaliation provision "broad enough to include a union [and] its officers . . . ."

The sweeping breadth of this provision is intentional. By expanding liability for retaliation to virtually any individual or organization, the statute provides the protection necessary to ensure workers feel safe to report violations. *See Arias*, 860 F.3d at 1190 (observing that the broad scope of FLSA Section 15 helps "maintain access to statutory remedial mechanisms") (cleaned up) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997)); *Sapperstein*, 188 F.3d at 857 ("Congress . . . wanted to encourage reporting of suspected violations by extending protection to employees who filed complaints [or] instituted proceedings . . . ."). This policy is an essential component of the broader family of employment

discrimination statutes, of which the FLSA is a part. *See Burlington N. & Sante Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006) ("Title VII depends for its enforcement upon the cooperation of employees who are willing to file complaints and act as witnesses."); *see also Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008) (noting the "almost uniform practice of courts in considering the authoritative body of Title VII case law when interpreting the comparable provisions of other federal statutes," including the FLSA).

This far-reaching anti-retaliation policy, as well as its specific expression in the broad text of Section 15 of the FLSA, demonstrate that Congress did not intend the CSRA to preclude FLSA retaliation claims against federal-sector unions. Indeed, this policy will be thwarted altogether for a substantial class of defendants if this Court deems these claims subsumed by the CSRA. Such a substantial carve-out from a bedrock principle of employment discrimination law should not be lightly assumed—yet that is exactly what the district court did. Op. at 19–20 (JA557–58) (dismissing FLSA claim with minimal analysis).

### B. Substantive Differences Between FLSA Retaliation and a ULP Based on the Duty of Fair Representation Also Show Congress Did Not Intend to Foreclose Retaliation Claims Against Federal-Sector Unions

Much like Title VII and the ADA, the CSRA does not preclude Lucas's FLSA claims because of stark substantive and remedial differences between an FLSA retaliation claim and a ULP charge based on the duty of fair representation. Indeed, the substantive gap between the two causes of action is even wider than with Title VII and the ADA. To prove FLSA retaliation, the plaintiff must show:

> (1) he made an FLSA complaint or otherwise engaged in protected conduct; (2) the defendant was aware that he had engaged in protected activity; (3) the defendant took an action that was materially adverse to the complainant and sufficient to dissuade a reasonable employee from further protected activity; and that (4) there was a causal relationship between the two.

*Benton v. Laborers' Joint Training Fund*, 121 F. Supp. 3d 41, 55 (D.D.C. 2015) (citation omitted). The range of "adverse actions" that qualify as FLSA retaliation is much broader than the conduct proscribed by the duty of fair representation. *Cf. Cooke v. Rosenker*, 601 F. Supp. 2d 64, (D.D.C. 2009) (adverse action for purposes of FLSA retaliation is anything that "could conceivably dissuade a reasonable worker from

making or supporting a charge of discrimination"). The latter is only implicated by actions taken in a union's "representative role"—that is, when it acts as a representative of the employees of a bargaining unit. *O'Neill*, 499 U.S. at 77; *see also In re Antilles Consol. Educ. Ass'n*, 36 FLRA 776, 788 (1990).[17] Thus, for example, a union officer could falsely report that an employee used illegal drugs to get her fired, or at least investigated, without violating the duty of fair representation. But if this same conduct were motivated by the employee filing a FLSA complaint, it would be actionable under Section 215. Again, this breadth is intentional—courts have recognized that enforcement of employment discrimination statutes "depends . . . upon the cooperation of employees who are willing to file complaints and act as witnesses." *Burlington N.*, 548 U.S. at 67. That can be achieved only through broad protection against retaliation, even by unions that are supposed to take the affected employee's interests to heart.

Another important substantive difference is the deference unions receive when defending against duty of fair representation claims. Courts

---

[17] "[T]he duty to fairly represent unit members under section 7114(a)(1) of the [FLMRS] applies only to activities undertaken by a labor union as exclusive representative."

and administrative tribunals presume individual union decisions are free from discriminatory animus and place a heavy burden on plaintiffs to prove otherwise. *See O'Neill*, 499 U.S. at 78 ("Any substantive examination of a union's performance . . . must be highly deferential . . . ."). That is not the case with FLSA retaliation, where defendants are put to their proof just like any other employment discrimination defendant. *Cooke*, 601 F. Supp. 2d at 78 (describing FLSA defendant's burden of proof under the "*McDonnell Douglas*" burden-shifting framework).

## CONCLUSION

The district court's judgments should be reversed and the cases remanded for proceedings on the merits.

Respectfully submitted,

**NIA LUCAS**
**By Counsel**

May 24, 2024

**/s/ David R. Dorey**

David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

The undersigned hereby certifies the following:

1.  This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7). It contains 9,165 words according to the word processing system used to prepare this brief.

2.  This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Respectfully submitted,

May 24, 2024

**/s/ David R. Dorey**
David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

**PROOF OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing brief

has been served on this date via USPS Priority Mail as follows:

Johnnie D. Green, *pro se*
6606 Bluebird Drive
Little Rock, Arkansas 72205


Respectfully submitted,

May 24, 2024

**/s/ David R. Dorey**
David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

**ADDENDUM**
**PERTINENT STATUTES AND REGULATIONS**
**Pursuant to D.C. Circuit Rule 28(a)(5)**

# TABLE OF CONTENTS

**Citation**                                                         **Page**

5 U.S.C. § 2302(a)(2)(A) .................................................................... Add-1

5 U.S.C. § 7104(f)(1) ......................................................................... Add-3

5 U.S.C. § 7114(a)(1) ......................................................................... Add-4

5 U.S.C. § 7116(a)–(c) ....................................................................... Add-5

5 U.S.C. § 7118(a)(1), (4)(A), (7) ...................................................... Add-8

5 U.S.C. § 7123(a) ............................................................................ Add-10

29 U.S.C. § 203(a) ............................................................................ Add-11

29 U.S.C. § 215(a)(3) ....................................................................... Add-12

42 U.S.C. § 1981a(a)–(b), (d) ........................................................... Add-13

42 U.S.C. § 2000e-2(c)(1)–(3) .......................................................... Add-17

42 U.S.C. § 2000e-3 ......................................................................... Add-18

42 U.S.C. § 2000e-5(k) ..................................................................... Add-19

42 U.S.C. § 12112(a)–(b) .................................................................. Add-20

42 U.S.C. § 12205 ............................................................................ Add-22

5 C.F.R. § 2423.10(a) ....................................................................... Add-23

5 C.F.R. § 2423.11(a), (c), (f)–(g) ..................................................... Add-24

5 C.F.R. § 2423.32 ........................................................................... Add-26

5 C.F.R. § 2430.1 ............................................................................. Add-27

5 C.F.R. § 2430.2(b) ........................................................................ Add-28

# 5 U.S.C. § 2302

## § 2302. Prohibited personnel practices

\* \* \*

(2) For the purpose of this section—

(A) "personnel action" means—

(i) an appointment;

(ii) a promotion;

(iii) an action under chapter 75 of this title or other disciplinary or corrective action;

(iv) a detail, transfer, or reassignment;

(v) a reinstatement;

(vi) a restoration;

(vii) a reemployment;

(viii) a performance evaluation under chapter 43 of this title or under title 38;

(ix) a decision concerning pay, benefits, or awards, or concerning education or training if the education or training may reasonably be expected to lead to an appointment, promotion, performance evaluation, or other action described in this subparagraph;

(x) a decision to order psychiatric testing or examination;

(xi) the implementation or enforcement of any nondisclosure policy, form, or agreement; and

(xii) any other significant change in duties, responsibilities, or working conditions;

with respect to an employee in, or applicant for, a covered position in an agency, and in the case of an alleged prohibited personnel practice described in subsection (b)(8), an employee or applicant for employment in a Government corporation as defined in section 9101 of title 31;

* * *

# 5 U.S.C. § 7104

## § 7104. Federal Labor Relations Authority

\* \* \*

(f)(1) The General Counsel of the Authority shall be appointed by the President, by and with the advice and consent of the Senate, for a term of 5 years. The General Counsel may be removed at any time by the President. The General Counsel shall hold no other office or position in the Government of the United States except as provided by law.

\* \* \*

# 5 U.S.C. § 7114

## § 7114. Representation rights and duties

\* \* \*

(a)(1) A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.

\* \* \*

# 5 U.S.C. § 7116

## § 7116. Unfair labor practices

(a) For the purpose of this chapter, it shall be an unfair labor practice for an agency—

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

(3) to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status;

(4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter;

(5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

(7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of this title) which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

(8) to otherwise fail or refuse to comply with any provision of this chapter.

(b) For the purpose of this chapter, it shall be an unfair labor practice for a labor organization—

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to cause or attempt to cause an agency to discriminate against any employee in the exercise by the employee of any right under this chapter;

(3) to coerce, discipline, fine, or attempt to coerce a member of the labor organization as punishment, reprisal, or for the purpose of hindering or impeding the member's work performance or productivity as an employee or the discharge of the member's duties as an employee;

(4) to discriminate against an employee with regard to the terms or conditions of membership in the labor organization on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition;

(5) to refuse to consult or negotiate in good faith with an agency as required by this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

(7)(A) to call, or participate in, a strike, work stoppage, or slowdown, or picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations, or

(B) to condone any activity described in subparagraph (A) of this paragraph by failing to take action to prevent or stop such activity; or

(8) to otherwise fail or refuse to comply with any provision of this chapter.

Nothing in paragraph (7) of this subsection shall result in any informational picketing which does not interfere with an agency's operations being considered as an unfair labor practice.

(c) For the purpose of this chapter it shall be an unfair labor practice for an exclusive representative to deny membership to any employee in the appropriate unit represented by such exclusive representative except for failure—

(1) to meet reasonable occupational standards uniformly required for admission, or

(2) to tender dues uniformly required as a condition of acquiring and retaining membership.

This subsection does not preclude any labor organization from enforcing discipline in accordance with procedures under its constitution or bylaws to the extent consistent with the provisions of this chapter.

* * *

## § 7118. Prevention of unfair labor practices

(a)(1) If any agency or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the agency or labor organization a complaint. In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint.

* * *

(4)(A) Except as provided in subparagraph (B) of this paragraph, no complaint shall be issued based on any alleged unfair labor practice which occurred more than 6 months before the filing of the charge with the Authority.

* * *

(7) If the Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) determines after any hearing on a complaint under paragraph (5) of this subsection that the preponderance of the evidence received demonstrates that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings of fact and shall issue and cause to be served on the agency or labor organization an order—

> (A) to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;

> (B) requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;

(C) requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or

(D) including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.

If any such order requires reinstatement of an employee with backpay, backpay may be required of the agency (as provided in section 5596 of this title) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.

* * *

## § 7123. Judicial review; enforcement

(a) Any person aggrieved by any final order of the Authority other than an order under—

> (1) section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or

> (2) section 7112 of this title (involving an appropriate unit determination),

may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.

\* \* \*

## § 203. Definitions

As used in this chapter—

(a) "Person" means an individual, partnership, association, corporation, business trust, legal representative, or any organized group of persons.

* * *

## § 215. Prohibited acts; prima facie evidence

(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

* * *

    (3) to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;

* * *

# 42 U.S.C. § 1981a

## § 1981a. Damages in cases of intentional discrimination in employment

(a) Right of recovery

    (1) Civil rights

    In an action brought by a complaining party under section 706 or 717 of the Civil Rights Act of 1964 against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) prohibited under section 703, 704, or 717 of the Act, and provided that the complaining party cannot recover under section 1981 of this title, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

    (2) Disability

    In an action brought by a complaining party under the powers, remedies, and procedures set forth in section 706 or 717 of the Civil Rights Act of 1964 (as provided in section 107(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12117(a)), and section 794a(a)(1) of Title 29, respectively) against a respondent who engaged in unlawful intentional discrimination (not an employment practice that is unlawful because of its disparate impact) under section 791 of Title 29 and the regulations implementing section 791 of Title 29, or who violated the requirements of section 791 of Title 29 or the regulations implementing section 791 of Title 29 concerning the provision of a reasonable accommodation, or section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112), or committed a violation of section 102(b)(5) of the Act, against an individual, the complaining party may recover compensatory and punitive damages as allowed in subsection (b), in addition to any relief

authorized by section 706(g) of the Civil Rights Act of 1964, from the respondent.

(3) Reasonable accommodation and good faith effort

In cases where a discriminatory practice involves the provision of a reasonable accommodation pursuant to section 102(b)(5) of the Americans with Disabilities Act of 1990 or regulations implementing section 791 of Title 29, damages may not be awarded under this section where the covered entity demonstrates good faith efforts, in consultation with the person with the disability who has informed the covered entity that accommodation is needed, to identify and make a reasonable accommodation that would provide such individual with an equally effective opportunity and would not cause an undue hardship on the operation of the business.

(b) Compensatory and punitive damages

(1) Determination of punitive damages

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual.

(2) Exclusions from compensatory damages

Compensatory damages awarded under this section shall not include backpay, interest on backpay, or any other type of relief authorized under section 706(g) of the Civil Rights Act of 1964.

(3) Limitations

The sum of the amount of compensatory damages awarded under this section for future pecuniary losses, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, and the amount of punitive damages awarded under this section, shall not exceed, for each complaining party—

> (A) in the case of a respondent who has more than 14 and fewer than 101 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $50,000;

> (B) in the case of a respondent who has more than 100 and fewer than 201 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $100,000; and

> (C) in the case of a respondent who has more than 200 and fewer than 501 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $200,000; and

> (D) in the case of a respondent who has more than 500 employees in each of 20 or more calendar weeks in the current or preceding calendar year, $300,000.

(4) Construction

Nothing in this section shall be construed to limit the scope of, or the relief available under, section 1981 of this title.

* * *

(d) Definitions

As used in this section:

(1) Complaining party

The term "complaining party" means—

(A) in the case of a person seeking to bring an action under subsection (a)(1), the Equal Employment Opportunity Commission, the Attorney General, or a person who may bring an action or proceeding under title VII of the Civil Rights Act of 1964 (42 U.S.C. 2000e et seq.); or

(B) in the case of a person seeking to bring an action under subsection (a)(2), the Equal Employment Opportunity Commission, the Attorney General, a person who may bring an action or proceeding under section 794a(a)(1) of Title 29, or a person who may bring an action or proceeding under title I of the Americans with Disabilities Act of 1990.

(2) Discriminatory practice

The term "discriminatory practice" means the discrimination described in paragraph (1), or the discrimination or the violation described in paragraph (2), of subsection (a).

# 42 U.S.C. § 2000e-2

## § 2000e-2. Unlawful employment practices

\* \* \*

(c) Labor organization practices

It shall be an unlawful employment practice for a labor organization—

(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex, or national origin; or

(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.

\* \* \*

## § 2000e-3. Other unlawful employment practices

(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings

It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

(b) Printing or publication of notices or advertisements indicating prohibited preference, limitation, specification, or discrimination; occupational qualification exception

It shall be an unlawful employment practice for an employer, labor organization, employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to print or publish or cause to be printed or published any notice or advertisement relating to employment by such an employer or membership in or any classification or referral for employment by such a labor organization, or relating to any classification or referral for employment by such an employment agency, or relating to admission to, or employment in, any program established to provide apprenticeship or other training by such a joint labor-management committee, indicating any preference, limitation, specification, or discrimination, based on race, color, religion, sex, or national origin, except that such a notice or advertisement may indicate a preference, limitation, specification, or discrimination based on religion, sex, or national origin when religion, sex, or national origin is a bona fide occupational qualification for employment.

## § 2000e-5. Enforcement provisions

\* \* \*

(k) Attorney's fee; liability of Commission and United States for costs

In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.

\* \* \*

## § 12112. Discrimination

(a) General rule

No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

(b) Construction

As used in subsection (a), the term "discriminate against a qualified individual on the basis of disability" includes—

   (1) limiting, segregating, or classifying a job applicant or employee in a way that adversely affects the opportunities or status of such applicant or employee because of the disability of such applicant or employee;

   (2) participating in a contractual or other arrangement or relationship that has the effect of subjecting a covered entity's qualified applicant or employee with a disability to the discrimination prohibited by this subchapter (such relationship includes a relationship with an employment or referral agency, labor union, an organization providing fringe benefits to an employee of the covered entity, or an organization providing training and apprenticeship programs);

   (3) utilizing standards, criteria, or methods of administration—

      (A) that have the effect of discrimination on the basis of disability; or

      (B) that perpetuate the discrimination of others who are subject to common administrative control;

(4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association;

(5)(A) not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity; or

(B) denying employment opportunities to a job applicant or employee who is an otherwise qualified individual with a disability, if such denial is based on the need of such covered entity to make reasonable accommodation to the physical or mental impairments of the employee or applicant;

(6) using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity; and

(7) failing to select and administer tests concerning employment in the most effective manner to ensure that, when such test is administered to a job applicant or employee who has a disability that impairs sensory, manual, or speaking skills, such test results accurately reflect the skills, aptitude, or whatever other factor of such applicant or employee that such test purports to measure, rather than reflecting the impaired sensory, manual, or speaking skills of such employee or applicant (except where such skills are the factors that the test purports to measure).

\* \* \*

## § 12205. Attorney's fees

In any action or administrative proceeding commenced pursuant to this chapter, the court or agency, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee, including litigation expenses, and costs, and the United States shall be liable for the foregoing the same as a private individual.

# 5 C.F.R. § 2423.10

## § 2423.10. What actions may the Regional Director take with regard to your charge?

(a) Regional Director action. The Regional Director, on behalf of the General Counsel, may take any of the following actions, as appropriate:

    (1) Approve a request to withdraw a charge;

    (2) Dismiss a charge;

    (3) Approve a written settlement agreement under § 2423.12;

    (4) Issue a complaint; or

    (5) Withdraw a complaint.

\* \* \*

## § 2423.11. What happens if a Regional Director decides not to issue a complaint?

(a) Opportunity to withdraw a charge. If the Regional Director determines that the charge has not been timely filed, that the charge fails to state an unfair labor practice, or for other appropriate reasons, the Regional Director may request the Charging Party to withdraw the charge.

* * *

(c) Appeal of a dismissal letter. The Charging Party may obtain review of the Regional Director's decision to dismiss a charge by filing an appeal with the General Counsel, either in writing or by email to ogc.appeals@flra.gov, within 25 days after the Regional Director served the decision. A Charging Party must serve a copy of the appeal on the Regional Director. The General Counsel must serve notice on the Charged Party that the Charging Party has filed an appeal.

* * *

(f) General Counsel action. The General Counsel may deny the appeal of the Regional Director's dismissal of the charge, or may grant the appeal and remand the case to the Regional Director to take further action. The General Counsel's decision on the appeal states the grounds listed in paragraph (e) of this section for denying or granting the appeal, and is served on all the parties. Absent a timely motion for reconsideration, the General Counsel's decision is final.

(g) Reconsideration. After the General Counsel issues a final decision, the Charging Party may move for reconsideration of the final decision if it can establish extraordinary circumstances in its moving papers. The motion must be filed within 10 days after the date on which the General Counsel's final decision is postmarked. A motion for reconsideration must state with particularity the extraordinary circumstances claimed and

must be supported by appropriate citations. The decision of the General Counsel on a motion for reconsideration is final.

## § 2423.32. Burden of proof before the Administrative Law Judge.

The General Counsel shall present the evidence in support of the complaint and have the burden of proving the allegations of the complaint by a preponderance of the evidence. The Respondent shall have the burden of proving any affirmative defenses that it raises to the allegations in the complaint.

## § 2430.1. Purpose.

The Equal Assess to Justice Act, 5 U.S.C. 504, provides for the award of attorney, agent, or witness fees and other expenses to eligible individuals and entities who are parties to Authority adversary adjudications. An eligible party may receive an award when it prevails over the General Counsel, unless the General Counsel's position in the proceeding was substantially justified, or special circumstances make an award unjust. The rules in this part describe the parties eligible for awards, and the Authority proceeding that is covered. They also set forth the procedures for applying for such awards, and the procedures by which the Authority will rule on such applications.

## § 2430.2. Proceedings affected; eligibility for award.

* * *

(b) A respondent in an unfair labor proceeding which has prevailed in the proceeding, or in a significant and discrete portion of the proceeding, and who otherwise meets the eligibility requirements of this section, is eligible to apply for an award of attorneys fees and other expenses allowable under the provisions of § 2430.4 of these rules.

> (1) Applicants eligible to receive an award in proceedings conducted by the Authority are any partnership, corporation, association, or public or private organization with a net worth of not more than $5 million ($7 million in cases involving adversary adjudications pending on or commenced on or after August 5, 1985) and not more than 500 employees.

> (2) For the purpose of eligibility, the net worth and number of employees of an applicant shall be determined as of the date the complaint was issued.

> (3) The employees of an applicant include all persons who regularly perform services for remuneration for the applicant, under the applicant's direction and control. Part-time employees shall be included on a proportional basis.

> (4) An applicant that participates in a proceeding primarily on behalf of one or more other persons or entities that would be ineligible is not itself eligible for an award.