# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰 for the 𝔇𝔦𝔰𝔱𝔯𝔦𝔠𝔱 𝔬𝔣 𝔆𝔬𝔩𝔲𝔪𝔟𝔦𝔞 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

———————

No. 23-7051

———————

NIA LUCAS,
*Plaintiff-Appellant,*

v.

AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES & AMERICAN
FEDERATION OF GOVERNMENT EMPLOYEES LOCAL 228,
*Defendants-Appellees.*

———————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————

**FINAL REPLY BRIEF OF APPELLANT**

Brian Wolfman
Regina Wang
GEORGETOWN LAW APPELLATE
COURTS IMMERSION CLINIC
600 New Jersey Avenue, NW
Suite 312
Washington, DC 20001
Phone: 202.661.6582

David R. Dorey
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

*Counsel for Plaintiff-Appellant Lucas*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ......................................................................ii

INTRODUCTION AND SUMMARY OF ARGUMENT ...........................1

ARGUMENT ............................................................................................2

    I.    THE CSRA'S TEXT AND STRUCTURE INCLUDE NO FAIRLY DISCERNABLE PREEMPTION OF GENERALLY APPLICABLE ANTI-DISCRIMINATION LAWS.................................................................2

    II.   THE *THUNDER BASIN* STEP-TWO FACTORS ALL POINT TO DISTRICT-COURT JURISDICTION .................................................8

    III.  TORT LAW IS THE SINGLE APPROPRIATE ANALOGUE FOR DISCRIMINATION CLAIMS..........................................................16

    IV.  UNIONS MAY BE HELD LIABLE FOR SEXUAL HARASSMENT .........18

    V.   UNION OFFICERS ARE PERSONALLY LIABLE FOR RETALIATION ...23

CONCLUSION .......................................................................................25

# TABLE OF AUTHORITIES[*]

## Cases

*Abreu v. Howard Univ.*,
93 F.4th 498 (D.C. Cir. 2024) ............................................................ 18

*AFGE v. Sec'y of the Air Force*,
716 F.3d 633 (2013) ........................................................................... 15

*AFGE v. Trump*,
929 F.3d 748 (2019) ........................................................................... 14

*Ark. Dairy Coop Ass'n, Inc. v. USDA*,
573 F.3d 815 (D.C. Cir. 2009) .............................................................. 4

*Atkinson v. Sinclair Refining Co.*,
370 U.S. 238 (1962) ........................................................................... 23

*Axon Enterprises Inc. v. FTC*,
598 U.S. 175 (2023) ............................................ 8, 9, 10, 12, 13, 21

*Children's Hosp. Ass'n of Tex. v. Azar*,
933 F.3d 764 (D.C. Cir. 2019) .............................................................. 7

*Cmty. Oncology All., Inc. v. OMB*,
987 F.3d 1137 (D.C. Cir. 2021) ......................................................... 7–8

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
596 U.S. 212 (2022) ...................................................................... 17, 18

*Dixon v. Int'l Bhd. of Police Officers*,
504 F.3d 73 (1st Cir. 2007) ............................................................ 21–22

*Doe v. SEC*,
28 F.4th 1306 (D.C. Cir. 2022) ............................................................ 5

*EEOC v. Pipefitters Ass'n Loc. Union 597*,
334 F.3d 656 (7th Cir. 2003) .............................................................. 22

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Elgin v. Dep't of the Treasury,*
567 U.S. 1 (2012) ................................................... 15

*Eliserio v. USW, Loc. 310,*
398 F.3d 1071 (8th Cir. 2005) .................................. 2

*Epic Sys. Corp. v. Lewis,*
584 U.S. 497 (2018) ............................................... 3

*Fed. Law Enf't Officers Ass'n v. Ahuja,*
62 F.4th 551, 558 (D.C. Cir. 2023) ..................... 3, 8

*Felice v. Sever,*
985 F.2d 1221 (3d Cir. 1993) ................................ 24

*Free Enter. Fund PCAOB,*
561 U.S. 477 (2010) .............................................. 10

*Goodman v. Lukens Steel Co.,*
482 U.S. 656 (1987) .......................................... 16–17

*Freeman v. Loc. Union No. 135 Chauffeurs,*
746 F.2d 1316 (7th Cir. 1984) .............................. 11

*Int'l Bhd. of Teamsters, etc. v. NLRB,*
587 F.2d 1176 (D.C. Cir. 1978) ............................ 11

*Karahalios v. Nat'l Fed'n of Fed. Emps., Loc. 1263,*
489 U.S. 527 (1989) ............................................. 5, 6

*Kolinske v. Lubbers,*
712 F.2d 471 (D.C. Cir. 1983) .............................. 11

*Lingle v. Norge Div. of Magic Chef,*
486 U.S. 399 (1988) .............................................. 24

*McDonnell Douglas Corp. v. Green,*
411 U.S. 792 (1973) ................................................ 5

*Meritor Savings Bank, FSB v. Vinson,*
477 U.S. 57 (1986) ............................................ 19, 21

*Montplaisir v. Leighton,*
875 F.2d 1 (1st Cir. 1989) .................................... 24

iii

*Price Waterhouse v. Hopkins*,
  490 U.S. 228 (1989) ............................................................ 17

*Scott v. City of N.Y. Dep't of Corrections*,
  641 F. Supp. 2d 211 (S.D.N.Y. 2009) ................................ 20

*Stafford v. George Wash. Univ.*,
  56 F.4th 50 (D.C. Cir. 2022) ............................... 17–18, 18

*Stelly v. W. Gulf Maritime Ass'n*,
  407 F. Supp. 3d 673 (S.D. Tex. 2019) ................................ 20

\*Thunder Basin Coal v. Reich*,
  510 U.S. 200 (1994) ....................................... 1, 3, 8, 10, 13

*Turgeon v. FLRA*,
  677 F.2d 937 (D.C. Cir. 1982) ....................................... 9–10

*United States v. Long*,
  997 F.3d 342 (D.C. Cir. 2021) ............................................ 4

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
  570 U.S. 338 (2013) ......................................................... 17

*Walter Irving Banks v. Int'l Union of Operating Eng'rs Loc. 99*,
  200 F. Supp. 3d 70 (D.D.C. 2016) ...................................... 3

## Statutes and Regulations

5 U.S.C. § 2302(a)(1) ........................................................ 7
5 U.S.C. § 2302(b)(1)(A)–(D) .......................................... 7
5 U.S.C. § 2302(d) ............................................................ 7
5 U.S.C. § 7122(a)(1) ...................................................... 13
5 U.S.C. § 7123(a) ............................................................ 9
29 U.S.C. § 185 .............................................................. 23
29 U.S.C. § 215(a)(3) ...................................................... 25
42 U.S.C. § 2000e–2(a)(1) .......................................... 18, 19
42 U.S.C. § 2000e–2(c)(1) ....................................... 4, 18, 19
42 U.S.C. § 2000e–5(f)(1) ................................................ 4

iv

**Other Authorities**

EEOC, *Enforcement Guidance on Harassment in the Workplace* (Apr. 29, 2024), *available at* https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace#_ftn118 .............................................. 21

## INTRODUCTION AND SUMMARY OF ARGUMENT

Overlapping, non-exclusive remedies are a well-established bedrock of federal anti-discrimination law. Flouting that law, the union's brief declares that federal-sector unions—and only federal-sector unions—have a special carve-out by which discrimination claims against them either must be fashioned into ULPs, or failing that, be nothing at all.

The union's remarkable position is unsupported by any authority, let alone a clear statement of congressional intent to create a disfavored class of millions of people who lack protection from and remedies for workplace discrimination perpetrated by union officials. Lacking any indication that Congress intended for the generally applicable, fundamental anti-discrimination laws to silently be so degraded, the Court should reverse the decisions below.

This conclusion is supported by application of the two-part test under *Thunder Basin Coal v. Reich*, 510 U.S. 200, 207 (1994): 1) there is no fairly discernible preemption of anti-discrimination laws in the CSRA; and 2) general anti-discrimination claims are not of the type Congress intended to be reviewed in the CSRA scheme. And that intentional tort

claims against federal unions are not preempted by the CSRA confirms that the wanton, reprehensible tort of intentional discrimination is no different.

Nor are unions exempt from harassment claims, which apply to unions in even more circumstances than employers given the expansive prohibitory language in Title VII that applies to union conduct. Finally, union officers are personally liable when they retaliate against individuals for asserting their rights under the FLSA.

## ARGUMENT

### I. THE CSRA'S TEXT AND STRUCTURE INCLUDE NO FAIRLY DISCERNABLE PREEMPTION OF GENERALLY APPLICABLE ANTI-DISCRIMINATION LAWS

The union agrees that overlapping fora and remedies are the settled norm of employment anti-discrimination, including with respect to private-sector unions. *E.g.*, Union Brief ("Br.") 19, 22. But it wants this Court to unearth a heretofore undiscovered chasm in those laws to create a federal-sector exemption for its benefit. The union says that is what Congress "believed," but it does not cite any authority for that sweeping conclusion. Br. 24. The absence of any authority should lead the Court to conclude that no exemption exists.

The first step of the test under *Thunder Basin* explains that "a statutory remedial scheme displaces district court review" only when "Congress's intent to allocate initial review exclusively to an administrative body is fairly discernible in the statutory scheme based on the statute's text, structure, and purpose." *Fed. Law Enf't Officers Ass'n v. Ahuja*, 62 F.4th 551, 558 (D.C. Cir. 2023) (cleaned up) (citing *Thunder Basin*, 510 U.S. at 207).

The union identifies nothing in the text of either the CSRA or anti-discrimination laws that says the former preempts the latter. It nonetheless seeks a holding that the CSRA implicitly abrogates generally applicable anti-discrimination laws and divests federal courts of jurisdiction. "A party seeking to suggest that two statutes cannot be harmonized, and that one displaces the other, bears the heavy burden of showing a clearly expressed congressional intention that such a result should follow." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up); *see also Walter Irving Banks v. Int'l Union of Operating Eng'rs Loc. 99*, 200 F. Supp. 3d 70, 75 (D.D.C. 2016) ("Defendants offer no authority for the proposition that federal anti-discrimination statutes are preempted by federal labor laws. Nor could they."). The sole textual

argument the union musters is that because a **different** section of the CSRA expressly preserves anti-discrimination claims against federal agencies, the lack of explicit preservation in the union section *ipso facto* means that discrimination claims are not preserved. That's wrong.

The union cannot show that Congress silently intended to exempt it from anti-discrimination laws. There is a "presumption that Congress legislates against and preserves existing law and background understandings." *United States v. Long*, 997 F.3d 342, 356 (D.C. Cir. 2021). One background understanding, the "general presumption in favor of judicial review," can be overcome "by specific language or specific legislative history that is a reliable indicator of congressional intent." *Ark. Dairy Coop Ass'n, Inc. v. USDA*, 573 F.3d 815, 823 (D.C. Cir. 2009). Title VII existed when the CSRA was enacted and creates district-court jurisdiction over discrimination claims against unions. 42 U.S.C. §§ 2000e–2(c)(1), 2000e–5(f)(1). And the union has identified no specific statutory language or legislative history that could overcome the presumption that Congress preserved that law and the judicial review it affords in enacting the CSRA.

The union, resisting this conclusion, points to the **absence** of specific language in the CSRA preserving a plaintiff's cause of action against her union under anti-discrimination laws as evidence that Congress intended to preempt it. Br. 24-25. The omission the union observes is meaningless because omissions in statutory text are "entirely dependent upon context." *Doe v. SEC*, 28 F.4th 1306, 1314 (D.C. Cir. 2022). The union supplies no context that could indicate the CSRA preempts general anti-discrimination laws—laws that "tolerate[] no . . . discrimination" at all in our society—for the special benefit of federal unions and to the detriment of millions of federal employees. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801 (1973). And there is none.

*Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527 (1989), does not point the other way as the union contends. *E.g.*, Br. 15. That case answered the question whether federal employees have a parallel right to bring duty of fair representation claims in federal court or an exclusive right to present them to FLRA via the CSRA. 489 U.S. at 529. The Supreme Court explained that before the CSRA's enactment federal employees had no right of judicial review for breach of the duty of fair representation, and the CSRA created for the

first time a right for federal employees to assert duty of fair representation claims as unfair labor practices with FLRA. *Id.* at 531. What Congress did not do at the same time was "furnish a parallel remedy in a federal district court to enforce the duty of fair representation" the CSRA created. *Id.* at 532 (observing the lack of "express suggestion" of congressional intent).

That is wholly different from the union's argument here that the CSRA **extinguished** extant rights federal employees had (and continue to have) under general anti-discrimination laws. *Karahalios* itself supports our point: FLRA was created to enforce "the duties imposed on agencies and unions by Title VII [of the CSRA], including the duty of fair representation," *id.* at 533, not the duties existing outside of the CSRA simply because the perpetrator happens to be a federal-sector union that is otherwise subject to FLRA's jurisdiction on certain issues.

Moreover, the union's argument runs headlong into the CSRA's framework, which strongly suggests why Congress's express preservation of anti-discrimination remedies against federal agencies— and agencies alone—made sense. That express preservation in 5 U.S.C. § 2302(d) comes after a long list of "prohibited personnel practice[s]" by

agencies including, among other things, discriminating against federal employees as otherwise prohibited by the general anti-discrimination laws. 5 U.S.C. § 2302(a)(1) (defining a "prohibited personnel practice" as anything described in § 2302(b)); 5 U.S.C. § 2302(b)(1)(A)–(D) (making it a "prohibited personnel practice" for an employee to discriminate against another employee or job applicant in violation of the Title VII, the ADEA, the FLSA, or the Rehabilitation Act). It is thus understandable for Congress to have clarified in § 2302(d) that simply because federal agency workplace discrimination is a prohibited personnel practice does not mean that it should be "construed to extinguish or lessen . . . any [other] right or remedy available" to employees or applicants under those very same anti-discrimination laws. 5 U.S.C. § 2302(d).

The presumption "that the presence of a phrase in one provision and its absence in another reveals Congress' design" "grows weaker with each difference in the formulation of the provisions under inspection." *Children's Hosp. Ass'n of Tex. v. Azar*, 933 F.3d 764, 771–72 (D.C. Cir. 2019); *cf. Cmty. Oncology All., Inc. v. OMB*, 987 F.3d 1137, 1141 (D.C. Cir. 2021) ("[W]e must presume that these different formulations—sharply juxtaposed in immediately adjacent causes of action—mean

something different."). The CSRA does not have an analogous prohibited personnel practice section for unions, so Congress didn't need to expressly preserve the general anti-discrimination laws for unions—and for Congress to do so would have been very odd because it would have been saving something that did not need to be saved. Accordingly, there is nothing "fairly discernable" in the statutory scheme that would require "initial review" of discrimination claims to take place at FLRA. *Ahuja*, 62 F.4th 551, 558.

## II. THE *THUNDER BASIN* STEP-TWO FACTORS ALL POINT TO DISTRICT-COURT JURISDICTION

As explained above, the first step of *Thunder Basin* does not preclude district court review of anti-discrimination claims against federal unions because there is no fairly discernable congressional intent of preclusion. The second step of *Thunder Basin* then asks whether the "claims at issue are of the type Congress intended to be reviewed within that statutory structure" and is answered by applying a three-factor test. *Ahuja*, 62 F.4th at 558, 560 (quoting *Thunder Basin*, 510 U.S. at 212). The Supreme Court recently clarified the application of the *Thunder Basin* step-two factors in *Axon Enterprises Inc. v. FTC*, 598 U.S. 175, 186 (2023). Lucas thus cites *Axon* for the following analysis of the *Thunder*

*Basin* factors, which demonstrates that none of them point to divesting the federal courts of jurisdiction over discrimination claims. If the *Thunder Basin* test is satisfied, courts "presume that Congress does not intend to limit jurisdiction." *Axon*, 598 U.S. at 186 (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 489 (2010)).

The first factor asks "could precluding district court jurisdiction foreclose all meaningful judicial review of the claim?" *Id*. This factor "recognizes that Congress rarely allows claims about agency action to escape effective judicial review." *Id*. As Lucas explained in her opening brief, there is no judicial review in any court of a ULP claim that is dismissed by FLRA's general counsel (as Lucas's claim was). Opening Brief ("Op. Br.") at 30.

The union responds that there is "potential review" of ULP proceedings under 5 U.S.C. § 7123(a). Br. 29–30 ("the scheme here ***may*** end in judicial review") (emphasis added). "Potential review" is not the standard, and the judicial review provided for in 5 U.S.C. § 7123(a) attaches to only a "final order of the Authority"—not to a dismissal order from FLRA's general counsel (as occurred here). *Turgeon v. FLRA*, 677 F.2d 937, 939 (D.C. Cir. 1982) ("Since the General Counsel has not issued

a complaint, and the Authority has not acted at all in this case, it is clear that there is no 'final order of the Authority' and hence no decision that we can review pursuant to section 7123."). So, "absent district court jurisdiction," Lucas "might never have had judicial recourse." *Axon*, 598 U.S. at 190; *id.* at 188 ("We found that the Exchange Act provided no 'meaningful avenue of relief' for the firm, given the separation between the Board and the Commission. Not every Board action, we explained, culminates in Commission action—which alone the statute makes reviewable in a court of appeals.") (quoting *Free Enter. Fund*, 561 U.S. at490–91).[1]

The second *Thunder Basin* factor asks whether the claim is "'wholly collateral' to the statute's review provisions"? *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212). The CSRA prohibits a limited amount of discrimination by unions and makes such discrimination a ULP, but it is nowhere close to coterminous with what Title VII and the ADA prohibit or remediate. *See* Op. Br. 24–39. It is also entirely unclear

---

[1] *See also Free Enter. Fund*, 561 U.S. at 490 ("We do not see how petitioners could meaningfully pursue their constitutional claims under the Government's theory. Section 78y provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule.") (emphasis in original).

how invidious discrimination committed by a union against a single individual could possibly state a claim for a ULP—which means there is likely no overlap at all. "[A] union's duty of fair representation derives from its status as exclusive bargaining representative . . . a union, therefore, can be held to represent employees unfairly only in regard to those matters as to which it represents them at all namely, rates of pay, wages, hours or other conditions of employment." *See Int'l Bhd. of Teamsters, etc. v. NLRB*, 587 F.2d 1176, 1183 (D.C. Cir. 1978). "In other words, the duty of fair representation extends only to matters involving an employee's dealings with his employer and ordinarily does not affect an employee's relationship with the union structure." *Kolinske v. Lubbers*, 712 F.2d 471, 481 (D.C. Cir. 1983); *see also Freeman v. Loc. Union No. 135 Chauffeurs*, 746 F.2d 1316, 1321 (7th Cir. 1984) ("If a union does not serve as the exclusive agent for the members of the bargaining unit with respect to a particular matter, there is no corresponding duty of fair representation."); Op. Br. 23–39. Any discrimination by the union not covered by the CSRA's limited discrimination ULP would be wholly collateral to FLRA's review "even

supposing [FLRA] took up a matter" for Lucas (which, as noted, it refused to do). *Axon*, 598 U.S. at 188.

The union maintains that a claim under one statutory scheme is not "wholly collateral" to a claim under another statutory scheme if a plaintiff could "obtain the same relief" under either. Br. 31. That may or may not be so, but the salient point—one that the union ignores—is that there are many more procedural, substantive, and remedial rights that Lucas would enjoy in a federal-court action under the anti-discrimination laws compared to ULP proceedings at FLRA. Op. Br. 23–39. The union appears to know this because it characterizes what Lucas sought in the court below as "the same *kind of* relief" she sought at FLRA—not the "same relief"—by vastly overgeneralizing her claims as seeking "a ruling on whether the representational conduct involving the Union was lawful." Br. 31 (emphasis added). What Lucas seeks instead is a specific ruling that the union violated the anti-discrimination laws; she will seek to prove this by using the procedural and substantive rights available to her in federal court; and if successful she will be entitled to the expansive remedies the anti-discrimination laws permit. And, as to the last point,

even the union admits that "Lucas cannot obtain the remedies she desires" at FLRA. *Id.* at 25.

The final *Thunder Basin* factor asks whether the claim is "outside the agency's expertise." *Axon*, 598 U.S. at 186 (quoting *Thunder Basin*, 510 U.S. at 212). FLRA may know a "good deal" about federal labor policy, but it knows "nothing special" about the generally applicable anti-discrimination laws that are nowhere in its jurisdictional grant. *Id.* at 194. Indeed, the agency with actual expertise on this issue—the EEOC—has participated in this Court as amicus and argues that the appropriate forum for Lucas's claims is federal district court not FLRA. EEOC Brief 7–23.

The handful of FLRA decisions the union cites dealing with FLRA's review of arbitration awards that involve discrimination issues do not show otherwise. Br. 32–33. FLRA may find an arbitration award "deficient" "because it is contrary to ***any*** law, rule, or regulation[.]" 5 U.S.C. § 7122(a)(1) (emphasis added). By the union's telling, then, all laws, rules, or regulations are within FLRA's "expertise" because they could be implicated in an arbitration, the result of which could eventually be subject to FLRA's review. This description of FLRA's purported

expertise lays bare the union's position: FLRA is the single expert on everything that could even possibly implicate a federal union and any person who wants to challenge union conduct must bend it into a ULP to seek review—which will be virtually certain to be fruitless, as explained in detail in Lucas's opening brief. Op. Br. 27–32, 35–37; *see also* pp. 9–10, *supra*.

And the context-free snippets from cases the union cites finding CSRA preemption likewise do not support its argument. *E.g.*, Br. 1–3. These cases involve union or employee lawsuits against federal agencies and/or federal officials, not employee lawsuits against federal-sector unions. For example, in *AFGE v. Trump*, the same union that is a party here was foreclosed from bringing catchall APA claims in federal court challenging executive orders "because [among many other things] the unions here are not cut off from review and relief. Rather, they can ultimately obtain review of and relief from the executive orders by litigating their claims through the statutory scheme in the context of concrete bargaining disputes." *AFGE v. Trump*, 929 F.3d 748, 757 (2019); *id.* at 760 ("The unions' challenge in this case is of the type that is regularly adjudicated through the FSLMRS's scheme: disputes over

whether the Statute has been violated.").[2] Here, by contrast, Lucas is "cut off from review and relief" without district court jurisdiction because her claims are not of the type FLRA "regularly adjudicates"—they have nothing to do with the CSRA. *Id.* at 757, 760.

---

[2] *Elgin v. Dep't of the Treasury*, 567 U.S. 1 (2012), concerned the discharge of employees from federal service who failed the register for the Selective Service. *Id.* at 6–7. The Court explained: "Given the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of **adverse employment actions**, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Id.* at 11–12 (emphasis added).

Likewise, in *AFGE v. Sec'y of the Air Force*, 716 F.3d 633 (2013), AFGE challenged in district court the Air Force's instructions that Air Reserve Technicians were required to wear military uniforms while performing civilian duties. *Id.* at 635. The Court dispatched AFGE's arguments (including that the district court could "more efficiently" adjudicate its claims) and held that the district court lacked jurisdiction:

> [T]he FSLMRS in fact provides a means to review the Air Force instructions—including, in some circumstances, judicial review—via at least these three routes. While the appellants may not prevail using one of these procedures or would prefer to challenge the Air Force instructions by some other means, that does not mean their claims may be brought outside the CSRA's exclusive remedial scheme.

*Id.* at 638.

"All three *Thunder Basin* factors thus point in the same direction—toward allowing district court review" of Lucas's claims. *Axon*, 598 U.S. at 195. Lucas cannot "receive meaningful judicial review" through the CSRA. *Id.* Her claims are "collateral to any decisions" FLRA "could make in individual enforcement proceedings." *Id.* at 195–96. And her claims "fall outside" FLRA's "sphere of expertise." *Id.* at 196. The "conclusion follows: The claims are not of the type the [CSRA] review scheme[] reach[es]" and a "district court can therefore review them." *Id.*

## III. TORT LAW IS THE SINGLE APPROPRIATE ANALOGUE FOR DISCRIMINATION CLAIMS

The union faults Lucas for citing examples of claims against federal unions held not preempted by the CSRA because, in those examples, the plaintiff "alleged an intentional tort such as defamation." Br. 34. But intentional torts are a wholly appropriate analogue to intentional discrimination and further demonstrate why the CSRA does not preempt general anti-discrimination laws.

The Supreme Court explained in *Goodman v. Lukens Steel Co.* that race-discrimination claims brought under 42 U.S.C. § 1981 "are in essence claims for personal injury," that such discrimination "is a fundamental injury to the ***individual rights*** of a person," and thus that

"the state statute applicable to such claims should be borrowed" for statute-of-limitations purposes. 482 U.S. 656, 661 (1987) (emphasis added). *See also, e.g.*, *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 223–24 (2022) ("After all, intentional discrimination is frequently a wanton, reprehensible tort."); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 346 (2013) (counting "federal statutory claims of workplace discrimination" as a "tort claim," including "intentional-discrimination [claims]" and noting that causation in fact is a "standard requirement of any tort claim").[3]

This Court recently relied on *Goodman*, observing that "discrimination is a fundamental injury to the individual rights of a person, a ***quintessential personal injury***." *Stafford v. George Wash. Univ.*, 56 F.4th 50, 54 (D.C. Cir. 2022) (emphasis added) (quoting

---

[3]    Like the common law of torts, the statutory employment "tort" created by Title VII has two basic purposes. The first is to deter conduct which has been identified as contrary to public policy and harmful to society has a whole. . . . The second goal . . . is to make persons whole for injuries suffered on account of unlawful employment discrimination.

*Price Waterhouse v. Hopkins*, 490 U.S. 228, 264–65 (1989) (plurality opinion) (O'Connor, J., concurring) (cleaned up).

*Goodman*, 482 U.S. at 661). Indeed, "[t]he Supreme Court has remarked that a personal injury tort is the only single analogue that could cover such diverse causes of action and accord civil rights statutes a sweep as broad as [their] language." *Id.* (quoting *Wilson v. Garcia*, 471 U.S. 261, 279 (1985)); *see also Abreu v. Howard Univ.*, 93 F.4th 498, 502 (D.C. Cir. 2024) (applying *Stafford* and holding that the ADA and Rehabilitation Act are "civil rights claims involving discrimination" analogous to personal-injury torts). Just as garden-variety intentional torts are not preempted by the CSRA, so too the "wanton, reprehensible tort" of intentional discrimination in violation of federal statutes is not preempted. *Cummings*, 596 U.S. at 223–24.

## IV.   UNIONS MAY BE HELD LIABLE FOR SEXUAL HARASSMENT

The union contends that it cannot be liable for workplace sexual harassment because the sole predicate for prohibition of harassment is the phrase "terms, conditions or privileges of employment" in Title VII, and that phrase appears in only the employer subsection of the statute (42 U.S.C. § 2000e–2(a)(1)), not in the provision covering unions (*id.* § 2000e–2(c)(1)). *See* Br. 41–42 (claiming the "statutory origin" of Title VII hostile work environment claims is § 2000e–2(a)(1)'s language

preventing an employer from discriminating against any individual with respect to "[her]… terms, conditions, or privileges of employment"). Not so.

The union bases this claim on *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57 (1986), which does not say that; instead, it explains— in the context of an unavailing argument that, in passing Title VII, Congress was concerned with remedying only "tangible loss" of "an economic character"—that "terms, conditions or privileges of employment" is an "expansive concept which sweeps into its protective ambit the practice of creating a working environment heavily charged" with discrimination. 477 U.S. 57, 64–65 (1986). To reach that conclusion the Court heavily relied on EEOC guidelines "specifying that 'sexual harassment,' as there defined, is a form of sex discrimination prohibited by Title VII" and that such "hostile environment" harassment violates Title VII. *Id.* at 65.

Section 2000e–2 is not so artificially restrictive as the union claims. The union subsection, § 2000e–2(c)(1), is in fact a more "expansive concept" than the employer subsection, § 2000e–2(a)(1), because the union section makes it an unlawful employment practice to "otherwise

discriminate against[] any individual because of his race, color, religion, sex, or national origin." Full stop. The employer subsection by contrast makes it an unlawful employment practice to "otherwise . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment . . . ." The employer subsection is thus restricted to specific workplace issues; the union section contains no restriction at all. *Stelly v. W. Gulf Maritime Ass'n*, 407 F. Supp. 3d 673, 679 (S.D. Tex. 2019) ("The clause 'with respect to his compensation, terms, conditions, or privileges of employment,' which is present only in the employer subsection, narrows, rather than expands, the operative language 'or otherwise to discriminate,' which is the prohibited conduct."); *see also id.* ("In fact, it appears that the statute if anything proscribes a broader range of 'other discrimination' for labor organizations than for employers."); *Scott v. City of N.Y. Dep't of Corrections*, 641 F. Supp. 2d 211, 224-25 (S.D.N.Y. 2009) (explaining that because subsection (c) does not contain the "terms [and] conditions of employment" language, "it bars ***any kind*** of 'discrimination' by a union") (emphasis added).

Just as the Supreme Court did in *Meritor*, this Court should look to EEOC's experience and informed judgment for guidance. *See Meritor*, 477 U.S. at 64–65 (explaining that EEOC's Guidelines, which "while not controlling upon the courts . . . do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance") (citation omitted). The Court should be guided by the Commission's amicus brief in this appeal, which confirms that unions can indeed be liable for workplace harassment based on its experience and a robust body of judicial decisions. EEOC Brief 23–30.

That conclusion is further confirmed by EEOC's new *Enforcement Guidance on Harassment in the Workplace*, published late last month.[4] The *Guidance* explains that while it only "addresses harassment claims . . . that prohibit discrimination by employers" there are unaddressed "potential claims of unlawful harassment . . . by other entities covered under Title VII, such as employment agencies and labor organizations."[5] The *Guidance* then cites with approval *Dixon v. International*

---

[4] EEOC, *Enforcement Guidance on Harassment in the Workplace* (Apr. 29, 2024), *available at* https://www.eeoc.gov/laws/guidance/enforcement-guidance-harassment-workplace#_ftn118.

[5] *Guidance* at n.4.

*Brotherhood of Police Officers*, 504 F.3d 73, 84–85 (1st Cir. 2007), explaining that the court there upheld "a jury verdict finding a union liable for sexual harassment that occurred during a union-sponsored bus trip."[6]

The EEOC, the *Dixon* decision, and other decisions cited in Lucas's opening brief (at 26–27) have the correct view of the issue, as further explained by the Eighth Circuit in *Eliserio v. USW, Local 310*: "A union has no affirmative duty under Title VII to investigate and take steps to remedy employer discrimination. On the other hand, a union may be held liable under Title VII if the union ***itself*** instigated or actively supported the discriminatory acts." 398 F.3d 1071, 1076-77 (8th Cir. 2005) (emphasis in original).[7]

---

[6] *Guidance* at n.4.

[7] The union takes a far too expansive view of *EEOC v. Pipefitters Association Local Union 597*, 334 F.3d 656 (7th Cir. 2003). *See* Br. 43. That case concerned whether a union could be liable for failing to ***prevent*** employer discrimination in the workplace. 334 F.3d at 659 (if the union "merely fails to effectuate changes in the workplace—if for example it urges the company to take steps to prevent harassment and the company fails to do so—the union is not guilty of discrimination, though the company is"). But it confirmed that a union is "the workers' agent in dealing with the company" and that if the union "discriminates in the performance of its agency function, it violates Title VII . . . ." *Id.*

## V.   Union Officers are Personally Liable for Retaliation

The union concludes by arguing that Appellee Kelly is "immune" from liability for retaliating against Lucas in violation of the FLSA. Br. at 54–55. The union says this is so because Kelly cannot be held liable for retaliating against Lucas when he was "acting within his official capacity" as union vice president, *id.* at 54, relying on *Atkinson v. Sinclair Refining Co.*, 370 U.S. 238, 249 (1962). *Atkinson* was about violation of a no-strike clause in a collective-bargaining agreement and raised the question whether, under § 301 of the Taft-Hartley Act, 29 U.S.C. § 185, the union was solely liable for the breach or whether its officers could be too. The Court held that only the union was liable because "[w]here the union has inflicted the injury it alone must pay." *Atkinson*, 370 U.S. at 249. *Atkinson* stands only for the proposition that when a union breaches a collective bargaining agreement its members are not simultaneously liable for that breach. As the Court put it, "[w]hen Congress passed § 301, it declared its view that only the union was to be made to respond for union wrongs, and that the union members were not to be subject to levy." 370 U.S. at 247–48.

Understanding the limits of *Atkinson*, courts have long held the union officers may be held liable under 29 U.S.C. § 185 for their own freestanding violations of law or contract outside of the terms of a collective bargaining agreement. *See, e.g., Lingle v. Norge Div. of Magic Chef*, 486 U.S. 399, 411 (1988) ("[T]here is nothing novel about recognizing that substantive rights in the labor relations context can exist without interpreting collective-bargaining agreements . . . ."); *Felice v. Sever*, 985 F.2d 1221, 1231 (3d Cir. 1993) ("We conclude that a state law claim brought against a union officer that does not implicate a collective bargaining agreement covered by section 301(a) does not give rise to section 301(b) immunity. When section 301(a) is inapplicable, the immunity provided by section 301(b) is also inapplicable.").[8]

Kelly's retaliation against Lucas was his own individual violation of the FLSA, which prohibits "***any person***" from retaliating against

---

[8] *Montplaisir v. Leighton*, 875 F.2d 1 (1st Cir. 1989), is not at odds with that conclusion. The Court there analogized *Atkinson* to the federal sector and held that public employees could not sue a union's lawyer for malpractice—because "a public-sector union cannot itself be sued for unfair labor practices, it would defy logic to allow disgruntled union members to accomplish much the same result by circumnavigation." *Id.* at 5. Lucas's retaliation claims are not unfair labor practices; they are standalone violations of the FLSA.

another for asserting FLSA rights—a discriminatory tort that caused personal injury to Lucas. 29 U.S.C. § 215(a)(3) (emphasis added) ("it shall be unlawful for any person . . . to discharge or in any other manner discriminate against an employee" for engaging in FLSA protected activity). Kelly's title within the union does not shield him from this unqualified rule nor is his conduct an unfair labor practice. *See also* pp. 10–12 and Section III, *supra*.

## CONCLUSION

For the foregoing reasons and those stated in Lucas's opening brief, the district court's judgments should be reversed and the cases remanded for proceedings on the merits.

Respectfully submitted,

**NIA LUCAS**
**By Counsel**

May 24, 2024

<div style="display:flex;justify-content:space-between;">

Brian Wolfman
DC Attorney I.D. No. 427491
Regina Wang
DC Attorney I.D. No. 90012722
Email: wolfmanb@georgetown.edu
GEORGETOWN LAW APPELLATE
COURTS IMMERSION CLINIC
600 New Jersey Avenue, NW
Suite 312
Washington, DC 20001
Phone: 202.661.6582

**/s/ David R. Dorey**
David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

</div>

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS**

The undersigned hereby certifies the following:

1.  This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7). It contains 5,042 words according to the word processing system used to prepare this brief.

2.  This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6). It has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Respectfully submitted,

May 24, 2024

/s/ **David R. Dorey**

David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

**PROOF OF SERVICE**

The undersigned hereby certifies that a copy of the foregoing brief

has been served on this date via USPS Priority Mail as follows:

Johnnie D. Green, *pro se*
6606 Bluebird Drive
Little Rock, Arkansas 72205

Respectfully submitted,

May 24, 2024
/s/ **David R. Dorey**
David R. Dorey
DC Attorney I.D. No. 1015586
Email: ddorey@liffwalsh.com
LIFF, WALSH & SIMMONS
181 Harry S. Truman Parkway
Suite 200
Annapolis, Maryland 21401
Phone: 410.266.9500

**SUPPLEMENTAL ADDENDUM**
**PERTINENT STATUTES AND REGULATIONS**
**Pursuant to D.C. Circuit Rule 28(a)(5)**

# TABLE OF CONTENTS

**Citation**                                                                    **Page**

5 U.S.C. § 2302(a)(1), (b)(1)(A)–(D), (d) ............................................... Add-1

5 U.S.C. § 7122(a)(1) ........................................................ Add-3

29 U.S.C. § 185 ............................................................. Add-4

42 U.S.C. § 2000e–2(a)(1) ................................................ Add-6

42 U.S.C. § 2000e–5(f)(1) ................................................. Add-7

# 5 U.S.C. § 2302

## § 2302. Prohibited personnel practices

\* \* \*

(a)(1) For the purpose of this title, "prohibited personnel practice" means any action described in subsection (b).

\* \* \*

(b) Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority--

(1) discriminate for or against any employee or applicant for employment--

(A) on the basis of race, color, religion, sex, or national origin, as prohibited under section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16);

(B) on the basis of age, as prohibited under sections 12 and 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 631, 633a);

(C) on the basis of sex, as prohibited under section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(d));

(D) on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791); or

(E) on the basis of marital status or political affiliation, as prohibited under any law, rule, or regulation;

\* \* \*

(d) This section shall not be construed to extinguish or lessen any effort to achieve equal employment opportunity through affirmative action or any right or remedy available to any employee or applicant for employment in the civil service under--

(1) section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e-16), prohibiting discrimination on the basis of race, color, religion, sex, or national origin;

(2) sections 12 and 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 631, 633a), prohibiting discrimination on the basis of age;

(3) under section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(d)), prohibiting discrimination on the basis of sex;

(4) section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791), prohibiting discrimination on the basis of handicapping condition; or

(5) the provisions of any law, rule, or regulation prohibiting discrimination on the basis of marital status or political affiliation.

# 5 U.S.C. § 7122

## § 7122. Exceptions to arbitral awards

(a) Either party to arbitration under this chapter may file with the Authority an exception to any arbitrator's award pursuant to the arbitration (other than an award relating to a matter described in section 7121(f) of this title). If upon review the Authority finds that the award is deficient--

> (1) because it is contrary to any law, rule, or regulation; or
> (2) on other grounds similar to those applied by Federal courts in private sector labor-management relations;

the Authority may take such action and make such recommendations concerning the award as it considers necessary, consistent with applicable laws, rules, or regulations.

## § 185. Suits by and against labor organizations

(a) Venue, amount, and citizenship

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

(b) Responsibility for acts of agent; entity for purposes of suit; enforcement of money judgments

Any labor organization which represents employees in an industry affecting commerce as defined in this chapter and any employer whose activities affect commerce as defined in this chapter shall be bound by the acts of its agents. Any such labor organization may sue or be sued as an entity and in behalf of the employees whom it represents in the courts of the United States. Any money judgment against a labor organization in a district court of the United States shall be enforceable only against the organization as an entity and against its assets, and shall not be enforceable against any individual member or his assets.

(c) Jurisdiction

For the purposes of actions and proceedings by or against labor organizations in the district courts of the United States, district courts shall be deemed to have jurisdiction of a labor organization (1) in the district in which such organization maintains its principal office, or (2) in any district in which its duly authorized officers or agents are engaged in representing or acting for employee members.

(d) Service of process

The service of summons, subpena, or other legal process of any court of the United States upon an officer or agent of a labor organization, in his capacity as such, shall constitute service upon the labor organization.

(e) Determination of question of agency

For the purposes of this section, in determining whether any person is acting as an "agent" of another person so as to make such other person responsible for his acts, the question of whether the specific acts performed were actually authorized or subsequently ratified shall not be controlling.

## 42 U.S.C. § 2000e-2

### § 2000e-2. Unlawful employment practices

(a) Employer practices

It shall be an unlawful employment practice for an employer--

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

## § 2000e-5. Enforcement provisions

\* \* \*

(f) Civil action by Commission, Attorney General, or person aggrieved; preconditions; procedure; appointment of attorney; payment of fees, costs, or security; intervention; stay of Federal proceedings; action for appropriate temporary or preliminary relief pending final disposition of charge; jurisdiction and venue of United States courts; designation of judge to hear and determine case; assignment of case for hearing; expedition of case; appointment of master

    (1) If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d), the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. If a charge filed with the Commission pursuant to subsection (b) is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of reference under subsection (c) or (d), whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission

has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsection (c) or (d) of this section or further efforts of the Commission to obtain voluntary compliance.

(2) Whenever a charge is filed with the Commission and the Commission concludes on the basis of a preliminary investigation that prompt judicial action is necessary to carry out the purposes of this Act, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, may bring an action for appropriate temporary or preliminary relief pending final disposition of such charge. Any temporary restraining order or other order granting preliminary or temporary relief shall be issued in accordance with rule 65 of the Federal Rules of Civil Procedure. It shall be the duty of a court having jurisdiction over proceedings under this section to assign cases for hearing at the earliest practicable date and to cause such cases to be in every way expedited.

(3) Each United States district court and each United States court of a place subject to the jurisdiction of the United States shall have jurisdiction of actions brought under this subchapter. Such an action may be brought in any judicial district in the State in which the unlawful employment practice is alleged to have been committed, in the judicial district in which the employment records relevant to such practice are maintained and administered, or in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice, but if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office. For purposes of sections 1404 and 1406 of Title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought.

(4) It shall be the duty of the chief judge of the district (or in his absence, the acting chief judge) in which the case is pending immediately to designate a judge in such district to hear and determine the case. In the event that no judge in the district is available to hear and determine the case, the chief judge of the district, or the acting chief judge, as the case may be, shall certify this fact to the chief judge of the circuit (or in his absence, the acting chief judge) who shall then designate a district or circuit judge of the circuit to hear and determine the case.

(5) It shall be the duty of the judge designated pursuant to this subsection to assign the case for hearing at the earliest practicable date and to cause the case to be in every way expedited. If such judge has not scheduled the case for trial within one hundred and twenty days after issue has been joined, that judge may appoint a master pursuant to rule 53 of the Federal Rules of Civil Procedure.