ORAL ARGUMENT NOT SCHEDULED
No. 23-7051

---

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

NIA LUCAS,

Plaintiff-Appellant,

v.

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO, AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES LOCAL 228, AND MICHAEL KELLY,

Defendants-Appellees.

_____

ON APPEAL FROM DECISIONS OF THE U.S. DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA

_____

FINAL BRIEF FOR THE DEFENDANTS-APPELLEES

MARK L. VINSON
Assistant General Counsel
AFGE, Office of General
Counsel
80 F Street N.W
Washington, D.C. 20001
(202) 639-6426
vinsom@afge.org
D.C. Bar No. 56167
Dated, May 24, 2024

# CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES

## A.    Parties

The underlying district court action involved Defendants in district court and Appellees here the American Federation of Government Employees, AFL-CIO, American Federation of Government Employees, Local 228, and Michael Kelly, "collectively the Union." The Plaintiff in district court and Appellant here is Nia Lucas.

## B.    Rulings Under Review

This appeal arises from two actions consolidated in the District Court of the District of Columbia: No. 22-cv-00777 and No. 22-cv-1540. On March 29, 2023, the Honorable Amy Berman Jackson issued a final order with an accompanying opinion dismissing both complaints. (JA 328.) *Lucas v. AFGE et al*. 2023 WL 2682175.  Appellant appealed the order on April 28, 2023.

## C.    Related Cases

This appeal is consolidated with *Lucas v. American Federation of Government Employees, et al.*, No. 23-7054 (D.C.Cir.). The Plaintiff-Appellant has filed separate actions against the Small Business Administration (her former employer), which are pending in the U.S. District Court for the District of

Columbia. *See Lucas v. Guzman, Adm'r, U.S. Small Bus. Admin.*, No. 1:21-cv-

00296 (D.D.C.) (ABJ); *Lucas v. Guzman, Adm'r, U.S. Small Bus. Admin.*, No.

1:22-cv-02101 (D.D.C.) (ABJ).

/s/ Mark L. Vinson
MARK L. VINSON
Assistant General Counsel
AFGE
80 F Street, NW
Washington, DC  20001
(202) 639-6426
(202) 639-6441 (Fax)

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Circuit Rule 26.1, the American Federation of Government Employees, ("AFGE National") and American Federation of Government Employees Local 228, ("Local 228") hereby disclose the following:

AFGE National and Local 228 are labor organizations and unincorporated associations representing government workers. Pursuant to the Federal Service Labor-Management Relations Statute, AFGE National and Local 228, either on their own or in conjunction with its affiliated locals, and/or national union, is certified by the U.S. Federal Labor Relations Authority as the exclusive representative for employees of the Small Business Administration. See 5 U.S.C. §§ 7111, 7112.

Neither AFGE National nor Local 228 have any parent companies nor are there any publicly held companies that possess an ownership interest in AFGE National or Local 228.

/s/ Mark L. Vinson
MARK L. VINSON
Assistant General Counsel
AFGE
80 F Street, NW
Washington, DC 20001
(202) 639-6426
vinsom@afge.org
On behalf of Appellees

# TABLE OF CONTENTS

CERTIFICATE OF PARTIES, RULINGS, AND RELATED CASES....................i

CORPORATE DISCLOSURE STATEMENT.......................................iii

TABLE OF CONTENTS .....................................................iv

TABLE OF AUTHORITIES..................................................vii

GLOSSARY............................................................. xii

STATEMENT OF JURISDICTION. ........................................... xiii

STATEMENT OF ISSUES ................................................. xiii

STATUTES AND REGULATIONS............................................ xiii

STATEMENT OF THE CASE.................................................1

STATEMENT OF THE FACTS ..............................................4

SUMMARY OF THE ARGUMENT ...........................................11

STANDARD OF REVIEW .................................................14

ARGUMENT ...........................................................15

I.   The Court Correctly Dismissed Lucas's Complaints Because
     The Gravamen Of Her Claims Involve the Representational
     Conduct Of A CSRA-Governed Union And Such Claims
     Are Subject To The CSRA's Exclusive Review Procedures,
     Not District Courts.................................................15

     A.   Under The CSRA The Exclusive Regulatory Power Over
          A CSRA-Governed Union's Representational Conduct Is
          Vested In The FLRA, And This Exclusivity Precludes
          Review Of A Title VII, ADA Or FLSA Claims Involving
          That Same Conduct In District Courts .............................17

B. Unlike the FLRA's Exclusive Jurisdiction Over A Claim Of A Breach Of The Duty Of Fair Representation Against A CSRA-Governed Union, The NLRB's Jurisdiction Over Such Claims Against A Private Sector Union Is Not Exclusive........................................20

C. Congress Explicitly Provided That Federal Employees Can Pursue Title VII And ADA Claims Against the Federal Government But Not CSRA-Governed Unions ...................................23

II. Likewise, The *Thunder Basin* Factors Confirm Congress Intended Lucas's Claims Be Pursued Through The CSRA's Exclusive Scheme Of Review And Not District Courts...............................25

A. The Step 1 Factor Of The *Thunder Basin* Test Is Satisfied Because It Is Fairly Discernible From The CSRA That Congress Intended The FLRA To Have Exclusive Jurisdiction Over Review Of The Representational Conduct of CSRA Governed Unions ...................................................................27

B. The Step 2 Factors Of The *Thunder Basin* Test Applied To Lucas's Complaints Confirm That Her Claims Are Of The Type Congress Intended To Be Reviewed Within The Statutory Scheme ....................................................................27

i. Finding Preclusion Would Not Foreclose All Meaningful Judicial Review Of Lucas's Claims ................................29
ii. Lucas's Complaints Are Not Wholly Collateral To The CSRA Review Scheme ..............................................30
iii. The FLRA Has Expertise To Bear On Lucas's Complaints..............32

III. Lucas's Attempt At Artful Pleading To Recast Her ULP Charges As Violations of Title VII, ADA, And The FLSA Must Fail Because The CSRA's Remedial Scheme Is Exclusive...............................34

IV. As A Matter of Law, A Labor Union Cannot Be Held Liable Under Title VII For Creating A Hostile Work Environment When It Is Not Acting As An Employer .............................41

V.    Defendant Kelly Is Immune From Suit Because Union Officers
      Cannot Be Sued In Their Individual Capacity For Their Actions
      As A Union Officer ...................................................................................54

CONCLUSION .......................................................................................................55

# TABLE OF AUTHORITIES

Page(s)

## Court Cases

*AFGE v. Secretary of the Air Force,*
  716 F.3d 633 (D.C. Cir. 2013).................................................... 1, 2, 3, 16, 25, 29
*Am. Fed'n of Gov't Emps. v. Loy,*
  367 F.3d 932 (D.C. Cir. 2004).........................................................27
*Am. Fed'n of Gov't Emps., AFL-CIO v. Trump,*
  929 F.3d 748 (D.C. Cir. 2019)................................................ 1, 27, 29, 30, 31, 32
*American Federation of Government Employees v. Federal Labor Relations*
  *Authority.,*835 F.2d 1458 (D.C. Cir. 1987) ...........................................20
*Anjelino v. New York Times Co.,*
  200 F.3d 73 (3rd Cir. 1999).......................................................... 45, 46
*Arch Coal, Inc. v. Acosta,*
  888 F.3d 493 (D.C. Cir. 2018).........................................................29
*Atkinson v. Sinclair Refining Co.,*
  370 U.S. 238 (1962) ....................................................................54
*Blankenship v. AFGE,* No. 3:15-cv-00294, 2016 WL 1276425
  (E.D. Va. Mar. 30, 2016)................................................................28
*Bolton v. Merit Systems Protection Bd.,*
  154 F.3d 1313 (Fed. Cir. 1998) .......................................................13
*Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.,*
  464 U.S. 89 (1983) ....................................................................1, 2
*Burton v. AFGE 1988,*
  No. 1:11-cv-01416, 2012 WL 3580399 (E.D.N.Y. Aug. 17, 2012)..................28
*Cogburn v. AFGE,*
  No. 1:06-cv-00425, 2006 WL 2884505 (S.D. Miss. Oct. 10, 2006) .................28
*Conejo v. Am. Fed'n of Gov't Emps.,* AFL-CIO,
  377 F.Supp.3d 16 (D.D.C. 2019).....................................................34
*Dixon v. International Brotherhood of Police Officers,*
  504 F.3d 73 (1st Cir. 2007)............................................................40, 44, 45, 47
*Dowd v. United Steelworkers of America, Local No. 286,*
  253 F.3d 1093 (8th Cir. 2001) ................................................ 45, 49, 50, 51, 52
*Ebert v. Poston,*
  266 U.S. 548 (1925)....................................................................24
*EEOC v. Pipefitters Ass'n Local 597,*
  334 F.3d 656 (7th Cir. 2003) .........................................................43, 53

*Electronic Privacy Information Center v. IRS*,
  910 F.3d 1232 (D.C. Cir. 2018)..........................................................................14
*Elgin v. Department of Treasury*,
  567 U.S. 1 (2012) ....................................................................... 2, 16, 31, 32
*Federal Law Enforcement Officers Association v. Ahuja*,
  62 F. 4th 551 (D.C. Cir. 2023) ..........................................................................15
*Filebark v. U.S. Dep't of Transp.*,
  555 F.3d 1009 (D.C. Cir. 2006) ................................................................. 16, 25
*Free Enterprise Fund v. Public Co. Accounting Oversight Bd*,
  561 U.S. 477 (2010) ..........................................................................................29
*Gutierrez v. Flores*,
  543 F.3d 248 (5th Cir. 2008)..............................................................................34
*Harris v. Forklift Systems, Inc*,
  510 U.S. 17 (1993) ............................................................................................51
*Hout v. City of Mansfield*,
  550 F. Supp. 2d 701 (N.D. Ohio 2008) ...........................................................44
*Hudson v. Am. Fed'n of Gov't* ., No. CV 19-2738 (JEB),
  2020 WL 3035039 (D.D.C. June 5, 2020).........................................................38
*Jarkesy v. SEC*,
  803 F.3d 9 (D.C. Cir. 2015)......................................................... 27, 28, 31
*Johnson v. Principi*,
  03-1367, 2004 WL 2044258 (N.D. Ill. Sept. 3, 2004) .....................................34

*Karahalios v. National Federation of Federal Employees, Local 1263*,
  489 U.S. 527 (1989) .......... 1, 15, 17, 18, 19, 20, 21, 22, 23, 25, 27, 34, 35, 36, 37
*Kasper v. City of* Middletown, 352 F. Supp.2d 216 (D. Conn. 2005)....................44
*Lindahl v. OPM*,
  470 U.S. 768 (1985) ............................................................................................1
*McDonnell Douglas Corp. v. Green*,
  411 U.S. 792 (1973) ..........................................................................................33
*Meritor Savings Bank, FSB v. Vinson*,
  477 U.S. 57 (1986) ..................................................................................... 41, 50
*Montplaisir v. Leighton*,
  875 F.2d 1 (1st Cir. 1989) ........................................................................... 35, 54
*Nat'l R.R. Passenger Corp. v. Morgan*,
  536 U.S. 101 (2002) ..........................................................................................44
*Petteys v. Butler*,
  367 F.2d 528 (8th Cir. 1966)..............................................................................25
*Phillips v. UAW International*,
  149 F.Supp.3d 790 (E.D. Mich. 2016) ..............................................................42

*Phillips v. UAW International*,
854 F.3d 323 (6th Cir. 2017) .................................................................. 42, 45, 47
*Price v. AFGE,* 3:15-cv-00293,
2016 WL 1276421 n.17 (E.D. Va. Mar. 30, 2016) .............................................28

*Reed v. Sturdivant*,
176 F.3d 1051 (8th Cir.1999) ...............................................................................2
*Rogers v. EEOC*,
454 F.2d 234 (5th Cir. 1971) ...............................................................................41
*Spagnola v. Mathis,*
859 F.2d 223 (D.C.Cir.1988)....................................................................... 12, 16
*Steadman v. Governor, U.S. Soldiers' & Airmen's Home*,
918 F.2d 963 (D.C. Cir. 1990)..............................................................................27
*Sullivan v. Potter, et al.*, No. Civ.A. 05-00818 HHK,
2006 WL 785289 (D.D.C. 2006)...........................................................................54

*\*Thunder Basin Coal v. Reich,*
510 U.S. 200 (1994) ...................................................... 13, 17, 25, 26, 28, 29, 32
*U.S. v. Fausto,*
484 U.S. 439 (1988) .............................................................................................11
*Underground Expansion v. Mineta,*
333 F.3d 193 (D.C. Cir. 2003)..............................................................................14
*United States Marshals Service v. Federal Labor Relations Authority*,
708 F.2d 1417 (9th Cir. 1983) ..............................................................................33
*United Steelworkers of America v. Weber,*
443 U.S. 193 (1979) .............................................................................................52
*Vaca v. Sipes* 386 U.S. 171 (1967) ..........................................................................21
*Wood v. American Federation of Government Employees*,
255 F. Supp.3d 190 (D.D.C. 2017)........................................................................34
*Woods v. Graphic Communications,*
925 F.2d 1195 (9th Cir. 1991) ............................................................................ 45

## Administrative Cases:

*American Federation of Government Employees Local 1345*
*Fort Carson,* Colorado (In Trustee*ship) and American Federation of*
*Government E*mployees, 53 F.L.R.A. 1789 (1998) ..............................................33
*American Federation of Government Employees, Local 3295 and*
*U.S. Department of the Treasury, Office of Thrift Supervision,*
*Washington, D.C.*, 51 F.L.R.A. 27 (1995) ............................................................33
*Health Care Financing Administration, Department of Health*
*and Human Services and American Federation of Government*
*Employees, L*ocal 1923, 35 F.L.R.A. 274 (1990) ...............................................32
*International Associated Machinists and Aerospace Workers,*
*Local 39, AFL-CIO*, 24 F.L.R.A. 352 (1986) ........................................................39
*Letterkenny Army Depot and International Brotherhood of*
*Police Offic*ers, Local 358, 35 F.L.R*.A. 113 (“*Le*tt*e*rkenny*”) ...............................33
*National Treasury Employees Union, and National Treasury Employees*
*Union, Chapter 48 and U.S. Department of the Treasury,*
*Internal Revenue Service, Southeast Region, Richmond* District,
54 F.L.R.A. 1197 (1998) ......................................................................................33

## Statutes

5 U.S.C. § 7120..............................................................................................................3
5 U.S.C. §7114 (a)(1)......................................................................................... 18, 21, 36
5 U.S.C. §7116 (b)(8).............................................................................................. 18, 21
5 U.S.C. §7116(b)(7)..................................................................................................... 35
5 U.S.C. §7118(a)(7)(a)(d).............................................................................................29
5 U.S.C. § 2302(b)(1)(a)(d) ...........................................................................................24
5 U.S.C. § 2302(d)(1)......................................................................................................23
5 U.S.C. § 7101 ...............................................................................................................1
5 U.S.C. § 7101(a)(1).......................................................................................................2

5 U.S.C. § 7103(a)(4)....................................................................................................2, 3
5 U.S.C. § 7116 ........................................................................................... 3, 18, 35
5 U.S.C. § 7116 (b)(1)................................................................................................ 36
5 U.S.C. § 7116(a)(8)......................................................................................................3
5 U.S.C. § 7118 ...............................................................................................................3
5 U.S.C. § 7118 (a)(1)............................................................................................. 18, 21
5 U.S.C. § 7123(a) ...................................................................................... 19, 20, 29

5 U.S.C. § 7123(b) ...................................................................31
5 U.S.C. §§ 7116(b)(1)-(8) .............................................. 8, 17, 40
5 U.S.C. §§ 7116(c)(1)-(2) ................................................ 7, 8, 40
5 U.S.C. §§ 7120(a)-(d) .................................................................3
29 U.S.C. § 187 .......................................................................22
29 U.S.C. § 185 .......................................................................21
29 U.S.C. § 185(a) ....................................................................21
29 U.S.C. § 216(b) ....................................................................40
29 U.S.C. §§ 151-169 ................................................................12
42 U.S.C. §2000e-2(a) ...............................................................41
42 U.S.C. § 2000e–2(a) and (c) ..................................................42
42 U.S.C. § 2000e–2(a)(1) .......................................... 41, 45, 47, 50
42 U.S.C. § 2000e-2(a)(1) and 2(c)(1) .......................... 43, 45, 47
42 U.S.C. § 2000e-2(a)-(c) ........................................................43
42 U.S.C. § 2000e–2(c)(1) ................................. 41, 42, 49, 51, 52, 53
42 U.S.C. § 2000e-2(c)(2) ..........................................................53
42 U.S.C. §§ 2000e-5(e)(1), 12117(a) .......................................35

## Rules

Fed. R. App. P. 32(a)(7)(B)(i) .....................................................56
FED. R. APP. P. RULE 32(A) ......................................................56

## Regulations

3 C.F.R §861 ...........................................................................23

*Authorities upon which we chiefly rely are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| ADA | Americans With Disabilities Act 42 U.S.C. § 12111 et seq. |
| AFGE | American Federation of Government Employees, AFL-CIO |
| CSRA | Title VII of the Civil Service Reform Act of 1978, 5 U.S.C. § 7101 *et seq.*, |
| FLSA | Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* |
| FSLMRS | The Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101–35 enacted under Title VII of the CSRA |
| LMRA | Labor Management Relations Act, 29 U.S.C. § 185 |
| Local 228 | American Federation of Government Employees Local 228 |
| NLRA | National Labor Relations Act, 29 U.S.C. §§ 151-169 |
| RLA | The Railway Labor Act (RLA) -- 45 U.S.C. 151, Et Seq. |
| Section 301(a) | 29 U.S.C. § 185(a) |
| Title VII | Title VII of the Civil Rights Act of 1964, 42 U.S.C §2000e et seq. |
| ULP | Unfair Labor Practice |
| Union | Appellees, American Federation of Government Employees, AFL-CIO, Local 228 and Michael Kelly |

## STATEMENT OF JURISDICTION

Plaintiff-Appellant Lucas invoked the district court's jurisdiction under 28 U.S.C. § 1331 because her complaints alleged violations of the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq*; Title VII of the Civil Rights Act, 42 U.S.C §2000e *et seq*; and the Americans With Disabilities Act, 42 U.S.C. § 12111 *et seq*. The district court issued an Opinion and Order on March 29, 2023, finding that it did not have jurisdiction to hear Lucas's claims.  On April 28, 2023, Lucas filed a timely Notice of Appeal. This court has jurisdiction under 28 U.S.C. § 1291. Defendants contend that the district court correctly concluded that it did not have jurisdiction to hear Lucas's claims.

## STATEMENT OF THE ISSUE

Whether the district court correctly found that Lucas's claims were preempted by the Civil Service Reform Act.

## STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum.

## STATEMENT OF THE CASE

**Civil Service Reform Act of 1978**

The Federal Service Labor-Management Relations Statute, 5 U.S.C. §§ 7101–35 ("the Statute" or "FSLMRS"), enacted under Title VII of the Civil Service Reform Act of 1978 Pub. L. 95-454, 92 Stat. 1111 *et seq*. ("CSRA") governs labor relations between federal government agencies and their employees.[1] *See Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) ("*Trump*"), (citing *Bureau of Alcohol, Tobacco & Firearms v. Fed. Labor Relations Auth.*, 464 U.S. 89, 91 (1983)). Congress passed the CSRA to "comprehensively overhaul[] the civil service system." *Lindahl v. OPM*, 470 U.S. 768, 773 (1985). The CSRA was intended to be an "integrated scheme of administrative and judicial review." *U.S. v. Fausto,* 484 U.S. 439, 443-444 (1988). Through the CSRA, Congress intended to channel a broad number of claims that are preempted even if alternative relief cannot be provided. *See Trump,* 929 F.3d at 756. (The CSRA "'can preclude a claim from being brought in a district court even if it forecloses the claim from administrative review' and provides no other way to bring the claim.")(quoting *AFGE v. Secretary of the Air Force*, 716 F.3d 633 (D.C. Cir.

---

[1] The FSLMRS, 5 U.S.C. §§7101 et seq. is set forth in Title VII of the CSRA.  *See Trump*, 929 F.3d at 752.  Some cases reference the FSLMRS as CSRA and not Title VII of the CSRA.  *See e.g. Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527, 532 (1989) This brief will refer to Title VII of the CSRA as FSLMRS or CSRA.

2013) (*Sec'y of Air Force*"); *see also Elgin v. Department of Treasury*, 567 U.S. 1, 11 (2012)("*Elgin*")("Just as the CSRA's 'elaborate' framework…demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review, it similarly indicates that extra-statutory review is not available to those employees to whom the CSRA grants administrative and judicial review.")

In enacting the CSRA, Congress not only set the framework for federal employees' rights in relation to federal agencies, but also "unquestionably intended to strengthen the position of federal unions." *Bureau of Alcohol, Tobacco, & Firearms v. FLRA*, 464 U.S. 89, 107 (1983). In that vein, Congress "intentionally provided—and intentionally chose not to provide—particular forums and procedures for particular kinds of claims." *Sec'y of Air Force*, 716 F.3d at 636. Moreover, Congress intended to subject "federal employee unions to the administrative remedies of the CSRA." *Reed v. Sturdivant*, 176 F.3d 1051, 1054 (8th Cir.1999). Congress specifically found the "right of employees to … participate through labor organizations of their choosing in decision[s] which affect them," to be one of the central purposes of the CSRA. 5 U.S.C. § 7101(a)(1).

Labor organizations that are "composed in whole or in part" of federal employees are subject to the CSRA's provisions. 5 U.S.C. § 7103(a)(4). Such labor organizations within the CSRA's scope are subject to regulation of their internal

affairs by the Department of Labor. See 5 § U.S.C. 7120(d), "[c]omplaints of violations of this section [that is, 5 U.S.C. 7120 as a whole] shall be filed with the Assistant Secretary." Through 5 U.S.C. § 7120, Congress granted the Department of Labor exclusive authority to adjudicate claims against a CSRA-governed labor organization based on the organization's internal affairs, electoral affairs, and standards of conduct. See 5 U.S.C. §§ 7120(a)-(d).

In tandem with 5 U.S.C. § 7120, Congress provided the Federal Labor Relations Authority ("FLRA") exclusive power to review unfair labor practices filed by "**any person**" against CSRA-governed labor organizations. See 5 U.S.C. § 7118 (providing for the processing of unfair labor practice against "labor organizations [] charged by any person.") (emphasis added). Congress, moreover, made the types of conduct chargeable as unfair labor practices extraordinarily broad. See 5 U.S.C. § 7116(a)(8) ("it shall be an unfair labor practice for a labor organization … to otherwise fail or refuse to comply with any provision of this chapter.")

Thus, in enacting 5 U.S.C. § 7120 and 5 U.S.C. § 7116, Congress channeled nearly every type of claim a person may have against a covered labor organization through the CSRA's administrative scheme.

## STATEMENT OF THE FACTS

The American Federation of Government Employees ("AFGE National") is a labor organization established pursuant to the Federal Service Labor-Management Relations Statute, 5 U.S.C. Chapter 71("FSLMRS").[2] AFGE Local 228 ("Local 228") is an affiliate of AFGE National and solely represents federal government employees at the SBA.[3] At all times relevant Michael Kelly was acting in his official capacity as National Vice President of AFGE District 9. (JA 361.) At all times relevant Johnnie Green was acting in his official capacity as president of Local 228. (JA 36.) Lucas is an African American woman and an Army veteran with a service-connected disability. (JA 46.) These cases stem from her work as an employee of the SBA, where she was employed in Washington DC from January 2017 until April 2020. (JA 45, 359.)

---

[2] This statement of facts draws on the pleadings from Lucas's complaints and documents in the pleadings incorporated by reference.

[3] Although Local 228 was a national local representing all SBA employees in the bargaining unit throughout the United States, it is undisputed that at all relevant times Johnnie Green was employed by SBA in Little Rock, Arkansas. (JA 379).

In October 2017, Lucas sought representation from Local 228 regarding, among other things, disputes over her wages. (JA 47.)

In 2018, Johnnie Green became the president of Local 228. (JA 46, 360.) In January 2018, Green represented Lucas by filing a union grievance against SBA. (JA 47.) The grievance was amended in February 2018 to include a wage and hour dispute from 2018, but the amended grievance did not include disputes for 2017 wages as Lucas had requested. (JA 47-48.)

In March 2018, Green invoked arbitration on the grievance, and a hearing was set for January 2019. (JA 48.) The next month, Green informed Lucas that she should find and pay for her own attorney to represent her in the arbitration. (JA 48.)

In January 2019, the arbitration hearing for Lucas's grievance was delayed until May 2019. (JA 48.)

In May of 2019, Lucas alleges she complained to Green about him sexually harassing her. (JA 48.) Lucas claims the harassment occurred from February 2018 through May 2019 and described the harassment as sexual advances from Green which involved him: espousing his deep affection for her; stating that he loved her; stating he was going to support her because she was a fellow veteran (JA 123);

telling her he loved her and wanted to support her financially (JA 48, 123); and speaking of his love and requesting that she profess her love for him. (JA 104.) She also alleges that she complained to Michael Kelly regarding the sexual harassment, discrimination, and wage and hour claims. (JA 49.)

Lucas alleges a week before the arbitration hearing was set to occur in May, Green replaced himself as her representative with Susan Rhodes. (JA 49.) According to Lucas, Green also told her that she did not have a right or need to be at the arbitration hearing based on the additional expenses and logistics associated with her being a nursing mother, and that Lucas's having a newborn was a burden to the union. (JA 49.) Lucas alleges she reported these incidents to Kelly. Id. After she complained Green did not make any more sexual advances to her. Indeed, Green did not communicate with her between June and October 2019. (JA 50.)

In May 2019, before the scheduled arbitration hearing, Lucas alleges she decided to represent herself, instead of continuing to pay for the union's attorney. (JA 50.) She informed the arbitrator, Felicia Busto, that she would represent

herself, but then, Lucas alleges, the arbitration was postponed, despite her request not to postpone the date. (JA 50.)

As of November 2019, Lucas alleges AFGE National did not take any action to address her harassment claims. Id.

On November 20, 2019, Lucas filed an unfair labor practice ("ULP") charge WA-CO-20-0049 with the FLRA against Local 228 for violation of the duty of fair representation regarding the continuous postponement of the arbitration hearing. (JA 50, 94.) Lucas also included sexual harassment claims against Green. (JA 50, 94.) Lucas concluded that Local 228 violated 5 U.S.C. §§ 7116(b)(1)-(8), and 5 U.S.C. §§ 7116(c)(1)-(2). (JA 92.)

Lucas alleges that after she filed the ULP, Green called her a "bitch" and told her he would ruin her federal career if she did not withdraw the complaints made to Kelly and the FLRA. (JA 51.) Lucas alleges that in November 2019 she was expelled from the union. Id.

Lucas alleges that even though the arbitration was invoked in March 2018, the Union delayed the arbitration for 688 days until it withdrew it completely as retaliation on January 22, 2020. (JA 363, 365.)

In response to Busto inquiring about the status of the arbitration hearing, on January 22, 2020, Green emailed Busto advising her that he had not heard from

Lucas or her representative and that Local 228 would no longer fund the arbitration. (JA 312.) He stated that he believed Lucas was pursuing her claims through the EEO process and advised Busto to close the file. Id.

On May 27, 2020, Lucas claims she discovered the conspiracy to withdraw her arbitration. (JA 363.) Lucas claims, among other things, that these actions prevented her from exercising her workplace rights, caused her to lose wages and other benefits, prompted her expulsion from Local 228, and forced her to retire. (JA 363-65.)

On July 23, 2020, Lucas filed another ULP, WA-CO-20-330, this time against AFGE District 9. (JA 96-99.) She claimed that the union violated 5 U.S.C. §§ 7116(b)(1)-(8), and 5 U.S.C. §§ 7116(c)(1)-(2) and said, among other things, Kelly aided Green in restricting her union rights and expelling her from the union. Id. Furthermore, she alleged Kelly sought to support the discrimination she experienced because of her sex; and he inhibited her negotiations with the SBA. Id.

The next day she submitted a third ULP, WA-CO-20-327, against Local 228. (JA 100-05.) She claimed, among other things, that Green: threatened her by stating she would lose her settlement agreement with the SBA if she did not support the union activities; expelled her from the union for filing a ULP charge; withdrew her arbitration; caused the SBA to discriminate against her

for exercising her rights under the FSLMRS; and requested that Lucas profess her love to him. (JA 104)

On August 20, 2020, Lucas filed a formal charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (JA 117-130.)

In her Charge she alleged, among other things, Local 228 discriminated against her on the bases of race, color, disability, and retaliation for engaging in protected activity when it did not represent her with her grievances against the SBA; and that AFGE National did not address her allegations of sexual harassment against Green. (JA 121-130.)

On October 28, 2020, the FLRA sent Lucas two letters addressing ULPs WA-CO-20-327 and WA-CO-20-330. (JA 110-16.) The FLRA dismissed both charges as untimely, declined to issue complaints, and explained that Lucas could appeal the decisions to the FLRA's General Counsel by November 20, 2020. Id. Lucas subsequently filed an appeal.[4]

**Procedural Facts**

On March 21, 2022, Lucas filed a complaint concerning the representational conduct of AFGE and Local 228 in District Court, Complaint No. 22-0777 ("777

---

[4] It is undisputed that Lucas filed appeals to WA-CO-20-327 and WA-CO-20-049 with the FLRA's Office of General Counsel.

Compl." or Anti-discrimination Complaint") (JA 44). Lucas's first complaint alleges the Union's failure to represent her was the result of discrimination and retaliation against her based on her sex and disability, and alleges Green created a hostile work environment in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Americans With Disabilities Act ("ADA"). (JA 44-57)

On May 27, 2022, Lucas filed a second complaint concerning the representational conduct of the Union. Complaint No. 22-1540 ("1540 Compl." or "FLSA Complaint" (JA 357-75) In the FLSA Complaint she alleges, among other things, the Union unlawfully retaliated against her after she filed a grievance involving overtime, and inappropriately interfered with her claims for relief. Id.

**District Court Decision**

On March 29, 2023, the Honorable Amy Berman Jackson issued a consolidated Opinion dismissing Lucas's complaints and denying her motions to amend. (JA 328-350.) ("Decision").

The district court found that Lucas filed three ULP charges with the FLRA complaining about the same facts and circumstances found in her complaint. Decision at 17, 19-20. The court held the CSRA preempted Lucas's claims because she was alleging that the the Union committed an ULP by breaching its duty of fair representation, and the CSRA grants the FLRA exclusive enforcement authority over such representation claims. Id. at 14-15, 20. The court reasoned that allowing

Lucas to pursue her claims would provide her with a parallel remedy in a federal district court to enforce the duty of fair representation. *Id*. at 18.

The district court also denied Lucas's motion to amend her complaint as futile, observing that Lucas attempted to excise facts relating to her union membership to avoid jurisdictional issues in the complaint. *Id* at 21. The court held that she could not sidestep the question with clever pleading because the duty of fair representation applies to all employees regardless of membership status. *Id*.

## SUMMARY OF ARGUMENT

The district court correctly dismissed Lucas's claims in this matter because it lacked subject matter jurisdiction to hear them. Over the past six years, Lucas, a former employee of SBA has filed numerous lawsuits alleging the same facts against different actors. However, the only matters before this Court are the district court's dismissal of the claims made against the Union in Lucas's complaints.

First, all of Lucas's claims are preempted by the CSRA's "integrated scheme of administrative and judicial review." *Fausto*, 484 U.S. at 443-444. Because Lucas was a bargaining unit employee at the SBA—represented by Local 228, a CSRA-governed union—any claims based on the representational conduct of Local 228 are reviewed under the "elaborate" administrative framework Congress created by enacting the CSRA. *Id*. Except for her harassment allegations, it is uncontested that

Lucas's claims involve the representational conduct of a CSRA-governed federal sector union that represented bargaining unit employees at the SBA. Thus, because the CSRA provides a mechanism for a federal bargaining unit employee to pursue a claim involving the representational conduct of a CSRA-governed union, Lucas "cannot circumvent [CSRA's scheme] by instead bringing a suit in district court." *Secretary of the Air Force*, 716 F.3d at 633.

Lucas and Amicus claim the CSRA does not preempt any of her claims because they are being brought under federal anti-discrimination laws and FLSA retaliation statutes. They argue that a breach in the duty of fair representation is different from Title VII, ADA, and FLSA claims because they are distinct and have independent causes of action with their unique requirements for establishing violations. Moreover, they argue that a breach in the duty of fair representation does not permit the remedies associated with Title VII, ADA, and FLSA claims. These arguments are unavailing because they fail to recognize the comprehensiveness of CSRA and that it is "the scope of the comprehensiveness of the statutory scheme, not the 'adequacy' of specific remedies thereunder, that counsels judicial abstention." *Spagnola v. Mathis,* 859 F.2d 223, 227 (D.C.Cir.1988) ("*Spagnola*") (*en banc*).

Their arguments also fail to recognize that the Union is governed by the CSRA, not the National Labor Relations Act, 29 U.S.C. §§ 151-169 "NLRA".

Unlike the NLRA, the CSRA expressly makes the breach of the duty of fair representation an ULP and establishes the exclusive administrative enforcement that forecloses review by district courts in the first instance. To hold otherwise would undermine Congress's intent to leave the enforcement of union and agency duties under the CSRA to the FLRA. Private sector and postal unions may assert such claims in district courts because they, unlike the Union, are not governed by the exclusive jurisdiction of duty of fair representation claims under the CSRA.[5] Thus, Lucas's reliance on such private sector and postal union cases is misplaced and incorrect.

The Supreme Court's two-step factor analysis in *Thunder Basin Coal v. Reich,* 510 U.S. 200 (1994) ("*Thunder Basin*") supports the conclusion that Lucas's complaints must be pursued through the CSRA's exclusive review procedures, and not district courts.

The first step is satisfied because it is fairly discernible from the CSRA Congress intended the FLRA to have exclusive jurisdiction over the review of the representational conduct of CSRA-governed unions. The second step is satisfied because Lucas's complaints are the type Congress intended to be reviewed within the CSRA's administrative scheme.

---

[5] "The postal service is the only federal entity subject to the jurisdiction of the...NLRB." *Bolton v. Merit Systems Protection Bd*., 154 F.3d 1313, 1317 (Fed. Cir. 1998).

Moreover still, Lucas's hostile work environment claim fails as a matter of law because that theory applies to employers, and it is undisputed that SBA, not the Union, was Lucas's employer.

Finally, we demonstrate that defendant Kelly is immune from suit because union officers cannot be sued in their individual capacity for their official actions as union officers.

## STANDARD OF REVIEW

This Court will review a dismissal for lack of subject matter jurisdiction de novo. *Electronic Privacy Information Center v. IRS*, 910 F.3d 1232, 1236 (D.C. Cir. 2018). Courts may dispose of a motion to dismiss for lack of subject matter jurisdiction under [Rule] 12(b)(1) on the complaint standing alone. *Coalition for Underground Expansion v. Mineta,* 333 F.3d 193, 198 (D.C. Cir. 2003).

# ARGUMENT

### I. The Court Correctly Dismissed Lucas's Complaints Because The Gravamen Of Her Claims Involve The Representational Conduct Of A CSRA-Governed Union And Such Claims Are Subject To The CSRA's Exclusive Review Procedures, Not District Courts.

The district court correctly concluded it did not have subject matter jurisdiction to hear Lucas' claims regarding the representational conduct of the Union because they are covered by CSRA's comprehensive scheme of review. Decision at 20. This Court has found that "[l]itigants generally may seek review of [conduct] in district court under any applicable jurisdictional grant, but Congress may preclude district court jurisdiction by establishing an alternative statutory scheme for administrative and judicial review as an exclusive system of review." *Federal Law Enforcement Officers Association v. Ahuja*, 62 F. 4th 551, 558 (D.C. Cir. 2023) ("*Ahuja*"), (cleaned up) The CSRA's administrative and judicial scheme is the exclusive process for challenging the representational conduct of CSRA-governed unions. *Karahalios v. National Federation of Federal Employees, Local 1263*, 489 U.S. 527, 532 (1989) ("*Karahalios*"). The CSRA precludes district court review of such claims and channels them through its comprehensive statutory review scheme requiring review and enforcement from the FLRA. *Karahalios*, 489 U.S. at 532.

On appeal, Lucas and Amicus concede that Lucas can pursue her claims under the CSRA's administrative procedure but argue that she can also independently pursue claims based on the "same factual core" in district court because they are "distinct and independent causes of actions." See Applt. Br. at 43-44, and Amicus at 8. They also argue that Title VII, ADA, and FLSA offer more remedies than the CSRA. The Supreme Court, in finding that constitutional claims may be preempted by CSRA, has rejected the premise of Lucas's and Amicus's argument. *Elgin*, 567 U.S. at 11 ("Just as the CSRA's 'elaborate' framework…demonstrates Congress' intent to entirely foreclose judicial review to employees to whom the CSRA denies statutory review, it similarly indicates that extra-statutory review is not available to those employees to whom the CSRA grants administrative and judicial review.")

This Court's precedent also makes clear that neither the "adequacy of specific remedies" under CSRA nor the availability of "some other kind of procedure" for bringing a claim, overrides CSRA's preemptive effect. *Sec'y of Air Force*, 716 F.3d at 638 (quoting *Filebark v. U.S. Dep't of Transp., 555 F.3d 1009, 1013* (D.C. Cir. 2006) ("*Filebark*") and *Spagnola* 859 F.2d at 227.) In other words, the fact that discrimination statutes provide Lucas with distinct remedies for her claims does not alter the fact that she must pursue those claims—involving the

representational conduct of CSRA-governed unions—through the CSRA's administrative review scheme and cannot do so directly in district court.

Below, we first show why this Court's precedent makes it clear that Lucas' claims are preempted because, at their core, they allege a breach of the duty of fair representation, which is an ULP.

Next, the two-step analysis described in *Thunder Basin Coal v. Reich*, 510 U.S. 200 (1994) ("*Thunder Basin*") further confirms that Lucas's complaints are the type Congress intended to be reviewed within the CSRA's administrative scheme.

**A. Under The CSRA The Exclusive Regulatory Power Over A CSRA-Governed Union's Representational Conduct Is Vested In The FLRA, And This Exclusivity Precludes Review Of A Title VII, ADA Or FLSA Claim Involving That Same Conduct In District Courts.**

It is settled law that breaches in the duty of fair representation between bargaining unit employees and their CSRA-governed unions are ULPS, and ULPs are governed exclusively by the FLRA. *See Karahalios* 489 U.S. at 532. Except for her hostile work environment claim, neither Lucas nor Amicus deny that the allegations in her complaint involve the representational conduct of Local 228 and AFGE National. Indeed, as stated above Lucas conceded as much when she filed three ULP charges citing the same conduct alleged in her complaints claiming that Local 228 conduct violated 5 U.S.C. §§ 7116(b)(1)–(8), and 5 U.S.C. §§ 7116(c)(1)–(2). (JA 90-99.)

"Since 1978, [the FSLMRS] has been the controlling authority [for federal sector labor relations.]" *Karahalios*, 489 U.S. at 531. In keeping with its purpose, the FSLMRS created nine ULPs for which a federal sector labor union might be liable. See 5 U.S.C. § 7116. Among these, the FSLMRS makes it an ULP for a labor organization to, "interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter." 5 U.S.C. § 7116 (b)(1); and for a labor organization to, "fail or refuse to comply with any provision of this chapter." 5 U.S.C. §7116 (b)(8). In turn, discrimination against a bargaining unit employee because of the race, sex, or disability of an employee is a ULP because the FSLMRS provides that an exclusive representative (i.e. Local 228), "is responsible for representing the interest of all employees in the unit it represents without **discrimination** and without regard to labor organization membership." 5 U.S.C. §7114 (a)(1). (emphasis added)

The FSLMRS vests exclusive original jurisdiction over claims stemming from alleged violations of these statutory creations with the FLRA, providing that, "if any agency or labor organization is charged by any person with having engaged in an [ULP], the General Counsel [of the FLRA] shall investigate the charge and may issue … a complaint." 5 U.S.C. § 7118 (a)(1). Next, the FSLMRS provides that the only way an ULP allegation may be reviewed by a court is on a party's

appeal of a final order of the FLRA to the United States Court of Appeals. 5 U.S.C. § 7123(a).

In *Karahalios*, the Supreme Court unequivocally ruled that the FSLMRS completely preempts both federal and state court jurisdiction over all matters that fall within its scope, including claims that a federal employee's union breached a duty of fair representation owed to that federal employee. *Karahalios*, 489 U.S. at 536-537 ("Had Congress intended the courts to enforce a federal employees union's duty of fair representation, we would expect to find some evidence of that intent in the [S]tatute or its legislative history. **We find none**.") (emphasis added). In reaching this conclusion, the Supreme Court relied on the FSLMRS's unique treatment of both the federal sector duty of fair representation and federal sector ULP claims. The *Karahalios* Court noted that, unlike its private sector counterparts, the CSRA expressly establishes a duty of fair representation, and expressly makes its breach an ULP. *Karahalios*, 489 U.S. at 532.

Put simply, the FSLMRS provides the exclusive avenue for federal employees to litigate claims that their union breached a duty of fair representation owed to them. *Id*.

**B. Unlike the FLRA's Exclusive Jurisdiction Over A Claim Of A Breach Of The Duty Of Fair Representation Against A CSRA-Governed Union, The NLRB's Jurisdiction Over Such Claims Against A Private Sector Union Is Not Exclusive.**

Lucas and Amicus argue that since the CSRA's duty of fair representation is modeled after the NLRA, and district courts may have concurrent jurisdiction with the NLRB over Title VII claims, the district court should exercise concurrent jurisdiction with the FLRA over Lucas's claims. Applt. Br. at 14-15; and Amicus at 22-23. This Court has urged "caution in the application of private sector labor law precedent to public sector labor cases[.]" *American Federation of Government Employees v. Federal Labor Relations Authority.* 835 F.2d 1458, 1461 (D.C. Cir. 1987). Lucas's and Amicus's arguments echo the petitioner's arguments in *Karahalios* and for the same reasons they fail.

The court in *Karahalios* explained:

> [The CSRA] is not a carbon copy of the NLRA, nor is the authority of the FLRA the same as that of the NLRB. The NLRA, like the RLA, did not expressly make a breach of the duty of fair representation an unfair labor practice and did not expressly provide for the enforcement of such a duty by the NLRB. That duty was implied by the Court because members of bargaining units were forced to accept unions as their exclusive bargaining agents. Because employees had no administrative remedy for a breach of the duty, we recognized a judicial cause of action on behalf of the employee. This occurred both under the RLA, *Steele v. Louisville & Nashville R. Co.*, supra; *Trainmen v. Howard,* 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952), and also under the LMRA, *Syres v. Oil Workers*, 350 U.S. 892, 76 S.Ct. 152, 100 L.Ed. 785 (1955); *Vaca v.*

> *Sipes*, []. Very dissimilarly, Title VII of the CSRA not only
> expressly recognizes the fair representation duty but also
> provides for its administrative enforcement.

*Karahalios*, 489 U.S. at 534.

In sum, the CSRA expressly makes a breach in the duty of fair representation

an ULP; and provides for its exclusive enforcement at the FLRA.  5 U.S.C. § 7114

(a)(1); 5 U.S.C. § 7116(b)(8); and 5 U.S.C. 7118(a)(1).

Before the enactment of the CSRA, the Supreme Court in *Vaca v. Sipes*

found that district courts had jurisdiction to enforce a private-sector union's duty of

fair representation because "it could not fairly be inferred that Congress intended

exclusive jurisdiction to lie with the NLRB."  386 U.S. 171, 179 (1967) ("*Vaca*").

The *Vaca* Court reasoned:

> Congress itself has carved out exceptions to the [NLRB]'s
> exclusive jurisdiction: Section 303 of the Labor Management
> Relations Act, 1947, 61 Stat. 158, 29 U.S.C. § 187, expressly
> permits anyone injured by a violation of N.L.R.A. § 8(b)(4) to
> recover damages in a federal court even though such unfair
> labor practices are also remediable by the [NLRB] § 301 of that
> Act, 61 Stat. 156, 29 U.S.C. § 185, which permits suits for
> breach of a collective bargaining agreement regardless of
> whether the particular breach is also an unfair labor practice
> within the jurisdiction of the [NLRB].

*Id*. at 179-80.

Specifically, section 301(a) of LMRA provides that a union may be "sued as

an entity and on behalf of the employees whom it represents in the courts of the

United States." 29 U.S.C. § 185(a).  Nothing in the legislative history of the

FSLMRS indicates that Congress contemplated direct judicial enforcement of the union's duty. *Karahalios*, 489 U.S. at 533. All complaints of ULPs were to be filed with the FLRA. *Id*. at 533. Furthermore, the FSLMRS contemplates the arbitration of unsettled grievances, but a House proposal that the duty to arbitrate could be enforced in federal court in the first instance was rejected. *Id*. at 533-534. There exists no equivalent to §301 of the LMRA, 29 U.S.C. §185, in the FSLMRS. Id. at 534. The Supreme Court found "no express suggestion in [the FSLMRS] that Congress intended to furnish a parallel remedy in a federal district court to enforce the duty of fair representation." *Karahalios*, 489 U.S. at 532. Noting that the duty of fair representation is "expressly recognized in the [FSLMRS], and an administrative remedy for its breach is expressly provided for before the FLRA," *Id*., the Court declined to imply a federal cause of action in favor of federal employees seeking to sue their union for a breach of the duty of fair representation.

Accordingly, Lucas and Amicus's argument that this court should treat Lucas's claims like those of a private sector union and allow district court jurisdiction lacks merit because—unlike for private sector unions—it cannot be inferred Congress meant to give the NLRB exclusive jurisdiction over duty of fair representation claims. However, Congress did expressly intend that the FLRA have exclusive jurisdiction of such claims against CSRA-governed unions. "In this case, there can be no mistaking Congress's intent to create a duty previously without

statutory basis, and no mistaking the authority of the FLRA to enforce that duty."

*Karahalios*, 489 U.S. at 536. "Also, because the courts played no role in enforcing a

union's fair representation duty under Executive Order No. 11491 § 10(e), 3 CFR

861 (1966-1970), and subsequent amended orders, under the pre-CSRA regulatory

regime, there was not in this context any pre-existing judicial role that at least

arguably Congress intended to preserve." *Id*.

### C. Congress Explicitly Provided That Federal Employees Could Still Pursue Title VII And ADA Claims Against The Federal Government, But Not CSRA-Governed Unions.

Further supporting Congress' intent to preempt district court jurisdiction of

ULP claims that involve allegations of discrimination is the CSRA's preservation of

federal employees' rights to bring Title VII and ADA suits against their employer,

the federal government, and not unions. The CSRA explicitly preserves the right of

federal employees to bring suit under Title VII and the ADA. See 5 U.S.C. §

2302(d)(1) and (b)(1). Section 2302(d)(1) provides:

> § 2302. Prohibited personnel practices.
> (d)  This section shall not be construed to extinguish or lessen any effort to
> achieve equal employment opportunity through affirmative action or any
> right or remedy available to any employee or applicant for employment in the
> civil service under—
> (1)section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16),
> prohibiting discrimination on the basis of race, color, religion, sex, or
> national origin[.]

5 U.S.C. 2302(d)(1).

Further, the CSRA provides in Section 2302(b)(1)(A)(D):

> (b)Any employee who has authority to take, direct others to take,
> recommend, or approve any personnel action, shall not, with respect
> to such authority—
> (1) discriminate for or against any employee or applicant for employment—
> (A)on the basis of race, color, religion, sex, or national origin, as
> prohibited under section 717 of the Civil Rights Act of 1964 (42
> U.S.C. 2000e–16);
> (D)on the basis of handicapping condition, as prohibited under section
> 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791)[.]

5 U.S.C. § 2302(b)(1)(A)(D).

Lucas argues that Congress did not intend to carve out exceptions for federal unions against anti-discrimination laws. Applt. Br. at 16-19. But that is exactly what Congress did. Under 5 U.S.C. § 2302(b)(1) and (d)(1), via 42 U.S.C. 2000e–16(c), employees can sue the government for violations of anti-discrimination laws in district court but not CSRA-governed unions.[6] Congress believed the incorporation of the duty of fair representation in the CSRA and providing an administrative remedy for its breach adequately addresses any claims of discrimination against covered unions. Lucas wants more than this, however, a *casus omissus* does not justify judicial legislation. *Ebert v. Poston*, 266 U.S. 548, 554 (1925) "[I]f the Congress [had] intended to provide additional exceptions, it

---

[6] 42 U.S.C. 2000e–16(c) provides in relevant part that an aggrieved employee can file a civil action in which the head of the department, agency, or unit, as appropriate, shall be the defendant.

would have done so in clear language." *Petteys v. Butler*, 367 F.2d 528, 538 (8th Cir. 1966) (Blackburn, J., dissenting). Moreover, as stated above, before the CSRA federal employees did not have any judicial review over unfair labor charges against federal government unions. *Karahalios*, 489 U.S. at 536. Unfortunately for Lucas "what you get under the CSRA is what you get." *Filebark* 555 F.3d at 1011. (cleaned up).

The district court's rationale for dismissing Lucas's complaints is not diminished because Lucas cannot obtain the remedies she desires. While Lucas may not prevail under the administrative procedures of the FLRA or would prefer to challenge the representational conduct of CSRA-governed unions by other means, that does not mean her claims may be brought outside the CSRA's exclusive remedial scheme in the first instance. As stated above not only can the CSRA deny a remedy, the "CSRA can preclude a claim from being brought in a district court even if it forecloses the claim from administrative review and has not 'identified some other kind of plaintiff or some other kind of procedure for bringing the claim.'" *Sec'y of Air Force*, 716 F.3d at 638 (cleaned up).

II.   **Likewise, The *Thunder Basin* Factors Confirm Congress Intended Lucas's Claims Be Pursued Through The CSRA's Exclusive Scheme Of Review And Not District Courts.**

The Supreme Court decision in *Thunder Basin* supports the conclusion that Lucas's claims cannot be pursued in district court. In *Thunder Basin* the Court

addressed the preclusive effect of the Federal Mine Safety and Health Amendments Act of 1977 ("Mine Act"). Thunder Basin, a coal company, objected to a Mine Act regulation that required it to post the names of certain union representatives. *Thunder Basin*, 510 U.S. at 203-04. Rather than seek review of the regulation through the Mine Act's judicial-review scheme, which contemplates that "[c]hallenges to enforcement [will be] reviewed by the Federal Mine Safety and Health Review Commission ... and by the appropriate United States court of appeals," Thunder Basin filed a lawsuit in federal district court in which it argued that the Mine Act's review scheme violated its due process rights under the Fifth Amendment. Id. at 204-06. The district court issued an injunction in Thunder Basin's favor, but the Supreme Court reversed, concluding that the district court lacked subject matter jurisdiction over the action. Id. at 205-07.

The Court held that when a statutory scheme, such as the Mine Act, "allocate[s] initial review to an administrative body" and authorizes only "delayed judicial review," courts must analyze certain factors when assessing whether Congress's intent to "preclude initial judicial review" can be "fairly," if impliedly, "discerned" from the statutory scheme. *Id*. at 207. The Court then analyzed these factors and concluded that all supported a finding of preclusion.

Using the framework outlined in *Thunder Basin* this Court will find that "Congress intended that a litigant proceed exclusively through a statutory scheme ...

when (i) such intent is 'fairly discernible in the statutory scheme,' and (ii) the litigant's claims are 'of the type Congress intended to be reviewed within [the] statutory structure.'" *Trump*, 929 F.3d at 754 (quoting *Jarkesy v. SEC*, 803 F.3d 9, 15 (D.C. Cir. 2015) ("*Jarkesy*")).

> **A.** **Step 1 Factor Of The *Thunder Basin* Test Is Satisfied Because It Is Fairly Discernible From The CSRA That Congress Intended The FLRA To Have Exclusive Jurisdiction Over Review Of The Representational Conduct of CSRA Governed Unions.**

Here, the first step is satisfied because nearly forty years of D.C. Circuit precedent compels the conclusion that it is "fairly discernible" from the statutory scheme that Congress intended CSRA's review procedures to be "exclusive with respect to claims within its scope*." Trump*, 929 F.3d at 755 (cleaned up); *see also Am. Fed'n of Gov't Emps. v. Loy,* 367 F.3d 932, 935 (D.C. Cir. 2004); *Steadman v. Governor, U.S. Soldiers' & Airmen's Home*, 918 F.2d 963, 967 (D.C. Cir. 1990)). *See also Karahalios* 489 U.S. at 532 (finding that Congress intended CSRA's review procedures to be the exclusive procedure for review of claims involving breaches of the duty of fair representation). See also *Supra* I(A).

> **B.** **The Step 2 Factors of *Thunder Basin* Test Applied To Lucas's Complaints Confirm That Her Claims Are Of The Type Congress Intended To Be Reviewed Within The Statutory Scheme.**

Moving to the next step, Lucas's claims are "of the type Congress intended to be reviewed within [the] statutory structure." *Trump*, 929 F.3d at 754 (cleaned up).

Indeed, neither Lucas nor Amicus deny that Lucas may seek redress under CSRA and that her claims, except for her hostile work environment claim, involve the representational conduct of the Union. Amicus at 8-9.

EEOC amicus argue instead that decisions in *Burton v. AFGE 1988*, No. 1:11-cv-01416, 2012 WL 3580399, at *6-13 (E.D.N.Y. Aug. 17, 2012) *Cogburn v. AFGE*, No. 1:06-cv-00425, 2006 WL 2884505, at *7 (S.D. Miss. Oct. 10, 2006) *Price v. AFGE*, No. 3:15-cv-00293, 2016 WL 1276421, at *6 n.17 (E.D. Va. Mar. 30, 2016) and *Blankenship v. AFGE*, No. 3:15-cv-00294, 2016 WL 1276425, at *6 n.18 (E.D. Va. Mar. 30, 2016) demonstrate that district courts have jurisdiction over Title VII or ADA claims against a federal-employee union even when those claims are premised on conduct that could also support an unfair representation claim. Amicus at 21.  However, none of the cases were examined under *Thunder Basin*, nor would they survive such an examination that would allow Lucas's claims to evade the FSLMRS's review scheme and bring her complaints to district court.

Lucas's claims do not satisfy the second step in the *Thunder Basin* test. In considering that second step, this Court has endorsed the use of three "general guideposts." *Jarkesy*, 803 F.3d at 17. Specifically, claims "will be found to fall outside of the scope of a special statutory scheme in only limited circumstances, when (1) a finding of preclusion might foreclose all meaningful judicial review; (2) the claim[s] [are] wholly collateral to the statutory review provisions; and (3) the

claims are beyond the expertise of the agency." *Arch Coal, Inc. v. Acosta*, 888 F.3d

493, 500 (D.C. Cir. 2018) (quoting *Free Enterprise Fund v. Public Co. Accounting*

*Oversight Bd*, 561 U.S. 477, 489 (2010); and *Thunder Basin,* 510 U.S. at 212–13).

Here, all three guideposts demonstrate that Lucas' claims are of the type Congress

intended to be reviewed through CSRA.

### i. Finding Preclusion Would Not Foreclose All Meaningful Judicial Review of Lucas's Claims.

First, requiring Lucas to proceed through the FSLMRS's scheme does not

foreclose "all meaningful judicial review" of her claims.  *Trump*, 929 F.3d at 755.

The statutory scheme provides a path for judicial review of a CSRA-governed

union's representational conduct—most obviously in the context of ULP

proceedings litigated directly before the Authority, with potential review by a court

of appeals. 5 U.S.C. § 7123(a). See also *Supra* I(A). This exclusive review scheme

applies regardless of whether the FLRA may grant the relief Lucas seeks. Namely,

claimants may be required "to raise their challenges through FSLMRS scheme even

if that [makes] it impossible to obtain particular forms of review or relief." *Trump*,

929 F.3d 748, 756 (D.C. Cir. 2019) (citing *AFGE v. Sec'y of the Air Force*, 716

F.3d 633, 636 (D.C. Cir. 2013)).  Because the scheme here may end in judicial

review, the first *Thunder Basin* factor demonstrates that Congress intended to

preclude direct judicial review of Lucas's claims outside of the statutory scheme.[7]

### ii. Lucas's Complaints Are Not Wholly Collateral To The CSRA Review Scheme.

Second, Lucas's claims are not "wholly collateral" to the statutory review

scheme. This Circuit has observed that this factor is "related" to whether

"meaningful review" is available; according to the decision in *Trump*, the two are

sometimes analyzed together, and this consideration is examined by asking whether

a plaintiff seeks the same relief it could seek in the agency proceeding.  *Trump*, 929

F.3d at 759-760.  The Court in *Trump* concluded that claims about challenged

executive orders were not "wholly collateral" because they were the type of claim

"regularly adjudicated" in the statutory scheme.  *Id*. at 760.

Like the claims of the appellees in *Trump*, Lucas's complaints, regarding the

representational conduct of a CSRA-governed union, are regularly litigated by the

FLRA.  Moreover, if the Union's conduct is found to be unlawful the remedies

available under the FSLMRS include orders to cease and desist from any such

unfair labor practice in which a labor organization is engaged; or such other action

as will carry out the purpose of the FSLMRS. See 5 U.S.C. §7118(a)(7)(a)(d).

---

[7] Lucas may still obtain judicial review of her ULP charges as it is undisputed that Lucas filed appeals to WA-CO-20-327 and WA-CO-20-049 with the FLRA's Office of General Counsel.

Where necessary, the FLRA "may petition any appropriate United States court of appeals for the enforcement of any order." 5 U.S.C. § 7123(b).

Moreover, a challenge is not "wholly collateral" to a statutory scheme if the plaintiff "aim[s] to obtain the same relief [it] could seek" through the statutory regime, especially where the claims are "inextricably intertwined with the conduct of the" statutory scheme's proceedings. *Jarkesy*, 803 F.3d at 23. *See also Elgin*, 567 U.S. at 22; *Trump* 929 F. 3d at 759-760.

There is no dispute that Lucas's claims are inextricably intertwined with the conduct proscribed in the FSLMRS as Lucas filed three ULP charges—the FLRA dismissed—alleging the same conduct at issue in her complaints. (JA 94, 98, 105, 110-16.) Lucas asked the district court for the same kind of relief she could have obtained through the statutory scheme, namely a ruling on whether the representational conduct involving the Union was lawful. Thus, "[a]s evidenced by [her] district court complaint[s]" and her previously filed ULPs, Lucas's "[anti-discrimination and FLSA complaint] claims are inextricably intertwined and [are] simply the vehicle by which [Lucas] seek[s] to [undermine] the [FLRA's] decision[s]" dismissing her complaints. *Jarkesy*, 803 F.3d at 23 (quoting *Elgin*, 567 U.S. at 20). *See Trump*, 929 F.3d at 760 (finding that the unions' challenges to the constitutionality of three executive orders affecting collective bargaining were not wholly collateral because the relief the unions sought—"rulings on

whether the executive orders are lawful and directives prohibiting agencies from

following the executive orders during bargaining disputes"—could also be

obtained through proceedings before the FLRA and then a federal court of

appeals). Accordingly, as with the appellees complaints in *Trump* Lucas's

complaints are also not wholly collateral to the CSRA review scheme.

### iii. The FLRA Has The Expertise To Bear On Lucas's Complaints.

Finally, under *Thunder Basin*'s third factor, the FLRA has expertise that may

be brought to bear on Lucas's Complaints. The agency-expertise inquiry is not

focused on "an agency's relative level of insight into the merits of a [Title VII,

ADA or FLSA]" question, *Trump*, 929 F.3d at 760, (cleaned up), but instead on

whether the agency has expertise that could be "brought to bear" on "the many

threshold questions that may accompany a [Title VII, ADA or FLSA retaliation]

claim and to which the [agency] can apply its expertise." *Elgin*, 567 U.S. at 22.

The FLRA's expertise may be brought to bear in this case because the FLRA

routinely reviews Title VII, retaliation, and other anti-discrimination claims. Under

section 7122(a) of the FSLMRS, the FLRA has jurisdiction over, and routinely

reviews arbitration awards that deal with violations of anti-discrimination laws. *See*

*Health Care Financing Administration, Department of Health and Human Services*

*and American Federation of Government Employees, Local 1923*, 35 F.L.R.A. 274,

291-93 (1990) (the FLRA interpreted and applied the Age Discrimination and

Employment Act). *American Federation of Government Employees, Local 3295 and U.S. Department of the Treasury, Office of Thrift Supervision, Washington, D.C.*, 51 F.L.R.A. 27, 33 (1995) (the FLRA reviewed the arbitrator's findings applicable to violations of Title VII of the Civil Rights Act of 1964). *National Treasury Employees Union, and National Treasury Employees Union, Chapter 48 and U.S. Department of the Treasury, Internal Revenue Service, Southeast Region, Richmond District*, 54 F.L.R.A. 1197 (1998) (same).

Moreover, the FLRA applies the framework outlined in *Letterkenny Army Depot and International Brotherhood of Police Officers, Loca*l 358, 35 F.L.R.A. 113 ("*Letterkenny*"), to cases involving alleged union discrimination against employees. *American Federation of Government Employees Local 1345 Fort Carson, Colorado* (In Trusteeship) and *American Federation of Government Employees,* 53 F.L.R.A. 1789, 1793 (1998). Moreover, the *Letterkenny* framework applies a two-step burden-shifting scheme of review to retaliation claims analogous to the burden-shifting scheme in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *Id*. at 1794. Thus, it cannot reasonably be disputed that the FLRA has expertise to bear on Lucas's Title VII, ADA, and FLSA retaliation claims.

In short, none of the *Thunder Basin* factors support Lucas's attempt to evade the FSLMRS's review scheme and bring her complaints to district court.

### III. Lucas's Attempt At Artful Pleading To Recast Her ULP Complaints As Violations Of Title VII, ADA And The FLSA Must Fail Because The CSRA's Remedial Scheme Is Exclusive.

The Court must reject Lucas's attempt at artful pleading to recast her claims as stemming from Title VII, ADA, and the FLSA. While CSRA does not "'preclude[ ] an employee from suing [her] union,' under all circumstances,'" courts have typically only found CSRA preclusion inapplicable where parties have alleged an intentional tort such as defamation. *See Wood v. American Federation of Government Employees*, 255 F. Supp.3d 190, 197 (D.D.C. 2017) (quoting *Gutierrez v. Flores*, 543 F.3d 248 (5th Cir. 2008); *see also Conejo v. Am. Fed'n of Gov't Emps*., AFL-CIO, 377 F.Supp.3d 16, 25 (D.D.C. 2019)(holding that plaintiff's state law defamation and invasion of privacy claims were not preempted by CSRA).

Moreover, courts, have, pursuant to the Supreme Court's mandate in *Karahalios*, routinely refused to allow federal employee plaintiffs to evade the CSRA's preemptive effect on ULP charges by artful pleading. *See e.g. Johnson v. Principi*, No. 03-1367, 2004 WL 2044258, at *5–7 (N.D. Ill. Sept. 3, 2004) (determining CSRA preempts duty of fair representation claims being labeled as discrimination claims against union); *see also United States Marshals Service v. Federal Labor Relations Authority*, 708 F.2d 1417, 1421 (9th Cir. 1983) (finding that artful pleading does not provide an escape from the FSLMRS' statutory

preemption of private causes of action); *see also Montplaisir v. Leighton*, 875 F.2d 1, 4 (1st Cir. 1989)("*Montplaisir*").

In *Montplaisir,* former federal air traffic controllers sued their union's attorneys for malpractice alleging bad advice regarding the consequences of engaging in an unlawful strike. *Montplaisir*, 875 F.2d at 1.

The court in *Mountpaisir* recognized that private suits against CSRA-governed unions "would seriously undermine what we deem to be the congressional scheme, namely to leave the enforcement of union and agency duties under the [CSRA] to the FLRA and to confine the courts to the role given them under the CSRA."  Id at 3. (cleaned up) The court stated "[w]here labor-law preemption is an issue, creative labeling cannot carry the day," the court admonished that the decision "not to couch their complaint as an [ULP] cuts no mustard."  *Id* at 4. Noting the statutory language making it a ULP for federal workers to condone or call for a strike, 5 U.S.C. §7116(b)(7), the court concluded that the claims before it were in reality ULP complaints by union members against their union. *Id* at 3. Since the CSRA preempted judicial review of such claims, the court correctly concluded that it would be equally disruptive to allow plaintiffs to "accomplish indirectly (by suing PATCO's lawyers) what *Karahalios* bars them from accomplishing directly (by suing PATCO)." *Id* at 4.

In the present case, although Lucas pleads violations of Title VII, ADA, and the FLSA, the factual allegations underpinning her claims make it clear that the gravamen of her complaints against the Union is a claim that Local 228 failed to represent her with her grievances against the SBA. Thus, it was appropriate for the district court to look to the gravamen of Lucas's claims against the Union and her attempt to re-characterize them for what they truly are; a disguised ULP alleging a breach of the duty of fair representation.[8]

As stated above under 5 U.S.C. 7114(a)(1), a CSRA-governed federal employee union's duty of fair representation includes the duty to "represent[] the interest of **all employees, not just members,** in the unit it represents "**without discrimination**" (emphasis added); *See Karahalios*, 489 U.S. at 531. This statutory language thus encompasses all the types of discrimination in employee representation that are prohibited in Title VII, ADA, and FLSA. Contrary to Amicus's assertions, Amicus at 11, this duty is for all bargaining unit employees

---

[8] The Union does not waive any Statute of Limitations defense that may be available in this case. Lucas did not file an EEOC Charge until August 20, 2020, (JA 117), any claims and or discrete actions occurring more than 300 days prior is barred by any potentially applicable statute of limitations. 42 U.S.C. §§ 2000e-5(e)(1), 12117(a). Although Lucas alleges a hostile work environment, she alleges that Local 228 refused to represent her in 2017 (JA 44); in May 2019 Green withdrew as her representative and replaced himself with an inexperienced steward (JA 49); and Green sexually harassed her from February 2018 through May 2019 by making sexual advances, including professing his love. (JA 48)

whether they are members or not. *Id*. Moreover, the FSLMRS provides that "it shall be an [ULP] for a labor organization to interfere with, restrain, or coerce **<u>any employee</u>** in the exercise by the employee of any right under this chapter." 5 U.S.C. 7116 (b)(1) (emphasis added).

The district court correctly held it did not have jurisdiction over Lucas's complaints because she was alleging that the Union committed ULPs and the CSRA grants the FLRA exclusive enforcement authority over such claims. Decision at 14-15. The district court observed that Lucas alleged the same facts listed in multiple ULP charges against the Union. Decision at 17. The court held that in each of the ULPs, Lucas specifically alleged that the conduct now underlying her claims under Title VII and the ADA contravened the CSRA's prohibition against ULPs. Decision at 18. The district court held that the allegations in her complaints are properly characterized as a mere repackaging of her claims under the CSRA for breach of the duty of fair representation. *Id*. "Allowing [Lucas] to pursue her claims before [the district court] would provide her with a "parallel remedy in a federal district court to enforce the duty of fair representation." *Id*. citing *Karahalios*, 489 U.S. at 532. Because Congress sought to foreclose this scheme and deny employees an additional avenue of review in federal court, the plaintiff cannot establish that the federal court has subject matter jurisdiction. *Id*. " Lucas cannot "escape the CSRA's reach by dressing up [a CSRA] claim with a different label—i.e., Title VII [of the

Civil Rights Act of 1964]…" Decision at 16, (citing *Hudson v. Am. Fed'n of Gov't*

*.*, No. CV 19-2738 (JEB), 2020 WL 3035039, at *7 (D.D.C. June 5, 2020), aff'd,

No. 20-5181, 2021 WL 4811388 (D.C. Cir. Oct. 12, 2021)).

The district court further held that Lucas's FLSA retaliation complaint cannot

be construed to be about anything other than the breach of the duty of fair

representation, which is unquestionably a ULP under the CSRA. Decision at 19.

The record supports the Court's conclusion as Lucas's FLSA complaint concerns

the representational conduct of the Union. For example, Lucas alleges:

> The defendants conspired with the SBA to delay, for approximately
> two years, her FLSA arbitration [JA 358].

> In May 2019, and again in January 2020, as a direct and proximate
> result of the grievance filed, defendants arbitrarily delayed her arbitration.
> [JA 367].

> The defendants promised her that her FLSA complaint would be
> arbitrated. AFGE National promised her that when Local 228
> postponed her arbitration, that it would intervene to resolve her FLSA
> complaint." [JA 366].

> The defendants promised her the ability to arbitrate her FLSA
> complaint that she grieved as early as 2018. [JA 370].

> After two years of the injustice of having her FLSA complaint
> delayed by the defendants, the plaintiff endured a perverse, abusive, violent
> workplace. She expected that there was only more to come
> after her discharge from the union for her protected activity. The
> defendants' reason for the delay and the withdrawal is discriminatory and
> pretextual. [JA 373].

Decision at 19.

A claim that a union representing federal employees improperly handled a grievance by delaying and ultimately failing to arbitrate a grievance is a claim for a breach of the duty of fair representation. *See American Federation of Government Employees, Local 1945 and Sam Cash,* 1993 WL 291350 * 10 (June 25, 1993)(FLRA held that a union breached its duty of fair representation and committed a ULP when it assured an employee that it would arbitrate his grievance and the employee relied on this assurance and ultimately lost the right to have his grievance arbitrated because the union never invoked arbitration. *See also*, *International Associated Machinists and Aerospace Workers, Local 39, AFL-CIO*, 24 F.L.R.A. 352, 353 (1986). (FLRA held it was a ULP for the union to mislead an employee into thinking that the union was going to file a grievance, and the employee's reliance on the union caused him to lose the right to file a timely grievance.)

Although Lucas does not refer to her claims as ULPs in her complaints, she understood that her allegations were ULPs as they alleged a breach of the duty of fair representation. Indeed, as stated above Lucas filed ULP charges against Local 228 and AFGE National asserting essentially the same claims she puts forward in Complaint 22-cv-1540.

In her ULPs, she alleged among other things: Local 228 violated the duty of fair representation when it continuously postponed the arbitration hearing. (JA 98,

104); Local 228 violated 5 U.S.C. §§ 7116(b)(1)-(8) and 5 U.S.C. §§ 7116(c)(1)-(2). (JA 92.)

AFGE National violated 5 U.S.C. §§ 7116(b)(1)-(8), and 5 U.S.C. §§ 7116(c)(1)-(2) when Kelly aided Green in restricting her union rights and expelling her from the union. (JA 98.) Furthermore, Kelly inhibited her negotiations with the SBA. Id.

Green: threatened her by stating she would lose her settlement agreement with the SBA if she did not support the union's activities; expelled her from the union for filing a ULP charge; withdrew her arbitration; caused the SBA to discriminate against her because she was exercising her rights under the FSLMRS; and requested that Lucas profess her love to him. (JA 104.)

Because Lucas's complaints are alleging principally that the Union breached the duty of representation by failing to represent her adequately with her grievances against SBA, the court correctly held—that as in her Anti-Discrimination Complaint —Lucas cannot pursue a breach of the duty of fair presentation merely by reframing it as among other things, a violation of the FLSA. Decision at 20. Accordingly, this Court should affirm the district court's ruling.[9]

---

[9] Even assuming the court had jurisdiction over Lucas's FLSA complaint, the claim fails because the Union was not her employer, and under the FLSA, only employers are liable for civil legal or equitable relief. 29 U.S.C. § 216(b). See Defendants' Opposition to Motion to Amend (JA 532-34.)

## IV. As A Matter Of Law, A Labor Union Cannot Be Held Liable Under Title VII For Creating A Hostile Work Environment When It Is Not Acting As an Employer.

Lucas's harassment claim fails because as a matter of law, a labor union cannot be held liable under Title VII for creating a hostile work environment when it is not acting as an employer and the Union was not her employer. The Supreme Court has explained, that a hostile work environment claim rests on the fact that "the phrase '**terms, conditions or privileges of employment** in [42 U.S.C. § 2000e–2(a)(1)] is an expansive concept which sweeps within its protective ambit the practice of creating a working environment heavily charged with ethnic or racial discrimination . . .' " *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986) ("*Meritor*") (quoting *Rogers v. EEOC*, 454 F.2d 234, 238 (5th Cir. 1971)) (emphasis added). Importantly, that language preventing an employer from discriminating against any individual with respect to "[her]… terms, conditions, or privileges of employment," 42 U.S.C. § 2000e–2(a)(1) is the statutory origin of Title VII hostile work environment claims. Id. *Meritor*, 477 U.S. at 65.

Congress wrote Title VII with different language in the relevant employer and union subsections. *Phillips v. UAW International*, 854 F.3d 323, 326 (6th Cir. 2017) ("*Phillips II*"). Only in the employer subsection is there a specific prohibition on discrimination with respect to "compensation terms, conditions, or privileges of employment. *Phillips II* 854 F.3d at, 326, citing §2000e-2(a). In contrast Title VII

prevents "a labor organization [from] exclud[ing] or...expel[ling] from its membership, or otherwise... discriminat[ing] against, any individual because of [her] race." 42 U.S.C. § 2000e–2(c)(1).

Lucas has conflated 42 U.S.C. § 2000e–2(a)(1) and (c)(1), suggesting that a labor union's liability under 42 U.S.C. § 2000e–2(c)(1) can be based on a hostile work environment theory of discrimination.

That this claim-originating language is missing from Title VII's union subsection was enough for the district court in *Phillips v. UAW International,* 149 F.Supp.3d 790 (E.D. Mich. 2016) (*Phillips I*) to conclude that unions are not liable for such claims. *Phillips II* 854 F.3d at, 326. That is because Title VII's "terms and conditions" language is the basis for hostile work environment claims but absent from Title VII's union subsection, the district court held that unions qua unions are not liable under Title VII for such claims. *Id.*

Assuming arguendo that the Union is a labor organization as defined in Title VII, Lucas's claims fails because it rests entirely upon the premise that Title VII permits a plaintiff to bring a hostile work environment claim against a labor union even when the union is not the employer. If this Court reaches this issue, it should reject that premise.

Judge Posner in the seventh circuit opined "[t]he duties of nondiscrimination imposed by sections [42 U.S.C. § 2000e–2 (a)(1) and (c)(1)] have reference to the

respective roles of company and union in the workplace. The company, not the union, controls the workplace . . . the union is not the company, but the workers' agent in dealing with the company." *EEOC v. Pipefitters Ass'n Local 597*, 334 F.3d 656, 659 (7th Cir. 2003) ("*Pipefitters*").

Unlike an employer, a labor union's liability under 42 U.S.C. § 2000e–2 (c)(1) is not based upon discrimination that alters employment terms; therefore, a union cannot be held liable under a hostile work environment theory when it is acting in its capacity as a bargaining representative. Simply put, to hold a party liable for creating a hostile work environment, that party must have the ability to alter the terms and conditions of employment—as an employer. *See Pipefitters*, 334 F.3d at 659 (rejecting EEOC's argument that employer and union liability under sections 42 U.S.C. § 2000e–2(a) and (c) is identical and holding that the agency's "asserted symmetry between employer and union is spurious" given their different roles and rights).

As Lucas brings this case against the Union as her bargaining representative, and not her employer, her claim fails as a matter of law. The plain language of Title VII does not support a finding to the contrary.

Lower courts that have addressed this issue have soundly rejected hostile work environment claims against unions not acting as employers. While the Union acknowledges that this authority is not binding on this Court, the analysis applied to

this issue is persuasive. In *Kasper v. City of Middletown*, the plaintiff brought suit against her employer and her union alleging, among other claims, that the union violated Title VII by creating a sexually hostile work environment when a union agent repeatedly called her "babe," and responded to her complaints by asking "What do you want us to do, buy pantyhose?" 352 F. Supp.2d 216, 231 (D. Conn. 2005). In dismissing the plaintiff's hostile work environment claim against the union, the court explained that "[t]he hostile work environment theory grows out of [section 2(a)(1)'s] language that employers may not discriminate in regard to any of the 'terms, conditions, or privileges' of employment." *Id*. at 234 (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 116 (2002)).

Likewise, in *Hout v. City of Mansfield*, 550 F. Supp. 2d 701 (N.D. Ohio 2008), a group of employees alleged a Title VII hostile work environment claim against their union for failing to take action to combat, and thereby allegedly condoning their employer's harassment. As in *Kasper*, the *Hout* court relied upon the statutory source of hostile work environment claims in 42 U.S.C. § 2000e–2 (a)(1) and dismissed the claims against the union as a matter of law because it was not the plaintiffs' employer. *Id*. at 742.

Lucas and Amicus rely on five inapt out-of-circuit cases to support Lucas's hostile work environment claim. Amicus at 24-25. Only one of the five cases— *Dixon v. International Brotherhood of Police Officers*, 504 F.3d 73 (1st Cir. 2007)

("*Dixon*")—however, makes a finding of liability with an analysis of the asymmetry discussed above between 42 U.S.C. § 2000e-2(a)(1) and 2(c)(1). Indeed, three of the cases— *Philips II*, *Woods v. Graphic Communications,* 925 F.2d 1195 (9th Cir. 1991) ("*Woods*"), and *Anjelino v. New York Times Co.,* 200 F.3d 73 (3rd Cir. 1999) ("*Anjelino*")—do not find that the unions are liable for a hostile work environment but merely state that such liability is possible. The two cases that did find the union liable—*Dowd v. United Steelworkers of America, Local No. 286*, 253 F.3d 1093 (8th Cir. 2001) ("*Dowd*") and *Dixon*—assert facts demonstrating that the unions had some control of the terms and conditions of the work setting and that members of the union took part in creating a hostile work environment. And even those cases had facts distinguishable from the facts alleged in Lucas's complaint.

Amicus mistakenly relies on *Woods* for the proposition that a union is liable under Title VII for harassing their members—or failing to remedy union agents' harassment of members—based on protected traits. Amicus at 25. The Ninth Circuit stated this proposition in support of its holding that the union was liable under **Washington state law**, which "prohibits any discrimination by a union against a member." *Woods*, 925 F.3d at 1201. Further, the Court found union liability in part because the union had an anti-discrimination provision within its collective bargaining agreement—which stated in part the "union shall not discriminate against an employee or applicant for employment, in any terms or conditions of

employment…"—thus "assum[ing] responsibility for preventing discrimination in the terms and conditions of employment." *Id*. Furthermore, this case only found Title VII liability for unions in *dicta*, as the district court barred the Title VII claims against the union for procedural defect, and the hostile work environment claims were based in Washington state law.

Amicus's reliance on *Angelino* fares no better. In *Anjelino* a group of New York Times mailroom employees brought suit against the New York Times Company, its publisher, and New York Mailers' union No.6 ("Local No. 6"), for sex discrimination and harassment under Title VII, among other claims. 200 F.3d at 78. They alleged, in part, that Local No. 6's hiring scheme disadvantaged workers based on sex. *Id*. The district court, without conducting a statutory analysis dismissed the appellant's amended complaint in its entirety. *Id*.

The Third Circuit affirmed the dismissal of claims against Local No. 6, even where they reversed the dismissal of the sexual harassment claims against the employer, because "[Local No.6] was not the employer of the appellants." *Anjelino*, 200 F.3d 73 at 95. While the court stipulated that "a union may be held liable under Title VII," they found that the record did not support the argument that "the union itself instigated or actively supported the discriminatory acts allegedly experienced by the appellants." *Id*. (emphasis in original). The court instead found that the Times was "the party responsible" for the sex-based discrimination and harassment.

*Id.* at 96. The court's statement—that a union is liable for harassment under Title VII—is supported by dicta. *Id.*

Further, this Court should also reject Lucas's reliance on *Phillips II* to support a union's liability for a hostile work environment claim when it is not an employer because the court of appeals did not reach the question of whether unions are liable for hostile work environment claims under Title VII. *Phillips II*, 854 F.3d at 327. It did state in *dicta* that there are good reasons to question the district court's reading. *Id.* at 326. However, the court explicitly declined to reach that question, which it acknowledged was a novel question of law for the Circuit. *Phillips*, 854 F.3d at 326.

While *Dixon* did not conduct a statutory analysis regarding the asymmetry between 42 U.S.C. § 2000e-2(a)(1) and 2(c)(1) it did find facts where the union was essentially acting as a quasi-employer. The facts demonstrated that the union had control over its members, and the members—while engaged in union activity—subjected employees to harassment. In this very distinct situation, unlike the facts of this case, the court found that the union was liable for those actions that occurred while the employees engaged in union activity.

In *Dixon*, a police officer and member of the International Brotherhood of Police Officers ("IBPO") Local 382 ("Local 382"), sued the national union, its local chapter, their presidents, and two individual police officers alleging discrimination,

retaliation, and defamation under both Title VII and Massachusetts state law.

*Dixon*, 504 F.3d at 73. The alleged harassment and retaliation arose from a union

trip to Boston for a gubernatorial rally. *Id*. at 78. When Dixon arrived for the trip,

she was subjected to "gender-based criticisms" relating to her outfit and presence

on an "all-male trip." *Id*. At 78. After attending the gubernatorial rally, the union

group went to several bars. *Id*. At one bar, they befriended another group that was

in town for a convention. *Id*. The group included Jason Kumm. *Id*. When the bar

closed at 2 a.m., Kumm did not know how to get back to his hotel. *Id*. Dixon

requested that the group's bus driver drop Kumm at his hotel on the way to theirs.

They obliged. *Id*. However, once everyone was on the bus, the group subjected both

Dixon and Kumm to severe sexual harassment. The comments, directed at Dixon

and Kumm, included:

> Why don't you fuck her? We all have. She gives great
> blowjobs. She will do you; she's done all of us. The bus
> driver, who testified that she had spent seven years trying
> to forget that night, explained that the word fuck was
> used so often that I was turning my mind off to it.

*Id*. 78-79. (emphasis added). The harassment escalated on the way to the hotel and

both Kumm and Dixon fled the vehicle for fear of their safety. *Id.* Local 382

president was on the bus and did not do anything to end the harassment. *Id*. Further,

after the incident, one police officer sought a temporary restraining order ("TRO")

against Dixon, knowing "the TRO would have the result, under department policy and Massachusetts law, of forcing the police department to put Dixon on administrative leave and [to] confiscate her weapon[.]" *Id*. The local news reported on the TRO, which prompted the president of the IBPO to host a local television show "produced and paid for by the union" in which he defended the male officers who harassed Dixon, the police chief, and the city manager. *Id*. at 79-80.

The court found that since the union organized and paid for the trip—and those on the trip understood it was a union trip, there was sufficient evidence to conclude that the "police officers were at the rally as representatives of the union." *Id*. at 85. Thus, the union was in control of the officers on the trip and was therefore liable for discriminatory harassment.

Only the 8th Circuit in *Dowd* conducted a statutory analysis and found the union was liable under the hostile work environment theory. 253 F.3d at 1093. In *Dowd*, a group of African American employees brought suit against their employer and union after they were subjected to race-based slurs and harassing conduct when crossing a union-organized picket line to get to work each day. *Id*. at 1096-1097. The court held that the plaintiffs could maintain a hostile work environment claim against the union—as a non-employer—because the phrase "or otherwise to discriminate against" in 42 U.S.C. § 2000e–2(c)(1) supports a discrimination claim under any theory of liability. *Id*. at 1102. However, the *Dowd* court erred in

ignoring the textual origin of hostile work environment claims in 42 U.S.C. § 2000e–2(a)(1) as explained above.

Moreover, *Dowd* is highly factually distinguishable from Lucas's case because the harassment in Dowd, affected the plaintiffs' work environment. In addition, the harassment was directly connected to a union-sponsored activity—the strike. *Id*. at 1103. Upon entering and exiting the workplace each day for a period of nine to eleven weeks, union members subjected the *Dowd* plaintiffs to severe racial harassment. *Id*. at 1102. The court stated the "touchstone for a Title VII hostile environment claim is whether "the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. *Id*. at 1103 (cleaned up). In *Dowd* union members subjected the plaintiffs to racial slurs and threats of physical violence each time they drove into and out of the plant. *Id*. There was evidence that the picketers threw tacks down in the pathway of the plaintiffs' cars and spat on their car windows. *Id*. In addition, there was evidence that the plaintiffs were fearful for their safety. *Id*. In effect, the plaintiffs had to "run a gauntlet of [racial epithets] in return for the privilege of being allowed to work and make a living ...." *Id*. (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

In contrast, Lucas does not offer any context as to where the harassing conduct occurred and alleges Green sexually harassed her from February 2018 until May 2019. (JA 44-56.) Lucas's only description of that sexual harassment was Green espousing his love and deep affection for her. In her Anti-Discrimination Complaint, she alleges "Green began to sexually harass [her], stating that he loved me and that he was going to support me because [she] was a fellow veteran..." (JA 123); "Green began making unwanted sexual advances toward her, including telling her he loved her and wanted to support her financially." (JA 48); "Greene's ongoing sexual harassment speaking of his love and requesting that she profess her love for him." (JA 104.) "[H]e continued to espouse his love to [her] which was rebuffed." Id. Furthermore, Lucas admits that she did not have any communication with Green after May 2019 until November 2019. (JA 50.) This factual difference is legally significant, because "[t]he touchstone for a Title VII hostile environment claim is whether the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc*, 510 U.S. 17, 21 (1993). Although *Dowd* held that the union could be liable under 42 U.S.C. § 2000e–2(c)(1), it recognized that a

hostile work environment claim requires that "the workplace" be "permeated with discrimination, ridicule and insult" to be actionable. *Dowd*, 253 F.3d at 1102. Therefore, even under *Dowd's* flawed interpretation of 42 U.S.C. § 2000e–2(c)(1), all hostile work environment claims require proof that the plaintiff's terms and conditions of employment were altered as a result of the alleged harassment. Lucas's claims are unlike those alleged in *Dowd* and do not support her claim that she was subjected to a hostile work environment that altered the terms and conditions of her employment.

Congress's primary concern in enacting Title VII was to address the alarming social and economic plight of African Americans. *See United Steelworkers of America v. Weber,* 443 U.S. 193, 202 (1979) ("*Steelworkers*")(the reality of employment discrimination against African-Americans provided the primary impetus for passage of Title VII). Particularly, Congress was concerned with advancing employment opportunities for African American workers in the face of high and unequal unemployment rates compared with white workers, recognizing that "the crux of the problem was to open employment opportunities for [African Americans] in occupations which have been traditionally closed to them." *Steelworkers, 443 U.S.* at *203*. (cleaned up). Title VII prohibits a union from classifying membership or referring for employment ". . . in any way which would deprive or tend to deprive any individual of employment opportunities or would

limit such employment opportunities or otherwise adversely affect [her] status as an employee . . ." See 42 U.S.C. § 2000e–2(c)(2).

Expanding the scope of 42 U.S.C. § 2000e–2(c)(1) in the manner advocated by Lucas and the EEOC, in addition to having no support in the text, structure, or history of Title VII, would completely transform the statute by placing greater liability on unions than employers, even though employers "and not the union, control[] the workplace." *Pipefitters*, 334 F.3d at 659. Amicus's interpretation of 42 U.S.C. § 2000e–2(c)(1) would illogically expose unions to liability from any union member claiming to be the victim of harassment, irrespective of whether the harassment had any impact on the employee's terms and conditions of employment. Such a liability is contrary to Congress's intent. An employer is not liable in this manner, and there is no evidence that the drafters of Title VII envisioned such an expansive view of union liability.

For the above-stated reasons, a union is not liable under Title VII for creating a hostile work environment when it is not acting as an employer is supported by the statute's text and legislative history. Lucas and Amicus advocate a drastic expansion of liability that is untethered to the language or purposes of Title VII. Accordingly, the Court should reject that contention.

**V. Defendant Kelly Is Immune From Suit Because Union Officers Cannot Be Sued In Their Individual Capacity For Their Actions As Union Officers.**

Individual officers are immune from suit when they are acting as union officers. *Sullivan v. Potter, et al*., No. Civ.A. 05-00818 HHK, 2006 WL 785289 (D.D.C. 2006) ("The union Defendants are correct [union Officers] cannot be sued in their individual capacity.") Defendant Kelly, at all times relevant to the complaint, was acting within his official capacity as AFGE National Vice President for District 9. (JA 361.)

The Supreme Court has explained, "[w]e have already said in another context that Section 301(b) of the Taft-Hartley Act at least evidences a congressional intention that the union as an entity, like a corporation, should in the absence of agreement be the sole source of recovery for injury inflicted by it." *Atkinson v. Sinclair Refining Co*. 370 U.S. 238, 249 (1962). "This policy cannot be evaded or truncated by the simple device of suing union agents or members, whether in contract or tort, or both, in a separate count or in a separate action for damages for violation of a collective bargaining contract for which damages the union itself is liable." *Id*.

Although *Atkinson* dealt with collective bargaining issues in the private sector, other courts have extended *Atkinson* to public sector labor disputes. *See, e.g.*, *Montplaisir*, 875 F.2d at 4 ("The [Supreme] Court has long held that 'union agents'

are not personally liable to third parties for acts performed on the union's behalf in the collective bargaining process.").

Accordingly, the Court should dismiss Defendant Kelly as a party.

## CONCLUSION

For the reasons set forth above, the Union respectfully request that this Court deny Lucas's appeal and sustain the district court's dismissal of her complaints and decisions denying Lucas's motions to amend.

May 24, 2024                    Respectfully submitted,

/s/ Mark L. Vinson
Mark L. Vinson, Esq.
Assistant General Counsel
Office of the General Counsel
AFGE, AFL-CIO
80 F Street, N.W.
Washington, D.C. 20001
Telephone Number:  (202) 639-6426
Facsimile Number:  (202) 379-2928
Email Address:     vinsom@afge.org

Counsel for Appellees

# FED. R. APP. P. RULE 32(A) CERTIFICATION

Pursuant to Fed. R. App. P. 32(a)(7)(B)(i), I hereby certify that this brief is double-spaced (except for extended quotations, headings, and footnotes) and is proportionally spaced, using Times New Roman font, 14-point type. Based on a word count of my word processing system, this brief contains fewer than 13,000 words. It contains 12,446 words excluding exempt material.

/s/ Mark L. Vinson
Mark L. Vinson
Counsel for Appellees

## CERTIFICATE OF SERVICE

I certify that, on May 24, 2024, I electronically filed the foregoing document, in

text-searchable PDF format, with the Clerk of the Court for the United States

Court of Appeals for the District of Columbia Circuit through the

appellate CM/ECF system. I further certify that the foregoing document is being

served on Appellant via transmission of Notices of Electronic Filing

generated by CM/ECF.

      Additionally, a copy of the foregoing brief will be served via UPS on

Defendant-Appellee Johnnie Green, a pro se litigant, as follows:

Johnnie Green
6606 Bluebird Drive
Little Rock, AR 72205

/s/ Mark L. Vinson
Mark L. Vinson
Counsel for Appellee

ADDENDUM
Relevant Statutes and Other Authorities

# TABLE OF CONTENTS

Citation                                                                 Page

5 U.S.C. § 2302(b)(1)(d)(1) ............................................................... A-3
5 U.S.C. § 7101(a)(1) ....................................................................... A-4
5 U.S.C. 7103(a)(4) ......................................................................... A-5
5 U.S.C. §7111(a) ............................................................................ A-6
5 U.S.C. §7112(a) ............................................................................ A-6
5 U.S.C. §7114(a)(1) ........................................................................ A-7
5 U.S.C. §7116 ................................................................................. A-8
5 U.S.C. §7116(b)(1) ........................................................................ A-9
5 U.S.C. §7116(c)(1)-(2) ................................................................ A-10
5 U.S.C. §7118(a)(1) ...................................................................... A-11
5 U.S.C. §7118(a)(7)(D) ................................................................ A-11
5 U.S.C. §7120 ............................................................................... A-13
5 U.S.C. §7123 ............................................................................... A-16
28 U.S.C. §1291 ............................................................................. A-17
28 U.S.C. §1331 ............................................................................. A-17
29 U.S.C. §185 ............................................................................... A-18
29 U.S.C. §187(a)(b) ...................................................................... A-18
29 U.S.C. §215(a)(3) ...................................................................... A-19
29 U.S.C. §216(b) ........................................................................... A-20
42 U.S.C. §2000e(d) ....................................................................... A-21
42 U.S.C. §2000e(e) ....................................................................... A-22
42 U.S.C. §2000e-2(a)(1) ............................................................... A-24
42 U.S.C. §2000e-2(c)(1)(2) .......................................................... A-24
42 U.S.C. §2000e-5(e)(1) ............................................................... A-25
42 U.S.C. §2000e-16(c)…………………………………………..…A-26
42 U.S.C. §12117(a) ....................................................................... A-27
42 U.S.C. §12111 ........................................................................... A-27

## 5 U.S.C. § 2302(b)(1)

(b)Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority—

(1) discriminate for or against any employee or applicant for employment—

(A)on the basis of race, color, religion, sex, or national origin, as prohibited under section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16);

(B)on the basis of age, as prohibited under sections 12 and 15 of the Age Discrimination in Employment Act of 1967 (29 U.S.C. 631, 633a);

(C)on the basis of sex, as prohibited under section 6(d) of the Fair Labor Standards Act of 1938 (29 U.S.C. 206(d));

(D)on the basis of handicapping condition, as prohibited under section 501 of the Rehabilitation Act of 1973 (29 U.S.C. 791); or

(E)on the basis of marital status or political affiliation, as prohibited under any law, rule, or regulation;

## 5 U.S.C. § 2302(d)(1)

§ 2302. Prohibited personnel practices.

(d)  This section shall not be construed to extinguish or lessen any effort to achieve

equal employment opportunity through affirmative action or any right or remedy

available to any employee or applicant for employment in the civil service under—

(1)section 717 of the Civil Rights Act of 1964 (42 U.S.C. 2000e–16), prohibiting

discrimination on the basis of race, color, religion, sex, or national origin;

**5 U.S.C. § 7101(a)(1)**

5 U.S.C. § 7101 Finding and Purpose

(a)The Congress finds that—

**(1) experience in both private and public employment indicates that the statutory protection of the right of employees to organize, bargain collectively, and participate through labor organizations of their own choosing in decisions which affect them—**

> **(A)safeguards the public interest,**
>
> **(B)contributes to the effective conduct of public business, and**
>
> **(C)facilitates and encourages the amicable settlements of disputes between employees and their employers involving conditions of employment[.]**

**5 U.S.C. 7103(a)(4)**

5 U.S. Code § 7103 - Definitions; application

(a) For the purpose of this chapter

**(4) "labor organization" means an organization composed in whole or in part of employees, in which employees participate and pay dues, and which has as a purpose the dealing with an agency concerning grievances and conditions of employment, but does not include—**

**(A)an organization which, by its constitution, bylaws, tacit agreement among its members, or otherwise, denies membership because of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition;**

**(B)an organization which advocates the overthrow of the constitutional form of government of the United States;**

**(C)an organization sponsored by an agency; or**

**(D)an organization which participates in the conduct of a strike against the Government or any agency thereof or imposes a duty or obligation to conduct, assist, or participate in such a strike;**

**5 U.S.C. 7111(a)**

5 U.S. Code § 7111 - Exclusive recognition of labor organizations

**(a)An agency shall accord exclusive recognition to a labor organization if the organization has been selected as the representative, in a secret ballot election, by a majority of the employees in an appropriate unit who cast valid ballots in the election.**

* * *

**5 U.S.C. 7112(a)**

5 U.S. Code § 7112 - Determination of appropriate units for labor organization representation

**a) The Authority shall determine the appropriateness of any unit. The Authority shall determine in each case whether, in order to ensure employees the fullest freedom in exercising the rights guaranteed under this chapter, the appropriate unit should be established on an agency, plant, installation, functional, or other basis and shall determine any unit to be an appropriate unit only if the determination will ensure a clear and identifiable community of interest among the employees in the unit and will promote effective dealings with, and efficiency of the operations of the agency involved.**

## 5 U.S.C. § 7114(a)(1)

5 U.S.C. § 7114 Representation rights and duties

**(a)(1) A labor organization which has been accorded exclusive recognition is the exclusive representative of the employees in the unit it represents and is entitled to act for, and negotiate collective bargaining agreements covering, all employees in the unit. An exclusive representative is responsible for representing the interests of all employees in the unit it represents without discrimination and without regard to labor organization membership.**

\* \* \*

## 5 U.S.C. § 7116

§ 7116. Unfair labor practices

(a) For the purpose of this chapter, it shall be an unfair labor practice for an agency—

    (1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

    (2) to encourage or discourage membership in any labor organization by discrimination in connection with hiring, tenure, promotion, or other conditions of employment;

    (3) to sponsor, control, or otherwise assist any labor organization, other than to furnish, upon request, customary and routine services and facilities if the services and facilities are also furnished on an impartial basis to other labor organizations having equivalent status;

    (4) to discipline or otherwise discriminate against an employee because the employee has filed a complaint, affidavit, or petition, or has given any information or testimony under this chapter;

    (5) to refuse to consult or negotiate in good faith with a labor organization as required by this chapter;

    (6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

    (7) to enforce any rule or regulation (other than a rule or regulation implementing section 2302 of this title) which is in conflict with any applicable collective bargaining agreement if the agreement was in effect before the date the rule or regulation was prescribed; or

    (8) to otherwise fail or refuse to comply with any provision of this chapter.

(b)For the purpose of this chapter, it shall be an unfair labor practice for a labor organization—

(1) to interfere with, restrain, or coerce any employee in the exercise by the employee of any right under this chapter;

(2) to cause or attempt to cause an agency to discriminate against any employee in the exercise by the employee of any right under this chapter;

(3) to coerce, discipline, fine, or attempt to coerce a member of the labor organization as punishment, reprisal, or for the purpose of hindering or impeding the member's work performance or productivity as an employee or the discharge of the member's duties as an employee;

(4) to discriminate against an employee with regard to the terms or conditions of membership in the labor organization on the basis of race, color, creed, national origin, sex, age, preferential or nonpreferential civil service status, political affiliation, marital status, or handicapping condition;

(5) to refuse to consult or negotiate in good faith with an agency as required by this chapter;

(6) to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter;

(7)

   (A)to call, or participate in, a strike, work stoppage, or slowdown, or

picketing of an agency in a labor-management dispute if such picketing interferes with an agency's operations, or

(B)to condone any activity described in subparagraph (A) of this paragraph by failing to take action to prevent or stop such activity; or

(8) to otherwise fail or refuse to comply with any provision of this chapter.

Nothing in paragraph (7) of this subsection shall result in any informational picketing which does not interfere with an agency's operations being considered as an unfair labor practice.

\* \* \*

## 5 U.S.C. § 7116(c)(1)-(2)

(c)For the purpose of this chapter it shall be an unfair labor practice for an exclusive representative to deny membership to any employee in the appropriate unit represented by such exclusive representative except for failure—

(1) to meet reasonable occupational standards uniformly required for admission, or

(2) to tender dues uniformly required as a condition of acquiring and retaining membership.

This subsection does not preclude any labor organization from enforcing discipline in accordance with procedures under its constitution or bylaws to the extent consistent with the provisions of this chapter.

## 5 U.S.C. § 7118(a)(1)

§ 7118. Prevention of unfair labor practices

**(a)(1) If any agency or labor organization is charged by any person with having engaged in or engaging in an unfair labor practice, the General Counsel shall investigate the charge and may issue and cause to be served upon the agency or labor organization a complaint. In any case in which the General Counsel does not issue a complaint because the charge fails to state an unfair labor practice, the General Counsel shall provide the person making the charge a written statement of the reasons for not issuing a complaint.**

\* \* \*

## 5 U.S.C. § 7118(a)(7)(D)

(7)If the Authority (or any member thereof or any individual employed by the Authority and designated for such purpose) determines after any hearing on a complaint under paragraph (5) of this subsection that the preponderance of the evidence received demonstrates that the agency or labor organization named in the complaint has engaged in or is engaging in an unfair labor practice, then the individual or individuals conducting the hearing shall state in writing their findings

of fact and shall issue and cause to be served on the agency or labor organization an order—

(A)to cease and desist from any such unfair labor practice in which the agency or labor organization is engaged;

(B)requiring the parties to renegotiate a collective bargaining agreement in accordance with the order of the Authority and requiring that the agreement, as amended, be given retroactive effect;

(C)requiring reinstatement of an employee with backpay in accordance with section 5596 of this title; or

**(D)including any combination of the actions described in subparagraphs (A) through (C) of this paragraph or such other action as will carry out the purpose of this chapter.**

**If any such order requires reinstatement of an employee with backpay, backpay may be required of the agency (as provided in section 5596 of this title) or of the labor organization, as the case may be, which is found to have engaged in the unfair labor practice involved.**

\* \* \*

## 5 U.S.C. § 7120

5 U.S.C. § 7120 Standards of conduct for labor organizations

(a)An agency shall only accord recognition to a labor organization that is free from corrupt influences and influences opposed to basic democratic principles. Except as provided in subsection (b) of this section, an organization is not required to prove that it is free from such influences if it is subject to governing requirements adopted by the organization or by a national or international labor organization or federation of labor organizations with which it is affiliated, or in which it participates, containing explicit and detailed provisions to which it subscribes calling for—

(1)the maintenance of democratic procedures and practices including provisions for periodic elections to be conducted subject to recognized safeguards and provisions defining and securing the right of individual members to participate in the affairs of the organization, to receive fair and equal treatment under the governing rules of the organization, and to receive fair process in disciplinary proceedings;

(2)the exclusion from office in the organization of persons affiliated with communist or other totalitarian movements and persons identified with corrupt influences;

(3)the prohibition of business or financial interests on the part of organization officers and agents which conflict with their duty to the organization and its members; and

(4)the maintenance of fiscal integrity in the conduct of the affairs of the organization, including provisions for accounting and financial controls and regular financial reports or summaries to be made available to members.

(b)Notwithstanding the fact that a labor organization has adopted or subscribed to standards of conduct as provided in subsection (a) of this section, the organization is required to furnish evidence of its freedom from corrupt influences or influences opposed to basic democratic principles if there is reasonable cause to believe that—

(1)the organization has been suspended or expelled from, or is subject to other sanction, by a parent labor organization, or federation of organizations with which it had been affiliated, because it has demonstrated an unwillingness or inability to comply with governing requirements comparable in purpose to those required by subsection (a) of this section; or

(2)the organization is in fact subject to influences that would preclude recognition under this chapter.

(c)A labor organization which has or seeks recognition as a representative of employees under this chapter shall file financial and other reports with the Assistant Secretary of Labor for Labor Management Relations, provide for bonding of officials and employees of the organization, and comply with trusteeship and election standards.

(d)The Assistant Secretary shall prescribe such regulations as are necessary to carry out the purposes of this section. Such regulations shall conform generally to the principles applied to labor organizations in the private sector. Complaints of violations of this section shall be filed with the Assistant Secretary. In any matter arising under this section, the Assistant Secretary may require a labor organization to cease and desist from violations of this section and require it to take such actions as he considers appropriate to carry out the policies of this section.

## 5 U.S.C. § 7123

§ 7123. Judicial review; enforcement

(a)     Any person aggrieved by any final order of the Authority other than an order under—

(1)     section 7122 of this title (involving an award by an arbitrator), unless the order involves an unfair labor practice under section 7118 of this title, or

(2)     **section 7112 of this title (involving an appropriate unit determination),may, during the 60-day period beginning on the date on which the order was issued, institute an action for judicial review of the Authority's order in the United States court of appeals in the circuit in which the person resides or transacts business or in the United States Court of Appeals for the District of Columbia.**

\* \* \*

**28 U.S.C. § 1291**

The courts of appeals (other than the United States Court of Appeals for the Federal Circuit) shall have jurisdiction of appeals from all final decisions of the district courts of the United States, the United States District Court for the District of the Canal Zone, the District Court of Guam, and the District Court of the Virgin Islands, except where a direct review may be had in the Supreme Court. The jurisdiction of the United States Court of Appeals for the Federal Circuit shall be limited to the jurisdiction described in sections 1292(c) and (d) and 1295 of this title.

* * *

**28 U.S.C. § 1331**

The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

* * *

## 29 U.S.C. § 185

29 U.S.C. § 185 Suits by and against labor organizations

(a)Venue, amount, and citizenship

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

\* \* \*

## 29 U.S.C. § 187(a)(b)

29 U.S.C. § 187 Unlawful activities or conduct; right to sue; jurisdiction; limitations; damages

(a)It shall be unlawful, for the purpose of this section only, in an industry or activity affecting commerce, for any labor organization to engage in any activity or conduct defined as an unfair labor practice in section 158(b)(4) of this title.

(b)Whoever shall be injured in his business or property by reason or [1] any violation of subsection (a) may sue therefor in any district court of the United States subject to the limitations and provisions of section 185 of this title without respect to the amount in controversy, or in any other court having jurisdiction of the parties, and shall recover the damages by him sustained and the cost of the suit.

## 29 U.S.C. § 215(a)(3)

§ 215. Prohibited acts; prima facie evidence

(a)After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

(3)to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee;

***

<u>**29 U.S.C. § 216(b)**</u>

**Damages; right of action; attorney's fees and costs; termination of right of action** Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages. Any employer who violates the provisions of section 215(a)(3) or 218d of this title shall be liable for such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3) or 218d of this title, including without limitation employment, reinstatement, promotion, and the payment of wages lost and an additional equal amount as liquidated damages. Any employer who violates section 203(m)(2)(B) of this title shall be liable to the employee or employees affected in the amount of the sum of any tip credit taken by the employer and all such tips unlawfully kept by the employer, and in an additional equal amount as liquidated damages. An action to recover the liability prescribed in the preceding sentences may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such

action is brought. The court in such action shall, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action. The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217 of this title in which (1) restraint is sought of any further delay in the payment of unpaid minimum wages, or the amount of unpaid overtime compensation, as the case may be, owing to such employee under section 206 or section 207 of this title by an employer liable therefor under the provisions of this subsection or (2) legal or equitable relief is sought as a result of alleged violations of section 215(a)(3) or 218d of this title.

***

## 42 U.S.C. § 2000e(d)

42 U.S.C. § 2000e(d)

(d)The term "labor organization" means a labor organization engaged in an industry affecting commerce, and any agent of such an organization, and includes any organization of any kind, any agency, or employee representation committee, group, association, or plan so engaged in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning

grievances, labor disputes, wages, rates of pay, hours, or other terms or conditions of employment, and any conference, general committee, joint or system board, or joint council so engaged which is subordinate to a national or international labor organization.

## 42 U.S.C. § 2000e(e)

(e)A labor organization shall be deemed to be engaged in an industry affecting commerce if (1) it maintains or operates a hiring hall or hiring office which procures employees for an employer or procures for employees opportunities to work for an employer, or (2) the number of its members (or, where it is a labor organization composed of other labor organizations or their representatives, if the aggregate number of the members of such other labor organization) is (A) twenty-five or more during the first year after March 24, 1972, or (B) fifteen or more thereafter, and such labor organization—

(1)is the certified representative of employees under the provisions of the National Labor Relations Act, as amended [29 U.S.C. 151 et seq.], or the Railway Labor Act, as amended [45 U.S.C. 151 et seq.];

(2)although not certified, is a national or international labor organization or a local labor organization recognized or acting as the representative of employees of an employer or employers engaged in an industry affecting commerce; or

(3)has chartered a local labor organization or subsidiary body which is representing or actively seeking to represent employees of employers within the meaning of paragraph (1) or (2); or

(4)has been chartered by a labor organization representing or actively seeking to represent employees within the meaning of paragraph (1) or (2) as the local or subordinate body through which such employees may enjoy membership or become affiliated with such labor organization; or

(5)is a conference, general committee, joint or system board, or joint council subordinate to a national or international labor organization, which includes a labor organization engaged in an industry affecting commerce within the meaning of any of the preceding paragraphs of this subsection.

## 42 U.S.C. § 2000e-2(a)(1)

(a)Employer practices

It shall be an unlawful employment practice for an employer—

(1)to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;


## 42 U.S.C. § 2000e-2(c)(1)(2)

(c)Labor organization practices

It shall be an unlawful employment practice for a labor organization—

(1)to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;

(2)to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as

an applicant for employment, because of such individual's race, color, religion, sex, or national origin[.]

***

## 42 U.S. Code § 2000e-5(e)(1)

42 U.S. Code § 2000e–5 - Enforcement provisions

(e)Time for filing charges; time for service of notice of charge on respondent; filing of charge by Commission with State or local agency; seniority system

(1)A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred and notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) shall be served upon the person against whom such charge is made within ten days thereafter, except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice

occurred, or within thirty days after receiving notice that the State or local agency has terminated the proceedings under the State or local law, whichever is earlier, and a copy of such charge shall be filed by the Commission with the State or local agency.

***

## 42 U.S. Code § 2000e-16(c)

(c)Civil action by employee or applicant for employment for redress of grievances; time for bringing of action; head of department, agency, or unit as defendant

Within 90 days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a), or by the Equal Employment Opportunity Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Equal Employment Opportunity Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final

action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be the defendant.

## 42 U.S. Code § 12117(a)

42 U.S.C. § 12117

(a)Powers, remedies, and procedures

The powers, remedies, and procedures set forth in sections 2000e–4,

2000e–5, 2000e–6, 2000e–8, and 2000e–9 of this title shall be the powers,

remedies, and procedures this subchapter provides to the Commission, to

the Attorney General, or to any person alleging discrimination on the basis

of disability in violation of any provision of this chapter, or regulations

promulgated under section 12116 of this title, concerning employment.


## 42 U.S.C. § 12111

42 U.S.C. § 12111 Definitions

As used in this subchapter:

(1) Commission

The term "Commission" means the Equal Employment Opportunity

Commission established by section 2000e–4 of this title.

(2) Covered entity

The term "covered entity" means an employer, employment agency, labor organization, or joint labor-management committee.

(3) Direct threat

The term "direct threat" means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation.

(4) Employee

The term "employee" means an individual employed by an employer. With respect to employment in a foreign country, such term includes an individual who is a citizen of the United States.

(5) Employer

(A) In general

The term "employer" means a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and any agent of such person, except that, for two years following the effective date of this subchapter, an employer means a person engaged in an industry affecting commerce who has 25 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year, and any agent of such person.

(B) Exceptions

The term "employer" does not include-

(i) the United States, a corporation wholly owned by the government of the United States, or an Indian tribe; or

(ii) a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of title 26.

(6) Illegal use of drugs

(A) In general

The term "illegal use of drugs" means the use of drugs, the possession or distribution of which is unlawful under the Controlled Substances Act [21 U.S.C. 801 et seq.]. Such term does not include the use of a drug taken under supervision by a licensed health care professional, or other uses authorized by the Controlled Substances Act or other provisions of Federal law.

(B) Drugs

The term "drug" means a controlled substance, as defined in schedules I through V of section 202 of the Controlled Substances Act [21 U.S.C. 812].

(7) Person, etc.

The terms "person", "labor organization", "employment agency", "commerce", and "industry affecting commerce", shall have the same meaning given such terms in section 2000e of this title.

(8) Qualified individual

The term "qualified individual" means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

(9) Reasonable accommodation

The term "reasonable accommodation" may include-

(A) making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(B) job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training

materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

(10) Undue hardship

(A) In general

The term "undue hardship" means an action requiring significant difficulty or expense, when considered in light of the factors set forth in subparagraph (B).

(B) Factors to be considered

In determining whether an accommodation would impose an undue hardship on a covered entity, factors to be considered include-

(i) the nature and cost of the accommodation needed under this chapter;

(ii) the overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation; the number of persons employed at such facility; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility;

(iii) the overall financial resources of the covered entity; the overall size of the business of a covered entity with respect to the number of its employees; the number, type, and location of its facilities; and

(iv) the type of operation or operations of the covered entity, including the composition, structure, and functions of the workforce of such entity; the geographic separateness, administrative, or fiscal relationship of the facility or facilities in question to the covered entity.